**INDEPENDENT LIVING RESOURCES, a non-profit corporation, and Robert W. Pike, Plaintiffs,**

v.

**OREGON ARENA CORPORATION, Defendant.**

Civ. No. 95–84–AS.

United States District Court, D. Oregon.

Nov. 12, 1997.

Steve Brischetto, Portland, OR, for Plaintiffs.

David B. Howorth, Foster Pepper & Shefelman, Portland, OR, Frank C. Morris, Jr., Carolyn Doppelt Gray, Epstein, Becker & Green, P.C., Washington, DC, for Defendant.

Okianer Christian Dark, U.S. Attorneys Office, Portland, OR, Thomas M. Contois, U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, for U.S.A. amicus.

## OPINION

ASHMANSKAS, United States Magistrate Judge:

I. INTRODUCTION ................................................705

II. MOTIONS FOR SUMMARY JUDGMENT ...............................706
 1. *Pattern and Practice* ................................706
 2. *Mental State* .......................................707
 3. *Dispersal of Wheelchair Seating:* ...................707
 A. Legal Standards: .................................708
 B. Level 7: .........................................710
 C. Vertical and Horizontal Distributon: ............714
 D. Availability of Wheelchair Seating: .............717
 (i) Is OAC Responsible for Infilling and Ticket Sale Policies? ..........718
 (ii) Do the Infilling and Ticket Sale Policies at the Rose Garden
 Violate the Title III Regulations? ............719
 (a) Season Tickets and Long–Term Contracts: ...................719
 (b) Tickets for Individual Games: .............................722
 (c) Tickets for Other Events: ................................723
 (d) Conclusion: ..............................................724
 4. *Companion Seats:* ..................................724

| | | | |
|---|---|---|---|
| | A. | Interpretation of Standard 4.33.3 | 724 |
| | B. | "Substantially Equivalent or Greater Access" | 726 |
| 5. | *Modified Aisle Seats:* | | 728 |
| 6. | *Line of Sight Over Standing Spectators:* | | 732 |
| | A. | Whether DOJ could Require that Wheelchair Users be Provided with a Line of Sight Over Standing Spectators | 732 |
| | B. | Whether such a Requirement does Exist, and Whether it is Binding Upon this Defendant | 734 |
| | | (i) Does Timing Matter? | 735 |
| | | (ii) Was the 1994 TAM Supplement a Valid Interpretive Regulation? | 736 |
| | | (a) Did DOJ Adopt the Access Board Commentary? | 737 |
| | | (b) Other Arguments Regarding Lines of Sight Over Standing Spectators | 742 |
| | | (c) The Access Board's Change of Heart | 743 |
| | | (d) Whether the ADA itself Provides an Independent Source of Authority for Requiring Lines of Sight Over Standing Spectators | 743 |
| | C. | Whether Defendant has any Defense to the Enforcement of a Requirement to Provide Lines of Sight over Standing Spectators | 747 |
| | D. | Conclusion | 758 |
| 7. | *Executive Suites:* | | 758 |
| | A. | Are the Suites Subject to Title III of the ADA? | 758 |
| | B. | Do Plaintiffs have Standing to Maintain this Claim? | 760 |
| | C. | Do the Suites Comply with the ADA? | 763 |
| | D. | Visual Alarms in the Suites: | 764 |
| 8. | *Premises Leased to Concessionaires:* | | 766 |
| 9. | *Camera Operator Areas:* | | 768 |
| | A. | Are the Camera Positions Covered by Title III? | 769 |
| | B. | Is there any Excuse for the Failure to Design these Camera Operator Positions to be Wheelchair Accessible? | 769 |
| III. | **DEFENDANT'S MOTION TO DISMISS ON GROUNDS OF MOOTNESS** | | 770 |
| 1. | *Whether Plaintiffs are Entitled to Recover Damages:* | | 771 |
| 2. | *Potential for Future Violations:* | | 774 |
| 3. | *Issues No Longer in Dispute:* | | 774 |
| 4. | *Conditions that Defendant Claims to have Redressed but Plaintiffs Disagree:* | | 776 |
| 5. | *Conditions that Defendant Denies are a Violation and has Not Modified* | | 779 |
| | A. | Protruding Object Hazards: | 779 |
| | | (i) Scope of Rule: | 779 |
| | | (ii) Protruding Objects in Parking Garages: | 780 |
| | | (iii) Placement of Planters, Waste Paper Baskets, and Similar Items Beneath Protruding Objects: | 780 |
| | | (iv) Mobile Trash Cart: | 781 |
| | | (v) Counters on Self–Service Food Carts: | 781 |
| | | (vi) Counters Mounted on Columns: | 781 |
| | | (vii) Baby–Changing Areas: | 782 |
| | | (viii) Protruding Objects Improperly Mounted Below 80 Inches AFF: | 782 |
| | | (ix) Visual Alarms Improperly Mounted Above 80 Inches AFF: | 783 |
| | B. | The Remaining 72 Issues: | 783 |
| IV. | **MISCELLANEOUS MOTIONS** | | 784 |
| V. | **CONCLUSION** | | 785 |

## I. INTRODUCTION

In 1990, Congress enacted the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* The purpose of this legislation was to eliminate discrimination against individuals with disabilities, 42 U.S.C.

§ 12101(b).[1] To date, most ADA litigation has focused upon Title I, which governs the duties that the ADA imposes upon employers. The instant action concerns the obligations that Title III of the ADA imposes upon those who construct and operate public accommodations such as indoor arenas. The cornerstone of Title III is 42 U.S.C. § 12182(a), which mandates that persons with a disability receive the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . ."

The locus of this action is the "Rose Garden," a multi-purpose indoor arena in Portland, Oregon. The Rose Garden was designed for first occupancy after January 26, 1993, and the last building permit, or permit extension, was certified after January 26, 1992. Consequently, the Rose Garden is subject to the rules governing "new construction." 42 U.S.C. § 12183(a)(1); 28 CFR § 36.401(a)(2). The principal tenants of the Rose Garden are the Portland Trail Blazers NBA basketball team and the Portland Winter Hawks of the Western Hockey League.[2] The arena also is used for a wide variety of other events, including ice shows, concerts, soccer, indoor football, and the circus. Plaintiffs contend that numerous features of the Rose Garden's construction, design, and operation violate the ADA as well as ORS 30.675 and ORS 659.425, the parallel state laws forbidding discrimination against persons with a disability.

The plaintiffs in this action are Robert Pike, a Portland attorney with a disability which requires that he use a wheelchair, and Independent Living Resources ("ILR"), a non-profit corporation "organized . . . for the purpose of promoting the rights and needs of persons with disabilities for full inclusion and equal access in all aspects of life and providing education, training, and independent living services to persons with disabilities." Complaint ¶ 5. The defendant is the Oregon Arena Corporation ("OAC"), a private company that built, owns, and operates the Rose Garden arena. The United States Department of Justice ("DOJ") has participated in these proceedings as *amicus curiae*. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C. § 636(c). This court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

Presently before the court are plaintiffs' motion (# 36) for partial summary judgment, defendant's motion (# 45–1) to dismiss portions of the case as moot, defendant's cross-motions (# 45–2 and # 62) for partial summary judgment, defendant's motion (# 42) to bar the testimony of plaintiffs' experts and to strike their report, defendant's motion (# 59) to compel plaintiffs' expert James Terry to answer certain questions posed during deposition, defendant's motion (# 129) to strike plaintiffs' supplemental concise statement of facts or individual paragraphs thereof, and plaintiffs' motion (# 135) to strike the affidavits of John Salmen, William Crockett, and Teresa Jacubowski.

## II. MOTIONS FOR SUMMARY JUDGMENT

### 1. *Pattern and Practice*

Plaintiffs have asked the court to rule "that there is a pattern of ADA violations in the Rose Garden Arena . . ." Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment at 20.[3] However,

---

1. Although the term "discrimination" evokes images of active discrimination, *e.g.*, a person is expressly forbidden to enter the premises because of his or her disability, Congress also intended to eliminate more passive forms of discrimination, *e.g.*, a person is physically unable to enter the premises because it lacks a wheelchair-accessible entrance. *See, e.g.*, H.R.Rep. No. 101–485(II) at 99 (1990), *reprinted at* 1990 U.S.C.C.A.N. 303, 382 (a primary purpose of the ADA is to "bring individuals with disabilities into the economic and social mainstream of American life.")

2. The Rose Garden also was designed to serve as the home for any future National Hockey League franchise in Portland.

3. After repeatedly asking the court to declare that defendant has engaged in a pattern or practice of ADA violations, plaintiffs belatedly asserted in an eleventh-hour memorandum that "[s]ince there has been no motion directed against this claim, this issue is not before the court." Plaintiffs' Reply to Defendant's Submission in Response to Plaintiffs' Limited Resurvey at 1.

the existence of a "pattern" or practice of violations typically is significant only in an action commenced by the United States Attorney General. *See* 42 U.S.C. § 12188(b)(1)(B); 28 CFR § 36.503; *Woolfolk v. Duncan* 872 F.Supp. 1381, 1391 (E.D.Pa.1995).

■ In an action by a private party for violation of Title III of the ADA, this court may award only injunctive relief, not damages. 42 U.S.C. § 12188; 42 U.S.C. § 2000a–3(a). For that reason, in an action by a private party alleging a violation of Title III of the ADA, the existence of a "pattern or practice" of discrimination is relevant only in limited circumstances, *e.g.,* to establish that the action is not moot, or that the plaintiff has standing, or that injunctive relief should be ordered because the violation is likely to recur. *Cf. Atakpa v. Perimeter OB–GYN Associates,* 912 F.Supp. 1566, 1573 (N.D.Ga. 1994) (dismissing ADA claim for lack of standing because the plaintiff did not allege that he would again be subjected to the same illegal practice);[4] *Hoepfl v. Barlow,* 906 F.Supp. 317 (E.D.Va.1995) (dismissing action because there was no evidence that plaintiff would again be subject to the same violation). A pattern and practice of violations may also be relevant if the court is exercising its equitable discretion in fashioning a remedy for a violation of Title III. *Cf. Paralyzed Veterans of America v. D.C. Arena, LP,* 117 F.3d 579, 589 (D.C.Cir.1997) (federal court may exercise some discretion in deciding what equitable relief to award for violations of Title III of the ADA).

For now, this court declines to decide whether there has been a "pattern" of ADA violations at the Rose Garden. Instead, the court will consider only whether a particular condition violates the ADA.

### 2. *Mental State* :

The court also declines plaintiffs' invitation to make findings regarding defendant's mental state, *i.e.,* whether the alleged violations were committed intentionally, negligently, or innocently. With limited exceptions, the defendant's mental state has little bearing upon whether the Rose Garden complies with the requirements of Title III of the ADA, at least in an action commenced by a private party. *Cf.* 42 U.S.C. § 12188(b)(5); 28 CFR § 36.504(d) ("good faith" is a relevant consideration when imposing civil penalties in an action brought by the Attorney General). Either the Rose Garden complies with the ADA, or it does not.

The court may consider defendant's good or bad faith when deciding what relief to grant in the event a violation is found. At times I also will discuss the decisions that led to the present state of affairs if they shed light on the reasons why a particular design was selected and whether it would have been possible for defendant to have more fully complied with the ADA. Defendant's mental state may also be relevant to the extent defendant contends that it detrimentally relied upon an interpretation of the ADA regulations prior to the one presently advocated by DOJ.[5]

### 3. *Dispersal of Wheelchair Seating:*

In drafting Title III of the ADA, Congress painted with a broad brush and then directed the Attorney General to promulgate regulations to implement the law. 42 U.S.C. § 12186(b). Those regulations were to include design standards, which must be "consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board," commonly referred to as the "Access Board."

---

4. Plaintiffs have submitted affidavits from individuals with disabilities attesting that their experience at the Rose Garden was so miserable that they have no plans to return. In *Atakpa,* 912 F.Supp. at 1573, the court held that the plaintiff lacked standing to seek injunctive relief against a medical clinic for ADA violations because—in view of her prior experience with the clinic—she admittedly had no intention of ever returning there. I am satisfied that in the instant case the affiants do wish to return to the Rose Garden, but they would like to see the alleged violations corrected first so that their future experiences are more satisfactory than the earlier events that they attended.

5. Defendant's position on this issue often is contradictory. Defendant denies that it is asserting a "detrimental reliance" defense, yet that argument permeates all of its briefs. That issue is discussed in more detail below.

42 U.S.C. § 12186(c). The guidelines issued by the Access Board are denominated the "ADA Accessibility Guidelines" ("ADAAG.") The design standards enacted by the Attorney General are identical to the ADAAGs, but are denominated as "Standards." Despite the technical distinction, the two terms often are used interchangeably.

Standard 4.1.3(19)[6] specifies the number of wheelchair spaces that must be provided in an "assembly area" such as a stadium, indoor arena, or theater. For assembly areas with a seating capacity over 500, the applicable formula is "one percent plus one," meaning the number of wheelchair spaces must be equal to one percent of the total seating capacity (plus one additional wheelchair space.) The seating capacity of the Rose Garden is approximately 19,044,[7] so there must be 191 wheelchair spaces (one percent of 19,044, plus one.)

The parties agree that—at least on paper—there are 191 wheelchair spaces at the Rose Garden. However, plaintiffs contend that many of those spaces exist solely on paper. Plaintiffs also contend that the wheelchair spaces are improperly concentrat-ed in "wheelchair ghettos" in comparatively undesirable locations of the arena. Plaintiffs' Reply Memo in Support of Summary Judgment at 11.

## A. Legal Standards:

■ "Providing services in the most integrated setting is a fundamental principle of the ADA." H.R.Rep. No. 101–485(II) at 102, *reprinted at* 1990 U.S.C.C.A.N. 303, 385. *See also* H.R.Rep. No. 101–485(III) at 56, *reprinted at* 1990 U.S.C.C.A.N. 445, 479. To implement that purpose, DOJ has promulgated Standard 4.33.3, which provides that:

> Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided[8] so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public.

DOJ interprets Standard 4.33.3 to require both vertical and horizontal dispersal, *i.e.,* in large arenas and stadiums such as the Rose Garden the wheelchair locations must be distributed in a manner that approximates the overall distribution of seats in the facility.[9]

---

**6.** The Standards are published at 28 CFR Part 36, App. A.

**7.** In multi-purpose arenas such as the Rose Garden, the seating capacity varies with the setup for each event. The parties have focused on the seating capacity for basketball games, since the Trail Blazers are a principal tenant and the seating capacity for basketball exceeds that for most other events at the Rose Garden. The figure 19,044 may not be precise; slightly different totals were cited in some of the materials submitted by the parties. However, the difference is not significant.

**8.** The phrase "provided so as to provide" is rather awkward, even by federal government standards, and may have been a clerical error. The context and legislative history of the rule suggest that a different word was intended in place of "provided," *e.g.,* "located," "situated," or "designed."

**9.** Although DOJ has not issued any formal interpretive regulations regarding this issue, its position has been articulated through enforcement activities, other publications, and the *amicus* briefs filed in the present action. *See, e.g.,* Memorandum of *Amicus Curiae* United States at 29 ("wheelchair seating [must] be distributed throughout all parts of the arena"); USDOJ pub-lication entitled "Accessible Stadiums" ("Wheelchair seating locations must be dispersed throughout all seating areas and provide a choice of admission prices and views comparable to those for the general public."); letter dated Aug. 26, 1993, from Thomas Contois to Josie Alexander (wheelchair spaces "must be dispersed more or less evenly throughout the categories of ticket prices and classes of seating" and thus proposed design in which there were "no wheelchair locations on the club level between home plate and first base, or between home plate and third base," was unacceptable); letter dated Oct. 22, 1996, from Asst. Atty. Gen. Deval Patrick to David Stern, NBA Commissioner (hereafter, "Letter to NBA Commissioner Stern") ("the arena's wheelchair locations must be proportionately distributed among each of the arena's categories of seating. Thus, if half of the arena's seats are in the lower level of the arena, then approximately half of the wheelchair locations must be in that level as well."); letter dated Nov. 21, 1994, from DOJ regarding Yakima County Stadium ("In order to fulfill the requirement that comparable lines of sight and admission prices be provided in new construction, wheelchair seating locations ... must be provided in a number equal to approximately one percent of the seats in each price range, level of amenities, and viewing angle. Thus, if there are 400 box seats located between first and third base, there should

By contrast, defendant contends that it is enough to provide at least *some* wheelchair spaces in each ticket price category.

DOJ's interpretation of the dispersal requirement in Standard 4.33.3 is consistent with the language of the regulation and the overall objectives of Title III of the ADA, and will be enforced by this court. Whatever merit there might be to defendant's argument in a smaller facility—a question I do not decide today—that argument cannot carry the day in a large arena such as the Rose Garden. I agree that wheelchair spaces ordinarily must be available in each ticket price category. However, that by itself will not always be enough to completely satisfy the requirement in Standard 4.33.3 that in large assembly areas wheelchair spaces must be an integral part of the seating plan and be dispersed so as to provide wheelchair users with a choice of sightlines and ticket prices comparable to those available to the general public.

Without a requirement for horizontal and vertical dispersal, an arena operator could simply designate a few token wheelchair seats in the better seating areas, and cluster the majority of wheelchair seats in the last row or in other undesirable locations. That is contrary to the Congressional intent in enacting Title III of the ADA. *Cf. Paralyzed Veterans of America v. Ellerbe Becket Architects & Engineers, P.C.*, 950 F.Supp. 393, 398, 404 (D.D.C.1996) (design by which wheelchair spaces were "ghettoized in the two end zones with only a few in the front rows and almost none in the center court sections" did not comply with dispersal requirements of Standard 4.33.3), *aff'd*, 117 F.3d 579. The ADA's dispersal requirements also could be circumvented merely by adjusting ticket prices for specific groups of seats in the same manner that electoral districts have long been subject to gerrymandering.[10] Such tactics undoubtedly would be challenged by groups such as plaintiffs, and the courts would then be asked to decide the validity of the ticket pricing plans for each basketball or hockey team in the nation. As fascinating a task as that might be, it would require the courts to intervene in decisions that are better left in the hands of arena operators.

I therefore reject defendant's contention that an arena operator satisfies its ADA obligations as a matter of law merely by providing some unspecified number of wheelchair spaces in each price category. While absolute homogeneity is usually neither feasible nor required—since wheelchair users cannot navigate stairways or the narrow passage leading to a seat in the middle of a row—neither may the arena operator relegate most wheelchair users to the dark corners of the arena. Rather, in large arenas such as the Rose Garden, the wheelchair locations must be distributed in a manner that roughly approximates the overall distribution of seats in the arena. *Cf. Paralyzed Veterans*, 950 F.Supp. at 402 (wheelchair spaces must be "dispersed throughout the bowl") and at 404 ("Dispersal requires a choice of various seating areas, good and bad, expensive and inexpensive, which generally matches those of ambulatory spectators" and "there must be spaces scattered throughout a sufficiently representative number of sections in the seating bowl to provide comparable choices.")

Plaintiffs contend that the wheelchair locations at the Rose Garden are not evenly distributed around the arena, but instead are unevenly clustered on Level 7 and in the corners of the end zones, and that most of

be approximately 4 wheelchair seating locations provided within the boxed seating areas located between first and third base.")

**10.** Indeed, a review of the ticket pricing maps furnished by defendant discloses some unusual features—particularly in sections 204, 213, 219, and 228 of the basketball configuration—that could be seen as *prima facie* evidence of such gerrymandering. The pricing maps for those sections contain a narrow corridor of seats priced at $72.85, which cuts through a section where all of the surrounding seats are priced at either $80.00 or $80.30. Those narrow corridors include 12 wheelchair seats, 3 for each of the four sections. Without those wheelchair seats, there would be no wheelchair seats at all in the $72.85 price category, which in turn would undermine defendant's contention that it has complied with the ADA by providing at least some wheelchair seats in each ticket price category. While that, by itself, is not conclusive evidence of intentional gerrymandering, it illustrates the potential for abuse if the court adopted the rule proposed by defendant, and also the problems the court would face in policing such a rule.

the wheelchair spaces exist only on paper. I will address each of those complaints in turn.

### B. Level 7:

█ The original design for the Rose Garden did not contemplate siting wheelchair spaces on Level 7. There was to be—and still is—no permanent seating on Level 7. Rather, there is some mechanical equipment, facilities for the media, and a fairly narrow concrete walkway high above the arena that was earmarked as a possible overflow area for standing room only crowds. A seating plan dated June 18, 1993, listed "117 standing and 117 temporary seating at Level 7." Another seating plan, dated July 8, 1992, indicated that—in lieu of some of that standing and temporary seating—Level 7 also would serve as a "hockey press/NBA overflow press" area, which means Level 7 actually was intended to accommodate even less than 234 patrons.

The decision to site 33 wheelchair spaces [11] on Level 7 was born of desperation, after defendant realized that its existing wheelchair seating plan did not comply with ADA requirements. Standard 4.33.3 mandates the provision of a seat for an ambulatory companion which shall be located "next to" the wheelchair space. DOJ has interpreted Standard 4.33.3 to require that the companion seat be side-by-side with the wheelchair space, and not in a different row of seats. However, defendant's architect—the firm of Ellerbe Becket, Inc.–designed the Rose Garden so that the wheelchair spaces would be in one row, on a concrete slab, and the ambulatory companions would sit in another row in front or behind. That clearly is not the design that is contemplated by Standard 4.33.3.

The rationale underlying the original front-to-back design is not difficult to discern. Defendant and Ellerbe Becket determined that if a companion seat was provided side-by-side with each wheelchair space, it would result in a substantial decrease in the seating capacity of the Rose Garden—a loss of 790 seats, according to defendant's own estimate made in early 1992. *See, e.g.*, Letter from Ellerbe Becket to Robert Collier, dated Feb. 5, 1992. That is because the square footage reserved for wheelchair users would have to be significantly increased in order to also provide room for their companions.

On or about February 5, 1992, Ellerbe Becket and defendant chose the front-to-back design over the side-to-side design, in order to gain (or to avoid the loss of) 790 ambulatory seats. Defendant and Ellerbe Becket were aware that the disabled community was interpreting Standard 4.33.3 to require a side-to-side design; however, Ellerbe Becket assured defendant that this was something "that the disabled community always asks for but does not get." Collier Depo. at 205. Defendant's senior project manager, Bob Collier, testified that he did not consult with the disabled community regarding the placement of the companion seat. Rather,

> We were told it was not a case of [what the disabled community] wanted. It was a case of what was required by law. And we were told at the time by Ellerbe that [what] was required was option one. And so we said, "Well, if that's what is required then that's—we can't voluntarily lose this many seats."

Collier Depo. at 111.

The correct placement of the companion seat was one of the concerns that Ellerbe Becket raised in a letter to defendant dated March 18, 1993. Ellerbe Becket warned defendant that it was proceeding on the assumption that the companion seat did not have to be side-to-side, but that there were other possible interpretations of the law. Ellerbe Becket urged defendant to seek legal counsel regarding that issue. Defendant chose not to do so. Collier Depo. at 131; Crockett Depo. at 104–05.

█ On July 15, 1993, Gordon Wood [12] sent a draft "ADA Client Letter" to Ellerbe

---

**11.** In some documents, the number of wheelchair locations on Level 7 is variously reported as 28 or 34. The number 33 is derived from the seating plan dated March 11, 1997, which was submitted by defendant as Exhibit 6 to Defen-

dant's Response to Questions from the Court. The numerical difference is not significant for purposes of the present motions.

**12.** At all relevant times, Wood was employed as an architect for Ellerbe Becket's Sports Design

Becket's project managers. The letter was a model for a letter that each project manager was to send to his or her respective clients, if they had not done so already. In that letter, the client was to be advised that DOJ had recently reviewed the design for a project that Ellerbe Becket was designing and had expressed the agency's views on various issues. Among other things, the client was to be cautioned that DOJ has "interpreted the term 'next to' to mean side-by-side with the wheelchair location, not just in close proximity, in front of, or behind." The client was also to be told that:

> This is the first time we have received an opinion from the Dept. of Justice. Even though the opinions of the four individuals who reviewed the other project do not carry the force of law, since the Department is mandated by the law to be the enforcement agency, we feel it is prudent to respect their opinion absent contrary results from a court.... [W]e recommend that you have legal counsel review the law and the approach to compliance followed on the project.

The record does not disclose whether defendant actually received a copy of this letter, though on its face the letter was intended to be disseminated to clients such as defendant. In any event, Ellerbe Becket was defendant's agent with regard to the design of the Rose Garden. The information within this letter falls squarely within the subject matter of the agency, on a matter of obvious importance to the principal. Under longstanding principles of agency law, Ellerbe Becket's knowledge regarding DOJ's interpretation of the ADA standards is properly imputed to defendant as Ellerbe Becket's principal.

At some time prior to July 15, 1993,[13] Ellerbe Becket knew the back-to-front design for the companion seats was contrary to DOJ's interpretation of Standard 4.33.3. Nonetheless, defendant and Ellerbe Becket did not alter their design for the Rose Garden.

In March 1994, Ellerbe Becket told defendant that the companion seats must be side-by-side with the wheelchair seating. In several angry letters, defendant asserted that this was the first time it had learned of DOJ's interpretation of the rule, and accused Ellerbe Becket of concealing its knowledge of that requirement. Ellerbe Becket responded that its knowledge regarding DOJ's interpretation of the ADA was confidential and could not be disclosed to Ellerbe Becket's clients.[14]

Regardless of who was responsible, the decision that companion seats had to be side-to-side resulted in an immediate crisis. Fewer wheelchairs could now be accommodated within each designated wheelchair area. As a result, defendant was short by as many as 80 wheelchair spaces. Defendant could designate additional wheelchair locations within the primary seating bowls, but that would mean the loss of approximately 12 regular seats for each additional wheelchair space created. Collier Depo. at 121. To minimize the loss of standard seats, defendant designated the concrete walkway on Level 7 as a

---

Group in Kansas City. His job was "[t]echnical review of projects and assistance to design teams for public assembly." Wood Depo. at 5. Wood "work[ed] as a sounding board for ideas that the various design teams have" and disseminated information between various design teams. *Id.* According to Richard DeFlon, who was a vice-president in the Sports Design Group at this time, Wood "was sort of a technical person" "who disseminated a lot of information to a lot of other people at Ellerbe Becket." DeFlon Depo. at 55. Wood was in a high enough position at the company to be sending memorandums to all project managers.

**13.** Richard DeFlon, a vice-president of Ellerbe Becket's Sports Design Group in Kansas City, attended some meetings in late March and early April 1993 with DOJ representatives to discuss DOJ's concerns regarding the facilities for the Atlanta Olympics, which Ellerbe Becket was helping to design. The requirement for side-to-side companion seating was discussed during those meetings. A letter from DOJ confirming those discussions, dated April 22, 1993, was circulated to high-ranking members of Ellerbe Becket's Sports Design Group no later than May 20, 1993. There is nothing in the letter which indicates that the contents—and in particular DOJ's interpretation of its own regulations—were considered to be confidential.

**14.** The court is skeptical of Ellerbe Becket's claim of confidentiality with respect to knowledge of how a governmental agency is interpreting the law. The court also observes that the July 15, 1993, model letter was drafted for the express purpose of conveying that information to Ellerbe Becket's project managers and clients.

wheelchair seating area and thereby "found" 33 new wheelchair/companion pairs. Collier Depo. at 120; Letter from Allison to Collier (Feb. 25, 1994.) [15]

Defendant has attempted to characterize Level 7 as an "integral" part of the Rose Garden seating plan.[16] It is not. The designation of 33 wheelchair spaces on Level 7 of the Rose Garden makes a mockery of the ADA's dispersal requirements. Level 7 is isolated from the main seating bowl, and primarily houses mechanical equipment and an overflow press area. There are no fixed seats on Level 7, nor were any ever planned. While there was some talk of using Level 7 as an overflow area, Level 7 was never designed to accommodate 3,300 portable seats or standing patrons, which is the number that would be required to justify 33 wheelchair spaces based upon a ratio of one wheelchair space for every 100 standard seats. Rather, the maximum occupancy that was projected for Level 7—even in its capacity as an overflow area—was 234 spectators (117 standing, and 117 seated in folding chairs). Data furnished by defendants indicates that—apart from the 33 wheelchair locations and 33 companion seats—there are just 16 ambulatory seats on Level 7 (not counting any infilling that may occur if the wheelchair spaces are not sold). Clearly this is not what was intended by the requirement that wheelchair spaces must be an integral part of the overall seating plan.

Defendant is entitled to credit for one or two wheelchair spaces on Level 7, based upon the number of ambulatory patrons that potentially can be accommodated on that level. Indeed, to the extent ambulatory seating

is available on Level 7, defendant is required to provide a proportional number of wheelchair spaces on that level. The problem is not that defendant has provided any wheelchair spaces on Level 7, but rather that defendant has placed a disproportionate percentage of the total number of wheelchair spaces on that level, while failing to provide a sufficient number of wheelchair spaces in other parts of the arena.

During the remedial phase of this case, the court will entertain any arguments that defendant may have for crediting a *few* additional wheelchair spaces on Level 7 in addition to that to which defendant would be entitled by a strictly proportional calculation based upon the number of ambulatory seats on that level. However, the court cannot envision any scenario by which defendant would be entitled to credit for 33 wheelchair spaces on Level 7, or anywhere close to that number. The placement of 33 wheelchair spaces on Level 7 simply cannot be reconciled with the dispersal requirements of Standard 4.33.3. Defendant in essence has created a "wheelchair ghetto" (to use plaintiffs' terminology), consigning wheelchair users to a special floor in the proverbial "nosebleed" section so that defendant may maximize the number of ambulatory seats in the more desirable locations in the Rose Garden. This is precisely the sort of discrimination that Title III was intended to abolish.

Of course, there is nothing to prevent defendant from providing more wheelchair locations than the law requires. For that reason, defendant may continue to provide 33 wheelchair spaces on Level 7, if it desires. However, only a fraction of those spaces will be

---

15. As late as February 25, 1994, the senior project architect, Steven Allison, was still referring to it as the "overflow" area. Letter from Allison to Collier (Feb. 25, 1994.)

16. Defendant has proffered a sentence from the deposition of Marsha Mazz, technical assistance coordinator for the Access Board, that was taken in another case. According to that testimony, integral seating means that "within the footprint of the assembly seating." That explanation begs the question; by definition the wheelchair locations are part of the assembly seating, albeit a distant part. The question is whether the wheelchair locations can be confined to "wheelchair

ghettos." Mazz's explanation also ignores the dispersal requirements of Standard 4.33.3.

In any event, the testimony of Ms. Mazz is inadmissible. This court has no intention of allowing the parties to call members of the Access Board, or its staff, or present or former DOJ employees, to testify regarding their interpretation of the ADA regulations. The court further observes that on the same page of her deposition Ms. Mazz cautioned that the Access Board's technical assistance "is not binding on the Department of Justice" which is the "enforcing authority" and any questions should properly be directed to DOJ as "the appropriate authority having jurisdiction."

credited towards compliance with the requirement that defendant provide one wheelchair space for every one hundred ambulatory seats throughout the entire arena. In addition, wheelchair users may not be relegated to Level 7, but must be provided a full range of seating options in all areas of the arena.

I will not decide today precisely how many Level 7 wheelchair spaces will be credited towards the one percent requirement, or what remedy I will order to redress this violation. I determine only that the placement of 33 wheelchair spaces on Level 7 violates the dispersal requirements of Standard 4.33.3, and that—after subtracting the excess spaces on Level 7—the arena as a whole violates the "one percent plus one" requirement contained in Standard 4.1.3(19).

Defendant argues that the one percent requirement should not be enforced, since present usage patterns indicate that comparatively few wheelchair users attend Rose Garden events. Plaintiffs respond that the low attendance is the result of the poor sightlines from wheelchair spaces; why should wheelchair users pay $65 to watch the back of the person in the next row? An additional consideration is that the arenas being built today should still be in service twenty or thirty years from now, during which time the demand for wheelchair spaces may well increase as the "baby boomer" generation ages and as improvements in wheelchair-friendly modes of transportation permit more wheelchair users to readily attend public events. It is far easier (and less costly) to design arenas with extra wheelchair capacity, some

of which can be in-filled if not presently needed, than to belatedly create new wheelchair capacity if demand increases in the future. See H.R.Rep. No. 101–485(III) at 60, reprinted at 1990 U.S.C.C.A.N. 445, 483 ("Because it costs far less to incorporate accessible design into the planning and construction of new buildings and of alterations. [as compared to retrofitting existing structures], a higher standard of 'readily accessible to and usable by' persons with disabilities has been. adopted in the ADA for new construction and alterations.")

In any event, this court did not establish the one percent requirement, and defendant has cited no authority that this court has any discretion to waive that requirement. Consequently, defendant's failure to comply with the one percent rule is a violation of Standard 4.1.3(19). ·

■ Defendant also points to a report by the "ADAAG Review Federal Advisory Committee" that recommends a reduction in the number of required wheelchair spaces. However, this recommendation does not have the force of law. Rather, it is the report of an advisory committee to the Access Board. Even if the Access Board eventually adopts that recommendation, it would then be subject to the notice and comment requirements of the APA. Any change in the law may also require approval by DOJ.[17] The advisory committee report may have some persuasive value, but it does not displace settled law that expressly mandates a "one percent plus one" formula for provision of wheelchair spaces in large arenas.[18]

---

17. Congress established a special procedure for enacting Title III regulations in the first place, but did not expressly establish a procedure for amending or supplementing those regulations. In addition, there is some disagreement concerning the proper application of the requirement that the DOJ regulations must be "consistent" with the Access Board guidelines. 42 U.S.C. § 12186(c). If the Access Board revises its guidelines, it is unclear whether DOJ would be obliged to follow suit, or if DOJ can amend its Standards without the Access Board's concurrence. These questions are not presently before this court.

18. It may be that some modification of the formula is warranted. The existing formula can be

inflexible. For instance, at the Rose Garden there reportedly is sufficient space in the various wheelchair areas to accommodate 28 additional wheelchairs, but not the companion seats that must accompany each of those wheelchairs. As a result, those 28 spaces cannot be counted towards the 191 wheelchair spaces that are required by Standard 4.1.3(19), since Standard 4.33.3 requires that each wheelchair space must have a companion seat next to it. Defendant argues, and not without some justification, that the "one wheelchair and one companion seat" model ignores the many other potential scenarios, e.g., one wheelchair user may be accompanied by three ambulatory companions, or vice versa. I do not, at this time, entirely rule out the possibility of allowing defendant some partial

■ Finally, defendant contends that it placed the 33 wheelchair spaces on Level 7 at the express request of the disabled community. That is not a valid excuse for ignoring the requirements of the Title III regulations. The regulations establish a national standard for minimum levels of accessibility in all new facilities. As a general rule, those designing or operating public accommodations are not free to pick and choose which of these legal requirements to follow, and which to ignore.[19]

In addition, the record offers no support for defendant's contention that the 33 wheelchair spaces were placed on Level 7 at the request of the disabled community. The documents cited by defendant—hearsay minutes of meetings prepared by defendant, most likely with an eye towards litigation and, thus, of dubious evidentiary value—reflect only that members of the disabled community recommended that defendant voluntarily provide wheelchair seating in *excess* of the "one percent plus one" required by Standard 4.1.3(19). There may have been some discussion of placing wheelchairs on Level 7, but only in the context of an emergency overflow wheelchair area to be used for special events when more wheelchair users might attend than could be accommodated by the everyday wheelchair seating.[20] There is no evidence that the disabled community suggested that a substantial percentage of the wheelchair seating required to satisfy the one percent requirement also be placed on Level 7. Moreover, those minutes are from community meetings that occurred more than two years before defendant belatedly decided to place 33 wheelchair spaces on Level 7.

Furthermore, as discussed elsewhere in this opinion, other contemporaneous documents and the deposition testimony of defendant's own employees establish that the sole reason for placing 33 wheelchair spaces on Level 7 was to avoid placing wheelchairs in the more desirable seating locations. In addition, defendant's senior project manager, Bob Collier, testified during deposition that defendant was not concerned with what representatives of the disabled community wanted, but was concerned only with satisfying the minimum requirements of the ADA. Collier Depo. at 111, 137–38, 205. His testimony belies defendant's eleventh hour contention that it placed a large percentage of wheelchair seating on Level 7 at the request of the disabled community.

There is no genuine factual dispute. Plaintiffs are entitled to partial summary judgment as a matter of law on the question of whether the concentration of so many wheelchair spaces on Level 7 violates the requirements Standard 4.33.3 and whether, after subtracting the excess spaces on Level 7, the arena as a whole violates the "one percent plus one" requirement mandated by Standard 4.1.3(19).

**C. Vertical and Horizontal Distribution:**

Plaintiffs also contend that the wheelchair seating is clustered in the corners of the end zones,[21] which they deem to be inferior seats, and that the wheelchair seating is not distributed on each level of the arena in proportion to the total seating on that level. Defendant concedes that the Rose Garden's wheelchair seating is not uniformly distributed, but contends that exact proportionality is not required. However, the present scheme is a far cry from exact or even rough proportionality.

---

credit for those 28 wheelchair spaces towards satisfaction of the "one percent plus one" requirement. That is something that I will consider further during the remedial phase of this case.

**19.** There are some limited exceptions, such as the provision in Standard 2.2 for equivalent facilitations, but those exceptions are not applicable here.

**20.** "[I]t was also brought up at one of our meetings that—before we made the change to the side to side versus front to back, that what would we do if we had an event that required

more wheelchair seats—more people in wheelchairs than what the ADA required. How would we handle a situation like that. Upon kind of reviewing that, we went up there and looked and, well, if we don't put anything on level 7 and we have an event there, we could handle a lot of additional wheelchair patrons over and above what at that time we thought was the ADA requirement."
Collier Depo. at 55–56.

**21.** "Corners of the end zone" is a football term more suitable to an outdoor stadium than an indoor arena, but I will use that term anyhow since its meaning is widely understood.

The record indicates that 124 of the Rose Garden's 191 wheelchair spaces—or 65 percent—are located in the corners of the end zone. Another 17 percent (33 of 191) of the wheelchair spaces are located on Level 7. Together, more than 82 percent of the Rose Garden's wheelchair spaces are clustered in those locations. Just 18 percent of the wheelchair spaces are distributed throughout the remainder of the arena. The numbers become even more lopsided after omitting wheelchair spaces that exist solely on paper because those spaces have been infilled with conventional seats (which will be discussed later in this opinion.)

There are no wheelchair locations at all behind the goal or basket; if one draws an imaginary line extending the sidelines of the basketball court up the seating bowl as far as the roof, there is not a single wheelchair location between the sidelines. There also are comparatively few wheelchair locations at mid-court or anywhere along the sidelines, and—as will be discussed below—most, if not all, of those wheelchair locations exist only on paper.

The undisputed evidence suggests that the clustering of wheelchair seating in the corners of the end zone resulted, in large part, from defendant's efforts to create approximately 80 additional wheelchair spaces after learning that the existing design for the companion seats violated the ADA. The evidence also shows that the corners of the end zone were chosen as the site for the additional wheelchair locations because defendant did not want to place wheelchairs in the more desirable seating areas.

A memorandum dated March 22, 1994, from defendant's chief project manager, Bob Collier, to other senior project managers, listed several options for locating additional wheelchair seats at the Rose Garden. One of those options was to install wheelchair seats in place of a camera area on one side of center court, and in place of a comparable row of seats on the other side of center court. This option had been recommended in a March 15, 1994, memorandum to defendant

from Ellerbe Becket, which concluded that the revision "should be acceptable to the NBA." [22] However, in his March 22 memorandum, Collier recommended that defendant not "pursue this revision, as it reduces our ability to accommodate press adequately, *as well as removes prime seats from the base mix.*" (emphasis added). On March 29, 1994, Ellerbe Becket wrote Collier:

> At your direction, we have not included the previously suggested revisions to seating areas on the west side of the court at Level Two. *This decision tends to locate a greater majority of wheelchair positions in "end zones," which may not be viewed favorably to some interpreters of ADA.*

(emphasis added). In other words, defendant made a conscious decision to place most of the additional wheelchair seating in the corners of the end zones, or up in the "nosebleed section" on Level 7, so the wheelchair seating would not displace "prime seats" at center court and a press area. *See also* Allison Depo. at 151–52 (Ellerbe Becket showed defendant several locations other than Level 7 where wheelchair spaces could be added, such as the west side of the arena at the main concourse level, but defendant rejected those alternatives and directed Ellerbe Becket to put 28 wheelchair spaces on Level 7.) This also appears to explain why there are not enough wheelchair spaces in the 100 level and preferred seating areas.

It is not necessary for this court to decide whether seats in the corners of the end zone or in the rafters of the arena are in fact less desirable than seats directly behind the basket or at mid-court. That is a matter of personal preference. The issue here is one of comparable choices being available to persons with disabilities. Defendant has offered no valid excuse for its failure to provide wheelchair spaces in entire sections of the arena.

Plaintiffs also have identified problems with the vertical distribution of wheelchair spaces at the Rose Garden. I previously concluded that defendant had improperly placed 33 wheelchair spaces on Level 7.

---

**22.** The NBA has rules governing the television camera facilities that must be available at each arena which hosts an NBA game.

716

Plaintiffs point out that, in the basketball configuration, there are proportionately too few wheelchair seats in the 100 level of the lower concourse and in the preferred seating. There are 5,264 seats on the 100 level, but only 38 wheelchair spaces. Approximately 52 wheelchair spaces should have been provided on that level of the arena if the wheelchair seating is to be distributed in a manner that is roughly proportionate to the overall distribution of seating at the Rose Garden, i.e., one percent of 5,264.

Absolute proportionality in the number of wheelchair spaces on each level is not required; some leeway must be permitted for design purposes. Unfortunately, neither the Access Board nor DOJ has seen fit to provide arena designers with much guidance regarding the degree of leeway that is permitted. In designing a quarter-billion dollar arena, the owner and designer understandably would like a definitive standard. They may not necessarily like the standard, but at least there will be a goalpost against which to measure their design, and some assurance that the design will not later be found to be in violation of the ADA.

In the absence of any definitive statement by DOJ or the Access Board, of necessity this court must define its own standard, consistent with the text and purposes of the ADA and its enabling regulations, and the reasonable interpretations that have been given to those laws by the agencies charged with their implementation and enforcement. The court intends for this to be an interim standard, serving only until the Access Board and DOJ provide a more detailed statement of what arena designers must do to satisfy the dispersal requirements.

■ Until that occurs, the court concludes that an arena the size of the Rose Garden is presumptively in compliance with the vertical dispersal requirement for wheelchair seating if the deviation from absolute proportionality does not exceed ten percent (or one wheelchair space, which ever is greater). In other words, if absolute proportionality (i.e., one percent of the ambulatory seating capacity)

would require that 52 wheelchair spaces be placed on a particular level of the arena, the vertical dispersal requirement is satisfied by placement of as few as 47 or as many as 57 of the required [23] wheelchair spaces on that particular level. Of course, the total number of wheelchair spaces in the arena still must satisfy the "one percent plus one" standard. In addition, the "safe harbor" rule articulated here pertains only to the quantity of wheelchair spaces that are required on each level of the arena, and not to the distribution of those wheelchair spaces within each level which may be subject to additional requirements.

If the vertical dispersal of the wheelchair spaces deviates by more than ten percent from the target number, that is not a per se ADA violation, but the burden falls upon the arena's owner or designer to justify the design and to demonstrate that they could not have more fully complied with the vertical dispersal requirement. That is a difficult burden to discharge, since the court begins with the strong presumption that it is possible to fully comply with the dispersal requirements.

■ There are only 38 wheelchair spaces on the 100 level of the lower concourse of the Rose Garden, a deviation of 27 percent from the 52 spaces that should have been provided and well outside the permissible range of 47 to 57 spaces. That falls far short of the mark. Likewise, there are 1,728 "preferred" seats at the Rose Garden, but only 12 wheelchair spaces. Absolute proportionality would mandate 17 wheelchair spaces on that level (one percent of 1,728.) The ten percent deviation rule allows a range of between 15 and 19 wheelchair spaces. Again, the facilities at the Rose Garden fall short of the mark, departing 29 percent from the standard. Defendant has offered no valid excuse for failing to provide a sufficient number of wheelchair spaces on the lower levels of the Rose Garden.

I conclude that the present design of the Rose Garden violates both the horizontal and

23. As noted earlier, the ADA does not preclude an arena operator from providing more wheelchair spaces than the law requires, but the excess spaces on this level ordinarily would not be credited towards satisfaction of the "one percent plus one" requirement.

vertical dispersal requirements of the ADA and its implementing regulations by improperly clustering the great majority of wheelchair spaces in certain parts of the arena, while few or no wheelchair spaces are available in the remainder of the arena.

At the same time, I reject some of the more extreme interpretations of the ADA that have been proposed. Although one goal of the ADA is to minimize the disparity between those persons with and without disabilities, the fact remains that wheelchair customers do differ from ambulatory customers in some important respects. Defendant did not create those distinctions, nor can it entirely eliminate them. Modern arenas are primarily vertical in orientation, a place where spectators often must ascend stairs to reach their seats. To some degree, these obstacles can be surmounted by providing elevators and by locating wheelchair spaces on accessible routes. Nonetheless, these physical constraints preclude mathematical homogeneity in the distribution of wheelchair seating. Moreover, in a multi-purpose arena such as the Rose Garden, in which there are many unique configurations, it may not always be feasible to provide front row wheelchair seats for every single event as plaintiffs have demanded.[24]

The court also acknowledges that in designing and operating this arena, defendant had to balance many concerns, only one of which was meeting the needs of wheelchair users. Defendant also had to be concerned, *inter alia*, with designing an arena that met the needs of those spectators not in wheelchairs—including some with other disabilities such as vision and hearing impairments. Defendant had to comply with fire and building codes, and to control costs so it was feasible to build the arena at all. The court will take such factors into account in deciding what remedy to require in this case, and in assessing the extent to which defendant can further disperse wheelchair locations at the Rose Garden and provide persons in wheelchairs

with the full range of seating choices that are available to ambulatory patrons.

Still, the fact remains that a disproportionate amount—82 percent of the wheelchair seating at the Rose Garden is clustered in the corners of the end zone or high up on Level 7. That is unacceptable in the design of a new arena such as the Rose Garden, and it does not comply with the requirements of Title III of the ADA and its enabling regulations.

### D. Availability of Wheelchair Seating:

Until this point, I have been considering the adequacy of the Rose Garden's wheelchair seating as it exists on paper. A related issue is whether those wheelchair spaces exist only on paper, or if they are in fact available for use by persons with disabilities.

Notwithstanding the colorful charts furnished by defendant which depict numerous wheelchair spaces, it appears that the only time many of those wheelchair locations were actually available for use by wheelchair patrons was on the day that the court toured the Rose Garden to inspect the wheelchair seating arrangements. The record evidences a policy and practice of systematically "infilling" the wheelchair locations with portable tiers of conventional seats for use by ambulatory patrons.

The primary motivation for infilling is economic. In an arena such as the Rose Garden, wheelchairs occupy more space than conventional seats, due to their size, the necessity of providing a wide aisle and room in which to maneuver, and the requirement to provide a companion seat next to each wheelchair space. However, the arena operator is precluded from charging wheelchair users a higher price commensurate with the additional space that is consumed. *See* 28 CFR § 36.301(c) (public accommodation may not impose a surcharge only on persons with disabilities to cover the cost of compliance with the ADA). *See also* Department of Justice, Americans with Disabilities Act Title

---

24. For instance, plaintiffs complain that in the hockey configuration the nearest wheelchair seat is 16 rows from the ice. I agree that this may not provide wheelchair users with seating choices comparable to those of ambulatory pa-

trons. However, I am unable to determine from this record whether it is feasible to provide front row wheelchair seats in the hockey configuration. The same is true of the various configurations for other events.

Three Technical Assistance Manual (hereafter, "TAM") (1993 and 1994 supp.) § III–4.1400 and § III–4.4600 (expressing DOJ's position that "[p]eople with disabilities may not be subjected to additional charges related to their use of a wheelchair.")

For Trail Blazers games at the Rose Garden, at least 133 of the wheelchair/companion pairs are routinely infilled with 1,028 conventional seats. Defendant's Submission in Response to Request from the Court at 8–9. Many of those conventional seats are priced at between forty-seven and eighty dollars, or more. Defendant's Ex. 6. Extrapolating from those numbers, infilling 133 wheelchair spaces with 1,028 conventional seats yields an additional fifty thousand dollars or so in ticket sale revenue for each Trail Blazers home game—and there are at least forty home games per season (and more if the Trail Blazers make the playoffs.) Conversely, if the Trail Blazers do not infill those wheelchair spaces, they potentially stand to lose over two million dollars in ticket revenues each season.[25] To those sums must be added the revenue generated by an extra thousand customers for the arena's concession stands, souvenir vendors, and restaurants.

These numbers provide defendant and its principal tenants with a powerful incentive to infill as many wheelchair spaces as possible. For the same reason, plaintiffs understandably fear that defendant may discourage attendance by wheelchair users, limit their choice of seats, and steer wheelchair fans to less expensive and less desirable seats. This is one of the most significant issues concerning the design and operation of the Rose Garden yet, to date, there is very little law defining the rights and obligations of the respective parties under these circumstances.

The Title III regulations provide that "[r]eadily removable seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users." Standard 4.33.3. The question presented here is whether the practice in the Rose

Garden exceeds the bounds of what is permissible.

### (i) Is OAC Responsible for Infilling and Ticket Sale Policies?

■ At the outset, I acknowledge defendant's protest that decisions regarding infilling, ticket sale policies, and other operational matters are made by individual event promoters and not by defendant OAC, which owns and operates the building. I do not find that distinction to be persuasive, at least on the facts of this case. The issue here does not concern a defined space leased to a private entity, such as a restaurant, an issue that I will address elsewhere in this opinion. Nor is this a case where a promoter for a single event took some action that allegedly violated the ADA. Rather, the policies and practices at issue here are pervasive, particularly on the part of the building's primary tenant, the Portland Trail Blazers.

Defendant, as the landlord, has the ability to alter the challenged policies and practices. These policies and practices go to the very heart of the arena's principal purpose and the issue of whether this public accommodation complies with the requirements established by the ADA. I also note the extremely close relationship between defendant and the Trail Blazers, including overlapping ownership and key management officials. Furthermore, some of the challenged ticket sale policies are included in the seating plans drawn up by defendant as early as July 9, 1992, three years before the arena opened for business. The same ticket sale policies are included in both the basketball and hockey seating plans. It appears to have been defendant, not the Trail Blazers, that formulated those policies. At a minimum, defendant actively participated in their design and implementation. In its briefs, defendant even describes these policies as "OAC's policy, which is followed by the Trail Blazer's." Defendant's Submission in Response to Request from the Court at 5. See also Defendant's

**25.** These numbers are only a rough estimate. There are many factors that affect those calculations. For instance, depending upon whether the arena was sold out, in the absence of those 1,028 seats some spectators might instead have purchased tickets elsewhere in the arena, though the remaining seats likely would have been in the upper levels of the arena and priced accordingly. The arena also loses the revenues it otherwise would have received from tickets sold to wheelchair users and their companions.

Submission in Response to the Court's Request of August 21, 1997, at 2 ("Under OAC's policy regarding the sale of modified aisle seats, which is followed by the Trail Blazers ...")

In addition, employees of defendant have assisted in implementing those practices, *e.g.*, by installing tiers of standard seats in designated wheelchair locations. Finally, for purposes of this claim, I am considering only whether to order injunctive relief, not whether to hold defendant liable for damages (which are not available under Title III of the ADA). I conclude that OAC is a proper defendant regarding this issue and that it is appropriate to address the challenged policies and practices in the context of this case.

### (ii) Do the Infilling and Ticket Sale Policies at the Rose Garden Violate the Title III Regulations?

#### (a) Season Tickets and Long-Term Contracts:

The vast majority of tickets for Trail Blazers games are sold on a season ticket basis. *See* Defendant's Submission at 6 ("The Trail Blazers business plan was to sell all but 1,500 of the seats in the Arena on a season ticket basis.") The more desirable seats are even more restrictive, requiring purchase of a multi-year contract for five, seven or nine years. Isaac Depo. at 45 ("[A] great percentage of our ticket holders are on a multi-year purchase basis, which becomes more than a right of first refusal. They've contracted to purchase their tickets for the next year.") Of the remaining seats, some are sold in multi-game packages, while others are available for individual games.

According to information furnished by defendant, in May 1994, more than a year before the Rose Garden was operational, future season tickets (at the Rose Garden) were offered to all current holders of season tickets at the Memorial Coliseum (which was home to the Trail Blazers before the Rose Garden was built.) Next, future season tickets were offered to those who already were on the waiting list to buy season tickets at the Coliseum. If there were not enough conventional seats available in a particular section, the wheelchair seats were replaced with conventional seats which were then sold to ambulatory patrons on the waiting list. The Trail Blazers next offered additional season tickets to those who were current season ticket holders at the Coliseum. Again, wheelchair seats were replaced by conventional seats and sold to ambulatory patrons. Finally, any remaining season tickets were offered to the general public, including those persons with disabilities.

The effects of this policy were predictable. Most seats for Trail Blazers games at the Rose Garden have been sold on a season ticket basis (or longer) to those who were existing season ticket holders at the Coliseum, few (if any) of whom use a wheelchair. Once a seat is sold on a season ticket basis, the holder has the right (or in many cases, the obligation) to renew that ticket each year, and most do renew. *See, e.g.*, Isaac Depo. at 45. Season ticket holders are entitled to renew their subscription each year notwithstanding that an ambulatory patron is occupying a designated "wheelchair" space and without regard to whether that space has been requested by a person using a wheelchair.

The end result is that most wheelchair locations in the Rose Garden exist only on paper, having been infilled with conventional seats and sold to ambulatory patrons on a season ticket or longer basis. Defendant admits that 27 of the 40 wheelchair sections at the Rose Garden have been "in-filled completely." Defendant's Submission at 8. In view of the high renewal rate among season ticket holders, the effect of this policy is to permanently infill nearly three-quarters of the wheelchair sections at the Rose Garden, including all (or almost all) of the more desirable seats. Those 27 wheelchair sections contain 133 of the 191 wheelchair spaces at the Rose Garden (or 133 of 158 wheelchair spaces after excluding the 33 spaces on Level 7.) In other words, fully 84 percent of the non-Level 7 wheelchair spaces are routinely infilled for every game, and that is not counting additional infilling for individual games. Those 133 wheelchair spaces have been replaced by 1,028 ambulatory seats. *Id.*

Standard 4.33.3 permits infilling of wheelchair spaces with *readily removable seats*

when the wheelchair spaces *are not needed* to accommodate wheelchair users. From a purely physical standpoint, the infilled seats at the Rose Garden are "readily removable." As a practical matter, however, those seats are permanently assigned to ambulatory patrons and are not available to wheelchair users. The policies adopted by defendant and its principal tenant defeat the purpose for requiring those seats to be "readily removable." Likewise, it is circular reasoning to say that those spaces are "not needed" to accommodate wheelchair users when anyone who inquired would be told that those spaces are not available.

Defendant argues that its policy does not discriminate against persons with disabilities because the season tickets were originally offered on the same basis to those with and without disabilities. The policy may be facially neutral, but its disparate impact is incontrovertible. *Cf.* TAM §§ III–4.1100 and 4.2100 (1993 ed. and 1994 supp.) (listing examples of policies that are facially neutral but nonetheless have a disparate impact upon persons with disabilities.)

That disparate impact is exacerbated by the manner in which season tickets are purchased and used and in which fans obtain single-game tickets. There undoubtedly are some devoted fans who purchase a season ticket and attend every home game during the season. However, the court takes judicial notice that it also is common practice to share a season ticket among several people, with each participant receiving a portion of the tickets for the season. Alternatively, season ticket holders may elect to attend some games, and give the tickets for the remaining games to friends, relatives, clients, business associates and co-workers, or else sell the undesired tickets. Such "surplus" tickets for individual Trail Blazers games have traditionally been sold through classi-

fied advertisements placed by season ticket holders or through other sources.[26]

From the standpoint of an ambulatory patron, season tickets are fungible; there are over a million residents in the Portland metropolitan area who are physically able to use those tickets. By contrast, the option to share a season ticket, or to sell or give away unwanted tickets, is generally not available to wheelchair users, unless the person sharing the season ticket or receiving the surplus ticket also uses a wheelchair. It may also be more difficult for individuals who use a wheelchair to commit to buying an entire season's worth of tickets, as opposed to a single game, because of the logistical problems that may be encountered in traveling to the arena.

Wheelchair users are similarly constrained in their ability to obtain tickets for individual games. An ambulatory patron who is not a season ticket holder, but desires to attend a game, may obtain a ticket from a friend, relative, or business associate who has a season ticket, or else purchase an excess "season" ticket for a single game through the classified advertisements or a ticket broker. Ambulatory patrons can use any of the thousands of "season" tickets that are sold for each game. Those in wheelchairs do not have that option. A wheelchair user cannot obtain an extra ticket from a friend, relative or business associate, or purchase a surplus ticket via the classified advertisements, unless the ticket happens to be for a wheelchair seat. That is extremely unlikely, since every (or almost every) season ticket in the entire Rose Garden has been sold to an ambulatory person, and the wheelchair spaces have been in-filled.[27]

The nominally "equal" policy that has been applied here is inherently unequal. Those in wheelchairs are effectively precluded from

---

26. Or at least Trail Blazers tickets were regularly advertised in years past, when they had a winning team. The eternally optimistic court will assume that the Trail Blazers soon will return to their former glory and tickets for Trail Blazers games will again be in high demand.

27. The Trail Blazers could make it easier for wheelchair users to buy, sell, and share tickets. For instance, if a wheelchair user acquires a ticket for a conventional seat from an ambulatory season ticket holder, the wheelchair user would be entitled to use the closest wheelchair space. Problems arise, however, if the nearby wheelchair spaces have all been infilled with conventional seats. A fan who has paid eighty dollars for a good center court seat will not appreciate being relegated to the five dollar wheelchair spaces on Level 7.

obtaining any of the better seats for events such as Trail Blazers games and will continue to be excluded for the foreseeable future.

Various ideas have been suggested to help alleviate this problem. DOJ's position is that defendant and its principal tenants should be prohibited from infilling wheelchair spaces unless the event is a complete sell-out, *i.e.*, every conventional seat in the building has been sold, as opposed to merely every seat in a particular price category. *See* United States' Responses to Questions Posed by the Court at 2 ("Before wheelchair locations can be replaced with other seating ... all other seats in the arena must first be sold.")

I question whether that is the best solution to the problem presented here, at least with regard to the Trail Blazers as opposed to other individual events. Although attendance has slumped a little during the past few years along with the home team's performance, historical patterns suggest that if necessary the Trail Blazers could sell every conventional seat in the house on a season ticket basis, albeit many of those tickets might then be resold through ticket brokers and other secondary markets on an individual game basis. Under the rule proposed by DOJ, once the arena is nominally a "sell out" the Trail Blazers could infill the wheelchair spaces and sell those seats on a season ticket basis to ambulatory patrons. The Trail Blazers would not be required to reserve any seats for wheelchair users. The net result would not be an improvement over the present circumstances.

Plaintiffs and DOJ have suggested that the right of first refusal to renew a season ticket for an infilled wheelchair seat should be conditioned upon that wheelchair seat not being requested by a wheelchair user. United States' Response to Questions at 3. This proposal may be difficult to implement because infilling of wheelchair areas is not a one-for-one proposition. Defendant has replaced 133 wheelchair spaces with 1,028 conventional seats; consequently, the presence of even a single wheelchair may displace dozens of season ticket holders.

Another option is to prohibit defendant from infilling such a large percentage of the seating inventory on what essentially is a permanent basis. A representative selection of wheelchair spaces would not be infilled in advance, but instead would be made available by the game or at most a 3 or 4–game package, as opposed to a season-ticket or long-term contract. These tickets would be available to wheelchair patrons up until the day of the game, or perhaps 24–48 hours before. If those wheelchair spaces are not sold, they could then be infilled and made available to the general public.

In its briefs, defendant represented that the Trail Blazers already withhold some wheelchair seats from sale to ensure that tickets are available up until the day of the game for purchase by persons in wheelchairs. However, that representation was contradicted by defendant's Vice President of Business Affairs, J. Isaac, who testified at deposition that there is no policy that requires disabled seating be retained up until 24–48 hours before an event. "[O]ur policy is that if we've sold out the other nondisabled seating, we can go ahead and sell the disabled seating if there's been no demand at that time ... [T]here's no policy that we have to retain [wheelchair spaces] up to a certain point in time." Isaac Depo. at 45.

The court also observes that the great majority of the spaces allegedly reserved for wheelchairs are on Level 7. *See* Defendant's Submission at 5 ("the Trail Blazers retain 17 wheelchair locations and 17 companion seats on Level 7 ... and several wheelchair locations in other parts of the seating bowl ...") That does not appear to be a representative selection of seating choices at the Rose Garden as a whole. Even assuming there is a policy of not infilling every last wheelchair space, it seems clear that the great majority of wheelchair spaces—and in particular those in desirable locations—are routinely infilled for every Trail Blazers game.

Furthermore, affidavits submitted by wheelchair users who attempted to obtain tickets for Blazer games suggest that—notwithstanding any alleged "policy" of setting aside spaces for wheelchairs—few, if any, wheelchair seats actually are available for purchase, or at least the ticket sales repre-

sentatives are not aware of the availability of those wheelchair spaces.

### (b) Tickets for Individual Games:

On paper, wheelchair users can purchase tickets for individual Trail Blazers games or multi-game packages (e.g., tickets for four games that are sold together.) However, plaintiffs have furnished affidavits from wheelchair users who attest that they attempted to purchase tickets and were told that there were no wheelchair tickets available at any location, or were steered to distant corners of the arena while ambulatory friends were able to purchase prime tickets for the same game. When the latter affiants arrived at the game, they allegedly discovered that the "unavailable" wheelchair seating was not occupied by other wheelchair users, but had been infilled with conventional seating. Some of those accounts are supported by affidavits from ambulatory patrons who claim to have witnessed these incidents and who were able to purchase tickets themselves for locations where wheelchair users were told that no seats were available. Defendant has responded that such incidents should not have occurred, but does not directly refute the allegations,[28] albeit that would be difficult to do given the nature of the allegations.

While not deciding at this time whether such incidents did, or did not, occur, the court again observes that the design of the Rose Garden and the present ticket sale and operational policies furnish defendant with a powerful economic incentive to discourage wheelchair use. The court has heard different estimates, but it appears that each wheelchair/companion pairing can be replaced by between five and ten standard seats, depending upon the layout of the particular wheelchair area.[29]

The design of the portable tiers means that replacement may be on an "all or nothing" basis, i.e., if a designated wheelchair location has a capacity of three wheelchairs, the presence of even one wheelchair in that location may preclude installation of any replacement seating. As a general rule, the sale of even a single wheelchair ticket for a given wheelchair area effectively precludes the sale of dozens of conventional tickets.[30] Conversely, each wheelchair area that is not used can be replaced by up to 56 conventional seats, depending upon the size of the wheelchair area.

The economic incentives are obvious. If a wheelchair user purchases a ticket in the $80 section, it may cost defendant (or the event promoter) several thousand dollars in ticket revenues depending upon the number of conventional seats that could otherwise have been infilled in that wheelchair area. That revenue loss can be avoided if the box office informs wheelchair users that there are no available wheelchair seats for the event; the wheelchair sections can then be infilled and sold to ambulatory patrons. Alternatively, the revenue loss can be minimized by telling wheelchair users that there are no $80 seats available, but offering to sell the wheelchair user one of the $5 spaces on Level 7 or a $15 space in the upper deck. Another means to minimize the loss of revenue is by steering all wheelchair users to a few wheelchair locations, thereby freeing up the remaining wheelchair locations for infilling, albeit at the expense of reducing the choice of seats available to wheelchair users. These are precisely the sort of tactics that plaintiffs claim they were subjected to whenever they have attempted to purchase wheelchair tickets for events at the Rose Garden.

**28.** An employee of defendant stated that he was not personally aware of any wheelchair users being turned away, but that is not the same as expressly denying that these incidents occurred.

**29.** Defendant has represented that the "number of conventional seats that can be sold when a wheelchair seating area is in-filled varies widely depending upon the size of the wheelchair seating area. The range [is] from 5 ambulatory in-filling 3 wheelchair locations to 56 ambulatory seats in-filling 5 wheelchair and 5 companion seats." Defendant's Submission at 9. Bob Col-

lier testified during deposition that each wheelchair/companion pair meant the loss of approximately 12 standard seats. Collier Depo. at 121. Defendant has also represented that 133 wheelchair/companion pairs have been infilled with 1,028 conventional seats. Defendant's Submission at 8.

**30.** Defendant has advised the court that the larger wheelchair seating areas can be partially infilled, while still leaving some room for wheelchair seating.

Plaintiff Pike states that he attempted to purchase a wheelchair ticket on Level 7 for a Trail Blazers game, but was informed that all Level 7 tickets for the entire year had been sold out before the start of the season. After defendant filed a brief denying that allegation, Pike says he again attempted to purchase a wheelchair seat on Level 7 and was again informed that no wheelchair spaces were available. While some mistakes might be attributable to start-up problems with a new arena, the latest incidents recounted by Pike allegedly occurred in March 1997, well after the time when any start-up bugs should have been resolved and after that specific issue had been called to defendant's attention in the course of this litigation.

Pike also recounts other occasions where he attempted to purchase tickets for Trail Blazers games and was told that no wheelchair spaces were available anywhere in the arena, but his ambulatory friend could purchase a conventional seat. After some telephone calls were placed to the Trail Blazers' front office, Pike eventually was given a wheelchair space in the corner of the end zone, although he wanted and was prepared to pay for a wheelchair space at center court. Pike also recounts an unsuccessful attempt to purchase wheelchair tickets for a hockey game at the Rose Garden. He allegedly was told that none of the wheelchair spaces at center ice was available for any game during the entire season, and the best seat available for wheelchair users was in the corners of the end zone. However, Pike's ambulatory companion was able to purchase a ticket for a conventional seat at center ice.

William Loyd has submitted an affidavit describing his attempt to purchase tickets for himself and two (apparently ambulatory) companions for a Trail Blazers game at the Rose Garden. Loyd was told that the only place where his party could sit together was on Level 7. When Loyd arrived at the game, however, he discovered that there were only a few wheelchairs occupying the numerous designated wheelchair spaces in the rest of the Rose Garden; instead, those wheelchair spaces had been infilled with conventional seats to make room for ambulatory patrons.[31]

Defendant has denied knowledge of any efforts to discourage attendance by wheelchair users or to steer them to specific sections. However, in view of the sizeable financial incentives involved, it might be even more surprising if such efforts have never occurred at the Rose Garden. DOJ recently deemed it necessary to expressly caution the NBA regarding such steering practices:

> One of the problems that has frequently arisen stems from a design in which several adjacent wheelchair locations are replaced by a platform or series of risers with multiple standard seats. This design can cause significant operational difficulties, as it prevents placing any readily removable standard seats in a wheelchair seating area whenever even one wheelchair user requests to sit in that area. It is not, of course, an acceptable alternative either to attempt to discourage wheelchair users from sitting in that area, or to "steer" them into areas where seats have already been purchased by other wheelchair users, or to conceal from wheelchair users who seek tickets that locations are available in wheelchair seating areas where no wheelchair users have yet purchased tickets.

Letter to NBA Commissioner Stern (Oct. 22, 1996) at 3.

### (c) Tickets for Other Events:

The arguments of the parties have focused upon the availability of tickets for Trail Blazers games. However, problems with "steering" or excessive infilling may occur in connection with other popular Rose Garden events, such as concerts. The policy pro-

---

**31.** Lindsey Nelson has submitted an affidavit describing his attempt to purchase tickets for two wheelchairs and an ambulatory companion. Nelson reportedly was informed that there was insufficient space to accommodate both wheelchairs in the same location, thus they would have to sit in separate sections. Upon arriving at the game, he discovered that in fact there was room for several wheelchairs. It is difficult to discern any direct economic benefit that would accrue to defendant by separating wheelchair users. Rather, defendant would have an incentive to cluster wheelchair users in one location so it could infill the other seats. Consequently, the incident described by Nelson may reflect inadequate training on the part of the ticket vendor, or defects in the computer program that is used to track available seats.

posed by DOJ would allow wheelchair spaces to be infilled with conventional seats only if the entire event is a sell-out. Defendant has proposed to infill wheelchair spaces with conventional seats as each category of tickets is exhausted.

An obvious problem with either proposal is the definition of a "sold out" event. The court takes judicial notice that, for popular events, large quantities of tickets may be purchased by ticket brokers for resale to the general public. An event may officially be deemed a "sell-out" even though tickets (for ambulatory patrons) still are readily available from the ticket broker. Wheelchair patrons would not have the same option, since the wheelchair spaces would have been infilled once the event was deemed a "sell-out." It is unclear how the policies proposed by the parties would apply to this situation.

### (d) Conclusion:

There are significant issues regarding infilling and ticket sale policies at the Rose Garden, particularly for Trail Blazers games but also for other events as well. Some of the alleged policies and practices, if proven to be true, may well constitute a violation of the ADA and its enabling regulations. DOJ has publicly taken a strong stance against "steering" and similar practices that limit the choices of wheelchair users. *See, e.g.,* Letter to NBA Commissioner Stern (Oct. 22, 1996.) On the other hand, it is understandable that an arena operator may seek to minimize the loss of seats and revenue by clustering several wheelchairs in a single wheelchair area— and infilling the remaining wheelchair locations—instead of each wheelchair occupying a different wheelchair area (that is designed to hold five or six wheelchairs) which effectively precludes infilling any of those wheelchair locations. This presents a classic public policy question: to what extent do the additional seating choices that would be available to wheelchair users outweigh the potential revenue loss to the arena operator, and vice versa?

Ideally, such policy questions should be decided either by Congress or by the administrative agency charged with implementing the statute, and not the judiciary. However, neither the statute nor the applicable regulation has delineated precisely where that line is drawn, and the parties have cited no other cases addressing this issue. Since this topic has been overshadowed by other matters in this case, the court will request additional briefing focused on the issues of infilling and ticket sale policies, the controlling legal standards and how they apply to this case, and the potential remedies if the court determines that the existing policies and practices violate the ADA. There may also be some factual disputes regarding the availability of tickets for wheelchair users and whether defendant or its principal tenants have engaged in "steering." For now, neither side is entitled to summary judgment on these particular issues.

### 4. *Companion Seats:*

▮ Standard 4.33.3 provides that "[a]t least one companion fixed seat shall be provided next to each wheelchair seating area." DOJ has interpreted this language to require that the companion seat be placed side-by-side with each wheelchair space, not in a different row. That is a reasonable reading of the regulation and will be followed by this court.

Most (but not all) of the conventional seats at the Rose Garden are either permanently attached to the floor or are part of large moveable tiers. By contrast, the companion seats at the Rose Garden are padded folding chairs. The conventional seats mostly bear the Irwin brand, while the companion seats bear the Clarin label.

### A. Interpretation of Standard 4.33.3

▮ Plaintiffs and DOJ contend that the companion seats at the Rose Garden violate Standard 4.33.3 because these are not "fixed" seats but portable folding chairs. They assert that the companion seat must be identical to the conventional seats used by the general public. Defendant counters that these Clarin folding seats are high-quality seats in their own right which are utilized for some of the most expensive tickets in the arena, such as concert floor tickets or courtside seats for basketball.

The term "companion fixed seat" is not defined in the regulations. While the term "fixed" might be read to mandate that the companion seat literally be bolted to the floor, it is more likely that the term was intended to denote a standard seat used by an ambulatory patron as opposed to a wheelchair space. It is difficult to discern any rational justification for mandating that the companion seat literally be bolted to the floor. The purpose of the companion seat is to permit an ambulatory companion to sit with the wheelchair patron. *See* H.R.Rep. No. 101–485(II) at 102, *reprinted at* 1990 U.S.C.C.A.N. 303, 385 (noting that, historically, patrons in wheelchairs often have been forced to separate from family or friends during the performance). That purpose is accomplished regardless of whether the companion seat is bolted to the floor or whether the chair can be folded when not in use.

A quality folding chair has some advantages over a companion seat bolted to the floor because it provides greater flexibility. Instead of a rigid seating pattern of one wheelchair and one fixed companion seat, it is possible to accommodate a wide variety of potential seating configurations, such as three wheelchairs and one ambulatory companion, or vice versa. There also is evidence in the record that, for a variety of medical reasons, some wheelchair users may require extra space. That need can more easily be accommodated with a portable seat than one that is bolted to the floor. A portable chair also permits in-filling of standard seats if a wheelchair section is not being used. That is not to say that a seat that is bolted to the floor cannot also serve as a companion seat; rather, the question posed here is whether the companion seat *must* be affixed to the floor.

Plaintiffs argue that a portable folding chair may be moved around and, therefore, might not be present when it is needed for use. However, the same problem could arise with the use of removable "fixed" chairs, or if the section was infilled for another event and the temporary seating was not removed, or if the "fixed" companion chairs must be reconfigured for a configuration other than one wheelchair and one companion. For that matter, any patron may arrive at the event and discover that the prior occupant spilled a large soft drink on the seat, or that someone else is sitting in the assigned seat. In each case, the remedy is to ask an usher to fix the problem. The possibility that a companion seat might be moved does not justify requiring that they be bolted to the floor.

Plaintiffs also have made vague allusions to safety issues concerning folding chairs, but have not elaborated upon those concerns or provided evidence that these folding chairs are not as safe as a chair that is bolted to the floor.

Plaintiffs' opposition to folding chairs might be better taken if defendant provided poor-quality folding chairs for companion seats, while all other spectators sat in plush chairs. That is not the case. The folding chairs in question are not significantly less comfortable than the standard seats used in the rest of the arena.[32] Indeed, plaintiffs all but concede that the Clarin seats would be permissible if they were attached to the floor with "super Velcro." Jan. 28, 1997 Tr. at 83.[33]

The only other potential justification that plaintiffs have asserted for requiring a companion seat to be bolted to the floor is to ensure that the companion seat is identical in every respect to the other seats in the arena, including its appearance. *See, e.g.,* Jan. 28, 1997 Tr. at 75 ("The only reason that you have a fixed seat next to a wheelchair location is because you want folks in wheelchairs to be treated the same as everyone else … It's like being integrated into what's going on. That's the reason.") and at 102 ("it's

---

32. There is no need to conduct a trial on that issue, complete with expert witnesses to advise the court on whether each chair is comfortable. Given the number of hours spent seated on the bench presiding over hearings and trials, if there is one thing that the average federal judge is qualified to do, it is to select a comfortable chair.

33. Plaintiffs originally asserted that the Clarin seats were inferior because they lacked armrests and cupholders. Defendant responded that none of the seats had cupholders. The point is moot, since the ADA does not mandate the provision of cupholders and armrests, at least under the facts of this case.

about putting companions in the same kind of seats that look like and operate the same way or are attached to the floor the same way as the seats that everybody else is using, so that people who use wheelchairs and their companions are not singled out or separated in any way or distinguished as little as possible from all of the other spectators in the arena.") and at 104–05 ("the intention is that the companion seat be the same kind of seat that other people are sitting in so that the companions blend in with the rest of the crowd ... [I]t's not about comfort or cupholders or armrests.")

The court acknowledges the desire that many wheelchair users have to blend in with the audience as a whole and not feel conspicuous. However, the reality is that wheelchair patrons are not identical to ambulatory patrons: they use wheelchairs for locomotion. By definition, wheelchair locations cannot be identical in every respect to the seats in the rest of the arena: there must be a level platform with sufficient room to maneuver a wheelchair, and there must be an access ramp suitable for wheelchairs. Plaintiffs also have demanded enhanced lines of sight that likely would require wheelchair platforms to be elevated somewhat above the surrounding rows of spectators. The physical appearance of these wheelchair locations necessarily will be different from that of the conventional seating. Defendant is not responsible for these facts, nor can defendant alter them. All defendant can do is to make reasonable efforts to accommodate the special needs of wheelchair users, consistent with the requirements of the ADA, while also considering the needs of other patrons.

Plaintiffs have suggested that portable seats are permissible so long as the chairs are affixed to the ground, such as a removable seat anchored in a track that in turn is affixed to the floor. That is one permissible alternative, but it is not the exclusive means for providing a companion seat, at least in the context of the Rose Garden. Neither plaintiffs nor DOJ have presented any evidence to show that the provision of a Clarin folding chair instead of a chair bolted to the floor interferes with the ability of a wheelchair user (or their ambulatory companions) to attend events at the Rose Garden, to enjoy the event, and to have substantially the same opportunity to benefit from that experience.

In summary, I do not read Standard 4.33.3 to prohibit the use of high-quality folding chairs as companion seats, at least under the circumstances present in this case. If DOJ or the Access Board believe otherwise, then they should amend Standard 4.33.3 to clarify that intention, and also should be prepared to articulate the rationale for such a rule.[34]

**B. "Substantially Equivalent or Greater Access"**

■ Even assuming, *arguendo*, that the term "fixed" seat literally requires that the seat be bolted to the ground, Standard 2.2 authorizes "the use of other designs and technologies ... where the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility." This is known as the "equivalent facilitation" exception. For the reasons discussed above, I conclude that under the facts of this case a high-quality folding companion seat is permissible because it provides "substantially equivalent or greater access to and usability of the" Rose Garden as compared to a companion seat that is bolted to the floor.

---

**34.** During oral argument, defendant repeatedly sought to commingle two very different issues, namely (1) whether a Clarin folding seat can be used as a companion seat, and (2) whether it is permissible for defendant to place 33 wheelchair spaces on Level 7. Defendant reasoned that if a folding chair may be used as a companion seat, then Level 7 is an integral part of the "fixed seating plan." *See, e.g.,* Jan. 28, 1997 Tr. at 91 ("The argument about level seven ... would go away, Your Honor, if we got a couple of steel clamps and took a drill out and drilled some holes in the concrete and screwed in some screws with clamps around the bottom of the chairs. We would then have a fixed seat.") Defendant is mistaken. The critical issue is not whether there are any "fixed" seats on Level 7, but whether defendant can relegate 33 wheelchair spaces to a separate level in a distant corner of the arena which houses just 16 seats for ambulatory patrons, while failing to provide adequate numbers of wheelchair spaces in the remainder of the arena. The court's analysis of the Level 7 issue would be the same even if a few conventional seats were bolted to the floor on Level 7.

Plaintiffs and DOJ protest that the equivalent facilitation exception is limited to "new" technologies, and folding chairs cannot qualify because they have been around for many years. I find nothing in the text of the regulation to support that limiting construction.

The purpose of the Title III regulations is to ensure that persons with disabilities have the opportunity to benefit from public accommodations. The various design standards are only the designated means for accomplishing those objectives. The equivalent facilitation exception is an acknowledgment that the federal government does not enjoy a monopoly on good ideas, and that there may be more than one means to accomplish a particular objective. Moreover, given the extraordinary complexities of designing and operating a structure such as the Rose Garden, and the many competing demands and requirements that must be addressed, arena designers and operators must be permitted some flexibility in how they approach particular problems. In addition, DOJ has acknowledged that in some instances an equivalent facilitation may be appropriate so that a designer can comply with both the ADA and state or local building codes. *See* TAM (1994 Supp.) § III–7.2100.[35]

At oral argument, DOJ argued that the "legislative history is quite clear that the equivalent facilitation provision was intended to cover things that were not yet in existence." Jan. 28, 1997 Tr. at 103–04. I do not find the legislative history to be as clear as DOJ contends. Moreover, DOJ sang a different tune at the time it promulgated this regulation:

> A few commenters ... asked the Department to include in the regulations a provision stating that departures from particular technical and scoping requirements of the accessibility standards will be permitted so long as the alternative methods used will provide substantially equivalent or greater access to an utilization of the facility. Such a provision is found in ADAAG 2.2 and by virtue of that fact is included in these regulations.

56 Fed. Reg. 35,544, 35,586 (July 26, 1991). There was no mention in the commentary of any requirement that the alternative methods not have existed at the time the Standards were enacted. Likewise, § III–7.2100 of the TAM does not indicate that alternative methods are limited to new technology. In fact, none of the five examples given in the TAM describe new technology. The TAM also makes clear that "[d]epartures from any provision in ADAAG are permitted so long as equivalent access is provided." *Id.*

DOJ understandably is reluctant to give each designer a license to decide the extent to which it will comply with the ADA regulations, or to revisit issues that already have been decided by DOJ and the Access Board to "strike their own balance." Jan. 29, 1997 Tr. at 41. I do not believe that the threat is as great as DOJ fears. The ADAAG Standards act as a safe harbor. A designer who adheres to the letter of those standards (as interpreted by the courts and DOJ) ordinarily will be in compliance with the ADA regulations, at least with regard to the particular design elements covered by those standards.

By contrast, a designer who chooses to utilize alternative methods that it believes will provide equal or greater access runs the risk that DOJ or the courts will not share his or her enthusiasm. In any enforcement action the burden will be upon the designer to demonstrate that the alternative method qualifies as an equivalent facilitation. *See* TAM (1994 supp.) § III–7.2100. The penalties for guessing wrong can be quite severe, especially for new construction; in extreme cases the court may order a non-compliant structure to be torn down and rebuilt in compliance with ADA standards. That prospect should serve to discourage abuse of the equivalent facilitation exception.

Moreover, many of the standards are not susceptible of an equivalent facilitation. For instance, if the Standards require the provision of 50 wheelchair spaces, the designer may not elect to provide only 25 spaces; that would not be an equivalent facilitation. Furthermore, if DOJ or the Access Board have

---

**35.** Of course, in the event of a truly irreconcilable conflict between the ADA regulations and a state or local building code, the federal law prevails.

considered and rejected certain methods, and decided that they are not an acceptable alternative, then that determination can be reflected in the rulemaking process, either in the text of the rule or the commentary. For instance, in § III–7.2100 of the TAM, DOJ expressly cautioned that "portable ramps are *not* considered equivalent facilitation." (emphasis in original).

With regard to folding companion seats, during oral argument DOJ represented that "the question about whether or not a folding chair was acceptable was specifically considered and rejected in the process of adopting the standards." Jan. 28, 1997 Tr. at 103–04. The court does not recall reading any such discussion in the text of the rule or in the formal response to comments or other commentary published with the proposed standards. The issue may have been discussed within the confines of the agency, but there is no evidence of such a discussion in the public record nor is it apparent from the face of the regulation. Unlike the sightlines issue, the court is not even aware of any extensive informal correspondence regarding the issue.

Lastly, there is no merit to plaintiffs' contention that the Clarin chairs are not an equivalent facilitation because the chairs are not affixed to the ground. The purpose of a "fixed" companion seat is not to be "fixed," but to provide a seat for a companion. An equivalent facilitation is one that provides "substantially equivalent or greater *access to and usability* of the facility." Standard 2.2. Whether the companion seat is bolted to the floor has little to do with its purpose of providing access to and usability of the facility for persons in wheelchairs.[36]

Defendant is entitled to partial summary judgment on the issue of the folding companion seats.

### 5. *Modified Aisle Seats:*

Standard 4.1.3(19) provides that, in addition to the required number of wheelchair spaces, "one percent, but not less than one, of all fixed seats shall be aisle seats with no armrests on the aisle side, or removable or folding armrests on the aisle side."

It is undisputed that defendant has provided the requisite quantity of modified aisle seats. However, plaintiff contends that most of those seats can not be counted towards satisfaction of this requirement because those modified aisle seats are not wheelchair-accessible. Defendant has represented that 14 of the modified aisle seats are located on wheelchair routes. To reach the remaining 177 modified aisle seats, the patron must traverse from one to three steps. Plaintiff contends that all of the modified aisle seats must be wheelchair-accessible.

Standard 4.1.3(19) does not expressly require that these modified aisle seats be wheelchair-accessible. However, in the commentary explaining this Standard, the Access Board explained that this provision was intended:

"to increase accessibility for wheelchair users who wish to transfer to a fixed seat and individuals with other mobility impairments for whom armrests present an obstacle. These seats must be identified by a sign or marker and a sign must be posted in the ticket office notifying patrons of their availability."

56 Fed. Reg. 35,408, 35,425 (July 26, 1991). The Access Board also explained that these modified aisle seats were to be in lieu of an

---

**36.** Notwithstanding defendant's dubious statement that "we did it in response to the request of the disabled community," Jan. 28, 1997 Tr. at 92, the argument that folding chairs constitute an equivalent facilitation appears to be an eleventh-hour argument conceived by lawyers. The record suggests that defendant originally chose the Clarin folding seats because defendant intended to seat the companion in the aisle behind the wheelchair. The companion seat had to be readily movable so the aisle could be used for ingress and egress by wheelchairs. When the companion seat design was modified to a side-by-side format, defendant kept the folding seats in the new design. The views of the disabled community do not appear to have been a factor in those decisions. Nonetheless, I do not find defendant's motives to be controlling here. Regardless of why defendant originally decided to use folding chairs, the question before the court is whether that is a permissible means to satisfy the requirement for provision of a companion seat.

equivalent number of wheelchair spaces that had been required under some other accessibility codes. Instead of requiring two percent of the seating to consist of wheelchair spaces, as was required under some codes, the Access Board decided to require one percent of the seating to be wheelchair spaces and one percent to be modified aisle seats.[37] *Id.* Although neither the commentary nor the text of the final rule expressly state that these modified aisle seats must be wheelchair-accessible, such a requirement is implicit, at least as to those seats that are intended to be occupied by wheelchair users.

The Access Board commentary indicates that these spaces also are intended for use by other persons who have mobility impairments but do not require the use of a wheelchair. The latter appears to be a reference to persons who use crutches or a walker, or who need to sit with one leg outstretched (*e.g.,* following knee surgery or a broken leg) or who, for various reasons, have difficulty reaching a seat in the middle of a row. The fact that such persons do not require a wheelchair suggests that many of these individuals may be able to navigate from one to three stairs, although some (*e.g.,* those who use a walker) may not be as mobile.

In adopting the language suggested by the Access Board, DOJ briefly summarized some of the design Standards. With respect to the modified aisle seats, DOJ explained that they were intended "for persons with mobility impairments who prefer to transfer from their wheelchairs to fixed seating." 56 Fed. Reg. 35,544, 35,587 (July 26, 1991). That implies that these aisle seats must be wheelchair-accessible.

DOJ elaborated upon this requirement in the TAM, advising designers that for new construction "at least one percent of all fixed seats must be aisle seats without armrests (or with removable armrests) to allow for transfer from a wheelchair." § III–7.5180 (1993 ed.) Again, the implication is that the seats are for the use of persons in wheelchairs. The same purpose is expressed in another section of the TAM:

> [I]n order to facilitate seating of wheelchair users who wish to transfer to existing seating when fixed seating is provided, a public accommodation must provide, to the extent readily achievable, a reasonable number of seats with removable aisleside armrests. Many persons who use wheelchairs are able to transfer to fixed seating with this relatively minor modification. This solution avoids the potential safety hazard created by the use of portable chairs, and it also fosters integration.

TAM § III–4.4600 (1993 ed.) [38]

Although the requirement could have been stated more explicitly in the Standard itself, both DOJ and the Access Board consistently have interpreted Standard 4.1.3(19) to require that either some or all of the modified aisle seats be accessible to persons in wheelchairs. Unfortunately, neither agency has defined what percentage of these seats must be wheelchair-accessible. One possible inference is that all of the modified aisle seats must be located on a wheelchair-accessible route. However, defendant has argued—and the court agrees—that such a requirement may be impossible to satisfy, at least in a large indoor arena such as the Rose Garden.

In some venues, where there are no stairs, it may be possible for all of the required modified aisle seats to be located on a wheelchair-accessible route. That is not the case in large arenas and stadiums, which as a rule

---

37. The Access Board commentary refers to the latter as "accessible aisle seats." *Id.* It is unclear whether the Access Board used that term as a synonym for "wheelchair-accessible," or whether the absence of the modifier "wheelchair" was intentional, and the term "accessible" merely referred to the modifications to the armrests. Standard 3.5 defines the term "accessible" as the state of being in compliance with the Standards. That circular definition is of no use in determining what is required to comply with the Standards.

38. This particular discussion concerned the requirements for removing barriers in *existing construction.* The Rose Garden is subject to the rules for new construction. Consequently, the "readily achievable" qualification is inapplicable here, since new construction must meet the highest standards. *See* H.R.Rep. No. 101–485(III) at 60 (explaining distinction between the two standards), *reprinted at* 1990 U.S.C.C.A.N. 445, 483, 485–86. In contrast to existing construction, there is no cost defense to the requirements for new construction. TAM § III–5.1000.

tend to be more steeply pitched. In such structures, the only aisle seats that are wheelchair-accessible are those immediately adjacent to a vomitory.[39] The remaining aisle seats are accessible only via stairs. Consequently, the potential quantum of wheelchair-accessible aisle seats is determined by the number of vomitories in the structure. By definition, there can be no more than two modified aisle seats per vomitory, one on either side of the aisle. Therefore, a minimum of 96 vomitories are needed to provide 191 modified aisle seats on wheelchair-accessible routes. Even that is not sufficient, however, because some of these wheelchair-accessible locations already are utilized for traditional wheelchair spaces, which also must be immediately adjacent to a vomitory.

After subtracting those wheelchair spaces, it is unlikely that there will be an additional 191 locations remaining that are immediately adjacent to vomitories so that each of the modified aisle seats can be reached without traversing any stairs.[40] Defendant therefore has placed many of the modified aisle seats within one to three steps of a vomitory. That may be within the range of many individuals who walk with the aid of crutches or a walker. Unfortunately, neither party presented any evidence on that question. The record also does not disclose whether defendant could have located more than 14 (though less than 191) modified aisle seats on wheelchair-accessible routes. In view of those deficiencies in the record, neither side is entitled to summary judgment at this time.

A related question is whether the concept of wheelchair "transfer" seats is even practical at all in a large arena such as the Rose Garden. The theory is that the wheelchair user will transfer from the wheelchair into a modified aisle seat. However, that leaves an unresolved problem: what to do with the empty wheelchair during the event.[41] Leaving the wheelchair in the aisle or against a wall might be a workable solution in facilities that have sufficient clear space, but it is not a viable option in the Rose Garden. With thousands of patrons attempting to navigate the narrow aisles, a wheelchair impeding the circulation pattern would represent a safety hazard.

In theory, a storage area could be set aside behind each modified aisle seat. However, that likely would mean the loss of an entire row of seats for each pair of modified aisle seats—and there are 191 of those seats.[42] That represents a substantial revenue loss, based solely upon the possibility that a patron may want to transfer from a wheelchair into a regular seat instead of using the wheelchair spaces that the arena operator already is required to provide.

Plaintiffs and DOJ contend that the arena operator must provide storage rooms for wheelchairs. If it were feasible to build storage areas into the vomitories themselves, so there would be a storage area within a few yards of each "transfer" seat without losing an entire row of seats, then that might be a workable solution (though that concept is one that seemingly must be incorporated into the original design of the building.) Otherwise, someone (*i.e.*, the arena operator) must

**39.** A "vomitory" is the opening that leads from the outer concourse into the seating bowl. It is through the vomitories that spectators enter and exit the seating area.

**40.** It is not necessary to conduct a trial on this issue, because plaintiff has not furnished evidence from which a reasonable fact finder could reach a different conclusion.

**41.** The same issue may arise with other mobility devices such as walkers.

**42.** There are several reasons why the addition of a wheelchair storage area behind the "aisle transfer seats" likely would mean the loss of the equivalent of an entire row of seats. First, although some wheelchairs can be folded when not in use, other wheelchair designs lack that capability, particularly motorized wheelchairs. The storage area must be large enough to accommodate either model. Second, although the stored wheelchair would occupy only the width of a single seat, no other seats could be placed in the "row" occupied by that storage area. That is because (1) the wheelchair storage may block access to the remainder of that row, and (2) in order for the aisle-transfer seat to be wheelchair-accessible, both rows would have to be at approximately the same elevation, hence the view from any seats in the rear row (*i.e.*, the row that contains the storage area) are likely to be obstructed by persons sitting in the front row (*i.e.*, the row that contains the modified aisle seat.)

transport each wheelchair to the secure storage area, and retrieve the wheelchair each time the patron desires to go to the restroom, or to a concession stand, or to use a pay phone, or to exit the building.

In the commentary that was published when DOJ adopted Standard 4.1.3(19), DOJ interpreted that Standard as requiring that "when a person in a wheelchair transfers to existing seating, the public accommodation *shall* provide assistance in handling the wheelchair of the patron with the disability." 56 Fed. Reg. 35,544, 35,572 (July 26, 1991) (emphasis added).[43]

Perhaps such a policy would be feasible in a smaller venue such as a meeting hall or movie theater. It is quite a different story in a large arena with several hundred "transfer" seats which—by law—must be dispersed throughout the arena. Even assuming that storage and retrieval of the wheelchair can be accommodated by the existing ushers, the court can envision a number of other issues associated with "transfer" seats. For instance, is the arena operator liable for damage to or loss of the wheelchair while in the operator's custody? Is the arena operator liable for false imprisonment if an usher forgets to retrieve a wheelchair, and the patron is unable to leave his or her seat? [44]

Perhaps these obstacles can be surmounted by additional regulations (limiting liability), innovative design (storage areas built into vomitories), or modern technology (*e.g.*, providing each patron in a transfer seat with an electronic device with which to summon an attendant to store or retrieve the wheelchair.) Nonetheless, having reviewed the regulations, the commentary, the TAM, and the record in this case, the court finds little evidence that the various issues associated with "wheelchair transfer seats"—and in particular, how the requirement is to be applied in the real world—have fully been considered by the Access Board and DOJ, or that adequate guidance is offered to arena designers and operators to help them to comply with the regulations governing such "transfer seats."

For the reasons stated earlier, I am denying summary judgment on this issue for either side. The parties will be given a further opportunity to enlighten the court as to the intent of the rule and whether it is possible for defendant to more fully comply with its mandate. I also will consider whether any changes should be made to the ticket sale policies for modified aisle seats.[45]

---

43. In its Technical Assistance Manual, DOJ seemed to retreat somewhat from that position:

> In situations when a person who uses a wheelchair transfers to existing seating, the public accommodation *may* provide assistance in handling the wheelchair of the patron with the disability.

TAM § III–4.4600 (1993 ed.) (emphasis added). "Shall" and "may" are very different standards. The court also observes that DOJ's brochure entitled "Accessible Stadiums" states only that one percent of all fixed seats must be modified aisle seats. There is no mention of any requirement that these aisle seats also be wheelchair-accessible, or that the stadium provide storage areas for wheelchairs and attendants to store and retrieve the wheelchairs. In the instant litigation, DOJ has asserted that public accommodations must provide wheelchair storage if "doing so would be a reasonable modification of the facility's practices and procedures." United States' Responses to Questions at 5. That begs the question of whether it is required in this particular instance, and whether the public accommodation must provide attendants to transport and retrieve the wheelchair.

44. The court also observes that two of the objectives sought by the plaintiffs and DOJ in this lawsuit—aisle "transfer" seats and lines of sight over standing spectators—appear to be mutually incompatible. If wheelchair patrons use modified aisle seats that are part of conventional seating rows—and therefore are not elevated—they cannot simultaneously obtain a line of sight over standing spectators (except perhaps to the extent that the adjacent aisle may provide some limited relief.)

45. In response to the court's questions, defendant has indicated that ticket sale policies for the modified aisle seats are substantially similar to those for wheelchair spaces. As each ticket category for an event is sold out, the modified aisle seats are released for sale to the general public. This policy implicates some of the same concerns that have been raised regarding wheelchair spaces, albeit to a lesser degree due to the absence of infilling.

Defendant also represented that the Trail Blazers retain "at least two modified aisle seats per game" to accommodate day of event demand and "emergency seats." Defendant's Submission in Response to the Court's Request of August 21, 1997. The latter number stands in stark contrast to the 191 modified aisle seats that the Trail Blazers are required to make available to

Regardless of the ultimate disposition in this case, DOJ and the Access Board should revisit this Standard and make appropriate revisions. Arena designers (and judges) should not be forced to speculate as to the law's intended operation.

### 6. *Line of Sight Over Standing Spectators:*

Plaintiffs contend that the Rose Garden violates Standard 4.33.3 because the arena does not provide wheelchair patrons with a line of sight over standing spectators.[46] Standard 4.33.3 provides that:

> Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public.

DOJ presently interprets Standard 4.33 to require that:

> In addition to requiring companion seating and dispersion of wheelchair locations, ADAAG requires that wheelchair locations provide people with disabilities lines of sight comparable to those for members of the general public. Thus, in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide lines of sight over spectators who stand. This can be accomplished in many ways, including placing wheelchair locations at the front of a seating section, or by providing sufficient additional elevation for wheelchair locations placed at the rear of seating sections to allow those spectators to see over the spectators who stand in front of them.

1994 TAM Supplement at 13. However, by itself the TAM does not impose any legal obligations. The TAM was not adopted in accordance with the notice and comment procedure established by the APA for new substantive rules, and it does not have the force of law. *Schmidt v. Safeway,* 864 F.Supp. 991, 1001 (D.Or.1994). Rather, the TAM is merely DOJ's interpretation of what is already required by the ADA and its implementing regulations. Consequently, the court must determine whether the TAM is a permissible interpretation of those existing laws.

For purposes of analyzing this claim, I will consider three distinct issues: (1) whether DOJ *could* require that wheelchair users be provided with a line of sight over standing spectators, (2) whether such a requirement actually does exist and whether it is binding upon this defendant, and, (3) whether defendant has any equitable defense to the enforcement of such a requirement.

### A. Whether DOJ *could* Require that Wheelchair Users be Provided with a Line of Sight Over Standing Spectators.

The underlying facts are not seriously disputed. During many sporting events, such as basketball and hockey, spectators routinely stand (if they are able) during the most important moments in the game. At the Rose Garden, this behavior is actively encouraged by messages on the scoreboard that urge spectators to show their support for the home team by standing. During other events such as concerts, spectators often stand throughout the entire event. Spectators who use wheelchairs typically are unable to stand. As a result, their view of the event is substantially or entirely obstructed. Instead of seeing the concert, or the goal or winning basket, patrons seated in wheelchairs at the Rose Garden [47] typically can see

---

the public. While there is room to debate the reasons for the disparity, at the moment there seems to be a vast gulf between the actual demand for modified aisle seats (and wheelchair spaces) at the Rose Garden and what the law requires arena operators to provide. That is a concern which the Access Board and DOJ may wish to address.

**46.** The wheelchair locations on Level 7 may provide a line of sight over standing spectators.

Defendant contends they do, while plaintiffs apparently dispute that claim. This might present a factual dispute, but it is not material in view of my earlier rulings regarding the Level 7 spaces.

**47.** The affidavits furnished by plaintiffs indicate that the make-shift wheelchair seating at the old Portland Coliseum provided far superior sightlines compared to the wheelchair seating at the newly constructed Rose Garden.

only the backs (or backsides) of those standing in front of them.

Defendant argues that the views of some ambulatory patrons are similarly obstructed, and complain that what plaintiffs really seek is not equality but preferential treatment. That argument misses the mark. *See Paralyzed Veterans,* 950 F.Supp. at 400 n. 16 (rejecting identical argument), *aff'd,* 117 F.3d 579. As Judge Hogan correctly observed, ambulatory spectators have the option of standing with the rest of the crowd and can thereby recapture most of the lost view. *Id.* Unless the spectator is unusually short or the person in front is quite tall, the loss of view is not total. Moreover, ambulatory patrons can move around or angle their bodies to obtain a better view, or stand on their chairs. Small children may be held aloft by their parents. In addition, for children the view blockage is likely to be only temporary, since they will grow taller during the coming years.

By contrast, spectators in wheelchairs typically do not have any of those options, nor is this just a temporary phase—such as childhood—that they are likely to grow out of. The view of a typical wheelchair patron at the Rose Garden is equivalent to that of an ambulatory spectator who is 42 inches tall (*i.e.*, three feet, six inches.) Allison Depo. at 148.[48] While some ambulatory spectators occasionally have an obstructed view, that experience is the rule, rather than the exception, for those who attend Rose Garden events in a wheelchair. It is no answer to say that some ambulatory spectators may also have obstructed sightlines. Even assuming that wheelchairs users would enjoy a slightly better sightline than some ambulatory spectators, that is preferable to the alternative suggested by defendant, which is to provide wheelchair users with sightlines that are guaranteed to be the worst in the house. In no way can the latter be construed as "comparable" sightlines. *Cf. Paralyzed Veterans,* 950 F.Supp. at 400 n. 16.

Compliance with the ADA may require more than the provision of nominally "identical" facilities for customers with disabilities. There is a difference between *physically* identical facilities and *functionally* equivalent facilities. If defendant provided "identical" men's and women's restrooms in the Rose Garden, each containing two toilet stalls and seventeen urinals, few would argue that the facilities were functionally comparable notwithstanding their physical similarity. The benefits and services derived by one group would be substantially less than the benefits and services derived by the other.

The same logic applies when analyzing compliance with the ADA. *See* 28 CFR § 36.202(b) (public accommodation must afford persons with disabilities an equal opportunity to benefit from the goods, services, or facilities). Indeed, if the ADA required only that public accommodations provide physically identical facilities for both ambulatory patrons and those in wheelchairs, then there would be no need to provide ramps and elevators; both groups would be given an "equal opportunity" to use the stairs.

Even before Congress enacted the ADA, it was comparatively rare for the owner of a public accommodation to stand on the front steps of the building holding a sign which read "no wheelchairs allowed." No sign was necessary. The imposing row of steps in front of the building already communicated the message that persons in wheelchairs were not welcome. Accordingly, the ADA requires more than merely refraining from active discrimination, *e.g.,* "you are forbidden to enter this building because you are in a wheelchair." The operator of a public accommodation may also be required to take affirmative steps to ensure that the "opportunity" to patronize the facility is a meaningful one. *See* H.R.Rep. No. 101–485(II) at 104 (May 15, 1990), *reprinted at* 1990 U.S.C.C.A.N. 267, 387. As a general rule, the objective of Title III is to provide persons with disabilities who utilize public accommodations with an experience that is functionally equivalent to that of other patrons, to the extent feasible given the limitations imposed by that person's disability. *See* 28 CFR §§ 36.202, .203, .302.

DOJ reasonably could have concluded that providing spectators in wheelchairs with lines of sight that are *physically* identical to those

---

48. Mr. Allison is a senior project architect for Ellerbe Becket, which designed the Rose Garden.

of ambulatory spectators often does not provide the wheelchair user with a *functionally* equivalent experience. Such facilities may be facially neutral but in practice have a disparate impact upon those in wheelchairs. For that reason, it may be necessary in some instances to provide enhanced lines of sight so that those who watch the event from a wheelchair may obtain a benefit comparable to that received by ambulatory spectators.[49]

To the extent this constitutes "preferential" treatment, the class of wheelchair users is always open to new members. However, the court has not observed—and does not anticipate—a rush of volunteers choosing to have their legs amputated so they may watch a basketball game from a wheelchair and thereby enjoy "preferential" sightlines. If actions speak louder than words, then it would appear that the "benefits" of being dependent upon a wheelchair may not be so substantial after all.

In summary, DOJ reasonably could have concluded that lines of sight over standing spectators are necessary during events at which spectators are expected (or even encouraged) to stand so that those who watch the event from a wheelchair may obtain a benefit comparable to that received by most ambulatory spectators. The ADA provides ample legal authority to support such a requirement. Indeed, all of the efforts that have been made to ensure accessible entrances, restrooms and concession stands at the Rose Garden are of little consequence if wheelchair users won't attend events at the

Rose Garden because they cannot see the event that they paid $65 to watch.

## B. Whether such a Requirement *does* Exist, and Whether it is Binding Upon this Defendant.

Although the ADA clearly would support a requirement to provide wheelchair users with sightlines over standing spectators in certain situations, the more difficult question is whether such a requirement does in fact exist, and whether defendant was subject to that requirement when it built the Rose Garden. The only courts to have considered the issue (in the context of other arenas) have reached different conclusions. Judge Thomas Hogan, of the District of Columbia, upheld DOJ's interpretation of Standard 4.33.3 as articulated in the 1994 TAM supplement. *Paralyzed Veterans*, 950 F.Supp. at 398. Judge Hogan's decision was affirmed by the DC Circuit, though the court considered it to be a close question. *Paralyzed Veterans*, 117 F.3d at 579, 587.

By contrast, Judge Joseph Irenas of the District of New Jersey concluded that the builder of a facility in which construction commenced before DOJ published its formal interpretation of Standard 4.33.3 was not required to provide sightlines over standing spectators. *Caruso v. Blockbuster–Sony Music Entertainment Centre*, 968 F.Supp. 210 (D.N.J.1997).[50] It is undisputed that construction of the Rose Garden commenced before DOJ published the final version of the 1994 TAM supplement.

---

**49.** The ADA does not require a public accommodation to "fundamentally alter the nature" of the goods or services being provided. 28 CFR § 36.302(a). However, it is essential to accurately identify the principal goods or services that are being provided, and to distinguish them from (1) services that are merely *collateral* to the primary goods or services (*e.g.*, restrooms at a concert hall, the reason for attending being the concert, not the restroom) and (2) the *means* for perceiving those services (*e.g.*, hearing, seeing, closed captioning, assistive listening devices), both of which a public accommodation may, in some instances, be required to alter in order to facilitate use of the facility and receipt of the principal goods and services by persons with disabilities. Requiring the basket to be lowered to 54 inches so that wheelchair users can play in the

NBA might "fundamentally alter the nature" of the entertainment (*e.g.*, a professional basketball game) being provided. By contrast, requiring the Rose Garden to provide an unobstructed line of sight for spectators in wheelchairs does not "fundamentally alter the nature" of the entertainment being provided, hence § 36.302(a) does not preclude the establishment of such a requirement.

**50.** Shortly before the instant opinion was issued, a decision was issued in a third case. Judge Tunheim, of the District of Minnesota, Fourth Division, found the *Paralyzed Veterans* opinion to be more persuasive than *Caruso*. *United States v. Ellerbe Becket, Inc.*, 976 F. Supp. 1262 (D. Minn. 1997).

The central question in each of these cases was whether the 1994 TAM supplement was a valid interpretive regulation, explaining DOJ's interpretation of a regulation that already existed—as the *Paralyzed Veterans* courts each concluded—or whether the TAM supplement was an invalid attempt to promulgate a new legislative [51] regulation that did not previously exist, as the *Caruso* court held. Although this court, of necessity, must decline to follow at least one of these decisions, the court nonetheless has found each of these thoughtful opinions to be helpful in analyzing the motions in the instant case.

### (i) Does Timing Matter?

I reject defendant's contention that the date on which construction commenced, or the progress that defendant had made in completing the seating bowl, somehow determines the validity or applicability of the line of sight requirement.[52] It is true that the defendant in *Paralyzed Veterans* did not finish the design of the DC arena until a month after DOJ published the TAM supplement that explicitly interpreted the phrase "lines of sight comparable to those for members of the general public" in the ADA regulations to require sightlines over standing spectators. By contrast, the defendant in *Caruso* commenced construction before the TAM supplement had been published. Likewise, the defendant here contends that it already had crossed the Rubicon and substantially completed the seating bowl before the TAM supplement was published in late 1994.

The *Caruso* court suggested that the difference in timing was significant, an argument that the defendant here also embraces. However, I conclude that—for purposes of

determining whether the Rose Garden was subject to DOJ's interpretation of Standard 4.33.3—it is irrelevant whether defendant was aware of DOJ's interpretation prior to the date when construction of the Rose Garden commenced or when the seating bowl was substantially completed.

The DOJ regulations at issue, including Standard 4.33.3, were enacted on or about July 26, 1991. Defendant concedes, as it must, that the Rose Garden was subject to those regulations. Consequently, if Standard 4.33.3 requires arena operators to provide wheelchair users with sightlines over standing spectators—as DOJ contends—then that has been the law ever since July 26, 1991, and the Rose Garden was subject to that requirement.

Perhaps, as defendant contends, the 1994 TAM supplement was the first time that DOJ publicly declared its present interpretation of Standard 4.33.3. Even if that were true,[53] the meaning of a regulation does not vary depending upon which DOJ official or which President is in office, nor must enforcement of a regulation await the agency's publication of a formal opinion interpreting that regulation. Moreover, Congress expressly provided that "failure in the development of dissemination of any technical assistance manual authorized by this Section" does not excuse compliance with the ADA. 42 U.S.C. § 12206(e).

Either Standard 4.33.3 requires newly constructed indoor arenas to provide wheelchair patrons with a line of sight over standing spectators—and has imposed such a duty ever since it was adopted in July 1991—or

**51.** Some courts use the terms "substantive regulation" and "interpretive regulation." However, that can be confusing, since the term "substantive" also is used to distinguish between substantive and "procedural" rules. For that reason, I have adopted the nomenclature proposed by Davis, which classifies regulations as being either "legislative" or "interpretive." *See, generally,* Davis & Pierce, *Administrative Law Treatise* (3d ed.1994), chap. 6.

**52.** Assuming, of course, that the facility in general is subject to the new construction requirements in Title III.

**53.** For the moment, I will assume that is true. However, there is uncontroverted evidence in the

record which establishes that during 1993 and 1994, in communications to persons involved in the design or construction of new arenas or outdoor stadiums—including defendant's architect and later defendant itself—DOJ repeatedly asserted that the line of sight requirement meant line of sight over standing spectators, and that DOJ intended to enforce such a requirement. The evidence in the record indicates that, although it did not discuss the issue in the original TAM, DOJ has otherwise asserted and enforced its position regarding lines of sight since at least early 1993, before ground was broken on the Rose Garden.

else Standard 4.33.3 does not impose such an obligation even today. If the "line of sight" requirement did not already exist, then DOJ could not create such a requirement in 1994 merely by adopting an interpretive regulation. That result could be accomplished only through a legislative regulation promulgated in accordance with the procedures established in the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, or perhaps through adjudication if applicable. *Cf. NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 290–95, 94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134 (1974) (discussing circumstances under which agency may announce new rule by adjudication.).

Consequently, it is not possible to harmonize the decisions in *Caruso* and *Paralyzed Veterans* by focusing upon the difference in the timing of the two projects. If the requirement for sightlines over standing spectators was inapplicable to the entertainment center in *Caruso*, then it likewise was inapplicable to the arena in *Paralyzed Veterans*, and vice versa.

Of course, even if the 1994 TAM supplement is determined to be a valid interpretive regulation, the courts may be reluctant to enforce, *post hoc*, an interpretation of a regulation that did not become apparent until after the defendant had committed itself to a particular course of conduct.[54] However, such equitable concerns do not invalidate the regulation, *per se*. Rather, those concerns are more properly considered in the context of an equitable defense, or at such time as the court decides what relief to order. That is particularly true in private ADA litigation where the potential remedy is limited to prospective injunctive relief, as opposed to damages, civil penalties, or criminal sanctions.

### (ii) Was the 1994 TAM Supplement a Valid Interpretive Regulation?

■ As a general rule, an agency's interpretation of its own regulations must be sustained unless "plainly erroneous or inconsistent" with the regulation. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994). The analysis here is complicated by the fact that there allegedly were two agency interpretations: one that was announced at the time the regulation was promulgated in July 1991, and a second interpretation formally published in the TAM supplement in Novem-

---

**54.** Although the law does not change merely because an interpretation of that law is announced for the first time, there are circumstances where, either for prudential or equitable reasons, the courts have declined to give retroactive effect to a newly announced interpretation of an existing law. *Cf. Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (declining to give retroactive effect to constitutional principles first announced after criminal conviction became final); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir.1993) (public officials may be entitled to immunity for conduct that did not violate clearly established law at the time of the events in question); *Pfaff v. U.S. Dept. of Housing & Urban Devel.*, 88 F.3d 739 (9th Cir.1996) (new standard was radical departure from agency's prior interpretation of the law, public had relied substantially and in good faith upon prior interpretation, and landlord was subject to fine or damages for violating standard that had not yet been announced.)

On the other hand, new interpretations of law frequently are announced for the first time in a pending action. *See, e.g., Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (when Supreme Court decides a case and applies the new legal rule established in that case to the parties before it, then all other courts must apply that rule to all pending cases, even though the events in question occurred pri-

or to the date the Supreme Court first announced the new rule.) Indeed, that is how law was—and continues to be—made under the common law system. A person may not know that a new tort or cause of action even exists until an action is filed against that person which contains such claims, and the claim is not dismissed by the court. Likewise, agencies traditionally have created policy and interpreted rules by means of adjudication. *See, e.g., SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

That the interpretation is first announced in a pending case typically does not preclude its application in that same case. *Id.* Indeed, such retrospective application arguably is the essential element that distinguishes policymaking by adjudication from legislative rulemaking which must comply with notice and comment procedures. *See Bowen v. Georgetown University Hospital*, 488 U.S. 204, 220–21, 109 S.Ct. 468, 477–78, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring). *See also* Davis & Pierce, *Administrative Law Treatise* § 6.6 (an agency may announce a new "rule" in an opinion resolving an adjudicatory dispute and apply the "rule" retroactively to the parties before it.) *Cf. Georgetown University Hospital*, 488 U.S. at 209, 109 S.Ct. at 472 (absent Congressional authorization, agency lacked authority to promulgate new legislative rules with retroactive application.)

ber 1994. When an agency announces a new interpretation of a regulation that effectively repudiates or substantially departs from the agency's previous interpretation of that same rule, that action is tantamount to an amendment of the rule itself and requires notice and comment rulemaking. *See National Family Planning and Reproductive Health Ass'n, Inc. v. Sullivan,* 979 F.2d 227 (D.C.Cir.1992); *Orengo Caraballo v. Reich,* 11 F.3d 186, 196 (D.C.Cir.1993).[55] Accordingly, whether the disputed section of the 1994 TAM supplement was a valid interpretive regulation hinges upon whether the agency previously had adopted a significantly different interpretation of Standard 4.33.3.

To support its contention that DOJ previously had construed Standard 4.33.3 as not requiring lines of sight over standing spectators, defendant first points to a speech by Irene Bowen, deputy chief of the Public Access Section of DOJ, at a conference of baseball stadium operators following the November 1992 presidential election. The court attributes little weight to that speech. Agencies ordinarily make policy through official actions, be it in the form of substantive or interpretive regulations or by way of adjudication or enforcement actions. Post-election remarks made by a mid-level official in a lame duck administration at a convention of baseball stadium operators do not constitute a binding interpretation of agency regulations.

Defendant's reliance on the affidavit of John R. Dunne also is flawed. Mr. Dunne was the Assistant Attorney General for Civil Rights in 1991, during the time when DOJ enacted the design Standards. In fact, it was Mr. Dunne who signed the original notice of proposed rulemaking issued by DOJ. 56 Fed. Reg. 7452, 7495 (Feb. 22, 1991). He has now proffered an affidavit expressing his views on how DOJ interpreted Standard 4.33.3 during 1991 and 1992. I question whether DOJ even had occasion to interpret Standard 4.33.3 during those years, since the new construction requirements applied only to buildings that were occupied after January 26, 1993, 28 CFR § 36.401(a)(2), which was six days after Mr. Dunne left office. Nor does the record disclose a single project to which the standard was applied during his tenure at DOJ.

In any event, agencies do not formulate policy or formally interpret administrative regulations through post-hoc affidavits from former agency officials, on behalf of a private litigant, expressing the affiant's personal view on how the agency previously interpreted the regulation. The question is not whether DOJ had privately reached a different interpretation of Standard 4.33.3 than the one the agency now articulates, but whether it had formally and publicly adopted such a contrary interpretation, whether by issuing interpretive regulations, asserting a position in litigation, or otherwise.

Defendant's final argument is the most substantial: whether DOJ adopted the commentary published by the Access Board to accompany the final ADAAGs.

### (a) Did DOJ Adopt the Access Board Commentary?

As noted earlier, when Congress passed the ADA, it painted with a broad brush, leaving many of the details to be determined by subsequent rulemaking and adjudication.[56]

---

**55.** A different rule applies when an agency announces a new interpretation of a *statute,* as opposed to a new interpretation of a regulation. *Cf. Chief Probation Officers of California v. Shalala,* 118 F.3d 1327, 1334 (9th Cir.1997) (agency is always free to revise its interpretation of a statute and to issue interpretive regulation announcing that new interpretation) and at 1337 (if new rule purports to interpret statute, then agency must comply with notice and comment procedures only if new rule is inconsistent with an existing legislative regulation having the force of law, as opposed to a prior interpretive rule) (citing *Shalala v. Guernsey Memorial Hospital,* 514 U.S. 87, 100, 115 S.Ct. 1232, 1239, 131 L.Ed.2d 106 (1995).) The difference is that a statute is enacted by Congress, not the agency, hence the agency is not creating new legal obligations but simply recognizing those that already existed. In addition, the notice and comment requirement would be eviscerated if the agency could create new obligations simply by announcing a new interpretation of an existing regulation.

**56.** The legislative history reveals that some members of Congress were uncomfortable with this feature of the ADA. Rep. Douglas protested that:

> Congress is abrogating it[s] constitutional duty by writing vague laws which must be clarified by the Federal courts. Our *responsibility* is to write laws which can be clearly understood

Congress established a special procedure for promulgating regulations to implement Title III. Not later than nine months after July 26, 1990—the date that the ADA became law—the Access Board was to issue "minimum guidelines" for implementing Title III. 42 U.S.C. § 12204(a). These minimum guidelines were intended to supplement and modify the existing minimum guidelines that the Access Board [57] previously had drafted to assist federal agencies in complying with pre–ADA laws such as the Rehabilitation Act of 1973, 29 U.S.C. § 794. *Id.*

Although the Access Board was charged with promulgating a set of guidelines, those guidelines in themselves were of no legal effect. Rather, Congress directed the Attorney General, not later than one year after July 26, 1990, to issue substantive regulations for implementing Title III of the ADA. 42 U.S.C. § 12186(b). Any standards included within those regulations "shall be consistent with the minimum guidelines and requirements issued by the [Access Board] in accordance with section 12204 of this title." 42 U.S.C. § 12186(c).

Congress further provided that, in the event the Attorney General failed to timely promulgate regulations to implement Title III, compliance with the existing Uniform Federal Accessibility Standards ("UFAS") that were in effect at the time the building permit was issued "shall suffice to satisfy the requirement that facilities be readily accessible to and usable by person with disabilities as required by section 12183 of this title," except that if the Access Board had completed its task then compliance with its guidelines "shall be necessary to satisfy the requirement[s]" of section 12183. 42 U.S.C. § 12186(d).

On January 22, 1991—three months before the final deadline established by Congress—the Access Board published its draft of proposed supplemental design guidelines and solicited public comment regarding that draft. 56 Fed. Reg. 2296 (Jan. 22, 1991). The pro-

posed guidelines included a draft version of what would later become Standard 4.33.3, which provided in relevant part that:

> Wheelchair areas shall be an integral part of any fixed seating plan and shall be dispersed throughout the seating area. They shall ... be located to provide lines of sight comparable to those for all viewing areas.

56 Fed. Reg. 2380. This language is identical to the language of an existing standard known as American National Standard Institute ("ANSI") document A117.1–1980. 56 Fed. Reg. 2327. The ANSI standards were themselves the basis for the pre–ADA standard known as the UFAS. *Caruso,* 968 F.Supp. at 217, 49 Fed. Reg. 31,528 (Aug. 7, 1984) (codified at 41 CFR subpt. 101–19.6, App. A).

When it published the draft Title III guidelines, the Access Board attached a separate commentary. The discussion regarding proposed Guideline 4.33.3 states that:

> This requirement appears to be adequate for theaters and concert halls, but may not suffice in sports arenas or race tracks where the audience frequently stands throughout a large portion of the game or event. In alterations of existing sports arenas, accessible spaces are frequently provided at the lower part of a seating tier projecting out above a lower seating tier or are built out over existing seats at the top of a tier providing a great differential in height. These solutions can work in newly constructed sports arenas as well, if sight lines relative to standing patrons are considered at the time of initial design. The Board seeks comments on whether full lines of sight over standing spectators in sports arenas and other similar assembly areas should be required.

56 Fed. Reg. 2296, 2315 (Jan. 22, 1991).

On February 22, 1991, DOJ published a draft of its own proposed regulations for implementing Title III. Some were regula-

---

when reading them—not have another branch of government do our job.

H.R.Rep. No. 101–485(III) at 94 (1990), *reprinted at* 1990 U.S.C.C.A.N. 511 (emphasis in original). His objections did not carry the day.

**57.** The Access Board has 24 members, 11 of whom are representatives of various federal agencies, and thirteen of whom are private citizens appointed by the President. 29 U.S.C. § 792(a)(1).

tions that DOJ itself had drafted, which covered matters other than those being addressed by the Access Board. In addition, DOJ proposed to adopt as its own accessibility standard the draft Access Board guidelines, *"with any amendment made by the [Access Board] during its rulemaking process."* 56 Fed. Reg. 7452, 7478–79 (Feb. 22, 1991) (emphasis added).

The notice published by DOJ on Feb. 22, 1991, did not expressly incorporate the Access Board's commentary. DOJ published a substantial commentary of its own regarding the proposed Title III regulations. 56 Fed. Reg. 7452. However, that commentary was devoted almost entirely to the portions of the regulations that DOJ had proposed in addition to the Access Board guidelines. DOJ did not publish an extensive commentary regarding the proposed guidelines that had been drafted by the Access Board. Moreover, DOJ advised the public that "any comments" regarding the proposed Access Board Guidelines—which DOJ was proposing to adopt as its own Standards—"should be sent to the [Access Board] at the address listed in its [Notice of Proposed Rulemaking]" rather than to DOJ. 56 Fed. Reg. at 7479.

DOJ scheduled four public hearings across the country to gather comments regarding the proposed Title III regulations. These public hearings and DOJ's request for comments appear to have been independent of the Access Board's notice and comment process. *Cf.* 56 Fed. Reg. at 35,409 (July 26, 1991) (Access Board held 14 public hearings around the country, and received 1,865 written comments) and 56 Fed. Reg. at 35,544 (July 26, 1991) (DOJ held 4 public hearings around the country, and received 2,940 written comments, including one comment from a consortium of 511 organizations). However, at all times DOJ was a member of the Access Board, and actively participated in the public hearings held by that Board and also in the drafting of the Access Board's proposed guidelines. *See* 56 Fed. Reg. at 35,586. DOJ also claims to have reviewed and considered *both* the written comments received by

DOJ and also those received by the Access Board, although the scope of the latter review may have been limited. *Id.*

On July 26, 1991—three months after the deadline established by Congress, 42 U.S.C. § 12204(a)—the Access Board published its final guidelines. The Access Board amended the draft of Guideline 4.33.3 to read, in relevant part:

> Wheelchair areas shall be an integral part of any fixed seating plan and shall be *provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public.*

56 Fed. Reg. 35,408, 35,514 (July 26, 1991) (emphasis in original). The italicized language differed from the draft that was published in January 1991, and also differed from the language of ANSI document A117.1–1980 and the UFAS.

Along with its final guidelines, the Access Board published a commentary discussing some of the public comments it had received, the changes that had been made, and the Board's interpretation of the guidelines. With regard to Guideline 4.33.3, the Access Board's commentary states that:

> The requirements in 4.33.3 for dispersal of wheelchair seating spaces have been modified. Wheelchair seating spaces must be an integral part of any fixed seating plan and be situated [58] so as to provide wheelchair users a choice of admission prices and lines of sight comparable to those available to the rest of the public.
>
> \* \* \* \* \* \*
>
> The [prior notice] asked questions regarding row spacing and lines of sight over standing spectators in sports arenas and other similar assembly areas.... Many commenters ... recommended that lines of sight should be provided over standing spectators \* \* \* \* *The issue of lines of sight over standing spectators will be addressed in guidelines for recreational facilities.*

---

**58.** I previously suggested that the phrase "provided so as to provide" in Standard 4.33.3 may have been a clerical error. The commentary accompanying the final rule uses the phrase "sit-

uated so as to provide," and that may have been the language that was intended to have been used in the final rule.

56 Fed. Reg. 35,408, 35,440 (July 26, 1991) (emphasis added). Later that day, DOJ published its own final regulations for implementing Title III. 56 Fed. Reg. 35,544 (July 26, 1991). Those regulations incorporated the language of the final guidelines adopted by the Access Board, but did not expressly adopt the Access Board's commentary. 56 Fed. Reg. 35,605–35,691. The final regulations adopted by DOJ included additional rules on topics that were not addressed by the Access Board. 56 Fed. Reg. 35,593–35,604. DOJ drafted an extensive commentary on those other sections. Portions of that commentary are reprinted at 28 CFR Part 36, App. B.

In both the *Paralyzed Veterans* case as well as the instant litigation, DOJ has asserted that although it adopted, verbatim, the *language* of the Guidelines drafted by the Access Board, it did not adopt the *commentary* published by the Access Board which discussed those Guidelines and therefore is not bound by anything which the Access Board said in that commentary. The *Paralyzed Veterans* court found that argument persuasive. 117 F.3d at 587. Although this court is inclined to give considerable deference to the views of the DC Circuit on matters of federal administrative law, in this instance I respectfully disagree with that Circuit's analysis.

 When promulgating a legislative regulation pursuant to the notice and comment provisions of the APA, an administrative agency ordinarily is required to explain the purpose and justification for the proposed rule and, in its final decision, to respond to significant criticisms of the proposed rule and to explain why the agency decided to adhere to (or to modify) the proposed rule. *See, e.g., Gamboa v. Rubin,* 80 F.3d 1338, 1346, *vacated on jurisdictional grounds,* 101 F.3d 90 (9th Cir.1996); *Reytblatt v. U.S. Nuclear Regulatory Comm'n,* 105 F.3d 715, 722 (D.C.Cir.1997) (agency must respond in reasoned manner to those comments that raise significant problems);

*International Fabricare Inst. v. U.S. EPA,* 972 F.2d 384, 389 (D.C.Cir.1992) (agency is required "to give reasoned responses to all significant comments in a rulemaking proceeding"); Davis & Pierce, *Administrative Law Treatise* (3d ed.1994 and 1996 supp.) § 7.4. If DOJ did not adopt the Access Board's commentary then, in order for the regulations to be valid, the separate commentary published by DOJ must by itself be sufficient to satisfy the notice and comment requirements.

In its response to the court's questions, DOJ asserted that its "commentary on the final rule fully satisfied the requirements" of the APA. United States' Responses to Second and Third Sets of Questions Posed by the Court at 10. I disagree. DOJ's commentary did discuss its decision to adopt the ADAAGs as a whole, as opposed to using some other established standard such as ANSI or UFAS, and DOJ did respond to public comments regarding that particular issue. 56 Fed. Reg. at 35,585–86.[59] DOJ's commentary also contained a brief summary of the Guidelines that it had copied from the Access Board's Guidelines. 56 Fed. Reg. at 35,586–35,589.

However, DOJ did not respond to public comments regarding individual Standards, nor did DOJ explain the agency's reasoning in adopting a specific Standard or why it had rejected alternative language suggested by persons commenting on the proposed Standards. That task was left to the Access Board. *See, e.g.,* 56 Fed. Reg. at 35,587 (in DOJ's view, the substantive comments received regarding the proposed Standards "have been addressed adequately in the final ADAAG. Largely in response to comments, the [Access] Board made numerous changes from its proposal . . .")

The macro-level commentary by DOJ stands in stark contrast to the detailed commentary that the Access Board published discussing the comments it had received regarding each of the proposed guidelines, re-

---

**59.** There appears to have been little room for debate on that topic. Congress expressly mandated that DOJ promulgate regulations consistent with the Guidelines enacted by the Access Board. 42 U.S.C. § 12186(c). Consequently, DOJ did not have the option of rejecting those Guidelines and adopting standards promulgated by some other organization, as advocated in some public comments.

sponding to those comments, and explaining what changes the Board had made (or not made) in response to the comments and the reasons for those decisions. *See* 56 Fed. Reg. 35,408–453.

The notice and comment rules have "never been interpreted to require [an] agency to respond to *every* comment, or to [analyze] *every* issue or alternative raised by comments." *American American Mining Congress v. U.S. EPA,* 907 F.2d 1179, 1187–88 (D.C.Cir.1990) (emphasis added and citation omitted). However, the separate commentary published by DOJ falls far short of the mark. It does not respond to *any* comments or analyze *any* issues or alternatives raised by comments regarding *specific* standards, as opposed to the macro-level question of whether DOJ should adopt this group of standards at all. *Cf. Gamboa,* 80 F.3d at 1346; *United States Satellite Broadcasting Co. v. FCC,* 740 F.2d 1177, 1188 (D.C.Cir. 1984) ("agency need not respond to every comment *so long as it responds in a reasoned manner to significant comments received* ") (emphasis added); *Idaho Farm Bureau Federation v. Babbitt,* 58 F.3d 1392, 1404 (9th Cir.1995) (agency must respond to significant comments which, if adopted, would require a change in the agency's proposed rule).[60]

If the Access Board's response to public comments regarding individual Guidelines was not implicitly incorporated by DOJ, then the agency did not respond to those comments before it adopted the Standards as binding regulations. Admittedly, there may have been little purpose in DOJ responding to comments regarding each individual Standard, if DOJ's Standards had to be consistent with the Access Board's guidelines and DOJ thus had little discretion to alter those Stan-

dards. Nonetheless, in its response to the public comments, the Access Board sometimes offered a limiting interpretation of a proposed Guideline which, in the Board's view, adequately addressed the concerns raised in that comment without the necessity of amending the proposed regulation. The Board also explained why it had established (or not established) certain requirements. Thus the issue here is not just whether the agency allegedly should have responded to public comments regarding the proposed rulemaking but whether an agency is bound by the responses that were in fact given.

This court does not understand how DOJ can simply disavow those limiting interpretations and the other responses by the Access Board to public comments regarding the substance of the ADAAGs/Standards—comments that DOJ, in its notice of proposed rulemaking, had specifically instructed the public to submit to the Access Board rather than to DOJ. 56 Fed. Reg. at 7479. If the Access Board's commentary was not binding upon DOJ, then that commentary and the entire notice and comment procedure were largely an empty exercise. Moreover, by representing that the comments that DOJ had received from the public regarding the proposed rule had been "addressed adequately in the final ADAAG" and by the "numerous changes" that the Access Board had made in response to those comments, DOJ implicitly endorsed the Access Board's response to the comments and the revisions that the Access Board had made in response to those comments.

The court also is influenced by the unusual two-step procedure that Congress mandated here, including a directive that the regulations issued by DOJ be "consistent with" the

---

**60.** *Mt. Diablo Hospital v. Shalala,* 3 F.3d 1226 (9th Cir.1993), is not to the contrary. At issue in that case was the methodology utilized to determine the reasonable cost of providing routine care, which relied in part upon data derived from reports obtained from the Bureau of Labor Statistics (BLS). When the draft rule was published, some health care providers submitted comments critical of the BLS data. The Secretary responded that the BLS data was used because it was the most reliable data available, but did not respond to each specific criticism of that data. The Ninth Circuit rejected a challenge to

the rulemaking procedure, reasoning that (1) the Secretary had adequately responded to the comments, and (2) this particular issue was of "minor significance" in the context of the overall rulemaking. *Id.* at 1234. By contrast, in the case *sub judice* DOJ claims to have made no response to the public comments regarding the substance of the Standards that it was proposing to adopt, even though the Access Board considered those comments to be significant enough to require making "numerous changes" to the proposed regulations. 56 Fed. Reg. at 35,587.

guidelines issued by the Access Board. 42 U.S.C. § 12186(c). This is not a case where the agency elected, on its own, to borrow some language from another agency's work product. DOJ was legally obliged to promulgate regulations "consistent with" the guidelines issued by the Access Board, and by DOJ's own admission the two agencies worked closely together in drafting those guidelines.

■■■■ The court concludes that the Access Board's response to public comments regarding the proposed Guidelines implicitly was adopted by DOJ when the latter proposed to, and then did, adopt as its own accessibility standard the draft Access Board guidelines, *"with any amendment made by the [Access Board] during its rulemaking process."* 56 Fed. Reg. 7452, 7478–79 (Feb. 22, 1991) (emphasis added).

### (b) Other Arguments Regarding Lines of Sight Over Standing Spectators

The parties have devoted considerable effort to debating whether—prior to July 1991—the architectural community customarily designed wheelchair spaces to provide sightlines over standing spectators. It does not appear that there was unanimity in that regard. *Cf. Paralyzed Veterans,* 117 F.3d at 583 (reaching a similar conclusion.) In addition, the parties' submissions often failed to distinguish between the sightlines utilized in designing conventional seating and those utilized in designing wheelchair seating, which are two very different issues.

In any event, the court concludes that this issue is of little relevance. The ADA was intended to usher in a new era for persons with disabilities. Accordingly, whether architects historically designed either conventional seating or wheelchair spaces to provide sightlines over standing spectators is not controlling in determining obligations under the ADA. Defendant also contends that Standard 4.33.3 was derived from an earlier ANSI standard, and should be interpreted similarly. However, in response to public comments the Access Board modified the language of Standard 4.33.3 so that it differs from the earlier ANSI standard, hence that is not a reliable basis for interpreting the

new Standard. The prior standard also was a voluntary standard that had not been interpreted by the courts or enforced by DOJ.

A more serious defect in the parties' contentions is their assumption that the term "lines of sight comparable to those for members of the general public" was referring to the line of sight in relation to standing spectators. After reviewing the text of the final rule, its development, and the various commentaries, the court concludes that Standard 4.33.3 actually was concerned only with the *dispersal* of wheelchair spaces—that those spaces had to be situated so as to provide "a choice of admission prices and lines of sight comparable to those for members of the general public." *Cf.* 56 Fed. Reg. at 2380 (original draft of rule: "Wheelchair areas shall be an integral part of any fixed seating plan and shall be *dispersed* throughout the seating area. They shall ... be *located* to provide lines of sight *comparable to those for all viewing areas.*"); 56 Fed. Reg. at 35,514 (final draft of rule: "Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public."); 56 Fed. Reg. at 35,440 (commentary explaining changes to final draft of rule: "The requirements in 4.33.3 for *dispersal* of wheelchair seating spaces have been modified. Wheelchair seating spaces must be an integral part of any fixed seating plan and be *situated* so as to provide wheelchair users a choice of admission prices and lines of sight comparable to those available to the rest of the public."); and 57 Fed. Reg. 60,612, 60,618 (Dec. 21, 1992, commentary summarizing earlier rulemaking: "The Board received a number of comments which recommended that ADAAG 4.33 (Assembly Areas) be expanded to address other issues such as companion seating, integration and dispersal, and transfer seating. An overwhelming majority of responses favored including a provision requiring lines of sight over standing spectators in sports arenas and other similar assembly areas.... After careful review of comments.... the Board modified the scoping provisions in the final ADAAG for wheel

chair seating, added requirements for transfer seats and companion seating, *and clarified the dispersal requirement....* Additionally, the Board felt it was essential to conduct further research on assembly areas with respect to other recommendations received in response to the rulemaking.") (emphasis added).

I conclude that the term "lines of sight" in the final rule was a reference to the distribution of the seats in the arena or stadium, *e.g.*, views from behind the plate, or first and third base, or the fifty-yard line. That is consistent with the court's determination (and DOJ's position) that it is not enough to simply provide a few token seats in each price range, or to concentrate all of the wheelchair spaces at a large arena in the corners of the end zone. They must be dispersed around the building to provide a choice of sightlines comparable to those available to the general public.[61]

Standard 4.33.3 does not purport to decide whether lines of sight over standing spectators are—or are not—necessary in order to comply with the ADA. On the contrary, the Access Board expressly deferred that decision until a subsequent rulemaking, though implying that there would be such a requirement and only the details remained to be determined. 56 Fed. Reg. at 35,440 ("The issue of lines of sight over standing spectators will be addressed in guidelines for recreational facilities.") Consequently, the interpretation of Standard 4.33.3 expressed in the 1994 TAM supplement is an attempt to impose a new substantive obligation, which may not be accomplished under the rubric of an "interpretive regulation."

**(c) The Access Board's Change of Heart.**

DOJ has furnished this court with an affidavit from the Executive Director of the Access Board, Lawrence W. Roffee, Jr., which states that the Access Board "has acquiesced in, and defers to," DOJ's interpretation of Standard 4.33.3 regarding sightlines over standing spectators. Mr. Roffee did not cite to any formal vote by the Board, or any public notice of the agency's change in position. I decline to recognize a materially different interpretation of a regulation that is first announced in the form of an affidavit proffered during litigation.

If the Access Board wishes to revise its interpretation of ADAAG 4.33.3 to include a requirement for lines of sight over standing spectators, it will have to do so through notice and comment rulemaking. *Cf. Fairfax Nursing Center, Inc. v. Califano*, 590 F.2d 1297, 1301 (4th Cir.1979) ("The Secretary is not free to promulgate regulations and then change their meaning by 'clarifications' or 'interpretations' issued without formal notice and comment."); *Caruso*, 968 F.Supp. at 215 ("the notice-and-comment requirements of the APA cannot be evaded by merely interpreting an existing regulation to cover subject matter consciously omitted from its scope.")

**(d) Whether the ADA itself Provides an Independent Source of Authority for Requiring Lines of Sight Over Standing Spectators.**

If the Access Board had addressed the sightlines issue in a subsequent rulemaking—as it had pledged to do in 1991—we might not be having this debate today. Instead, the years have slipped by while the

---

**61.** The *Paralyzed Veterans* court rejected that interpretation of the "lines of sight" requirement because "the regulation, by requiring facilities with over 300 seats to provide wheelchair seating 'in more than one location' and to give wheelchair users a choice of admission prices, already accomplishes the dispersal objective, and therefore 'lines of sight comparable' must have an added meaning—and the most obvious is an unobstructed view." *Paralyzed Veterans*, 117 F.3d at 583. I respectfully disagree. If it were enough to provide wheelchair spaces in "more than one location" and to give wheelchair users a "choice of admission prices," then defendant would be free to locate virtually all of the wheel-chair spaces on Level 7, so long as it provided a handful of spaces in at least one other location. I also note that plaintiffs' principal complaint regarding the distribution of wheelchair spaces at the Rose Garden is that they are deprived of a choice of sightlines, being largely confined to the corners of the end zone. Plaintiffs contend defendant should also provide wheelchair spaces that offer sightlines from behind the basket, at mid-court, and in the front row for hockey. Thus it would not have been redundant for the Access Board to have used the term "lines of sight" to refer to the distribution of wheelchair spaces.

Access Board has "continued to study this matter." Roffee Decl. ¶ 5. On December 21, 1992, the Access Board published a draft rule covering Title II of the ADA, which pertains to facilities owned by state and local government. In the commentary to that draft, the Access Board observed that:

> During the initial rulemaking, the board requested information on lines of sight at seating locations for persons who use wheelchairs. See 56 Fed. Reg. 2296 (Jan. 22, 1991). The Board received a number of comments which recommended that ADAAG 4.33 (Assembly Areas) be expanded to address other issues such as companion seating, integration and dispersal, and transfer seating. An overwhelming majority of responses favored including a provision requiring lines of sight over standing spectators in sports arenas and other similar assembly areas. A few commenters opposed such a provision because it would either be unenforceable, add significant costs or reduce seating capacity. Some commenters felt that an entry level or front row seating location was acceptable if companion seating was available for more than one person.

> After careful review of comments and of State accessibility codes and standards, the Board modified the scoping provisions in the final ADAAG for wheel chair seating, added requirements for transfer seats and companion seating, and clarified the dispersal requirement. See 56 FR 35408 (July 26, 1991). Additionally, the Board felt it was essential to conduct further research on assembly areas with respect to other recommendations received in response to the rulemaking. The Board is currently sponsoring a research project on accessibility in assembly areas which will provide additional information for future revisions of ADAAG. The Board intends to address the issue of lines of sight over standing spectators in the guidelines for recreational facilities which will be proposed at a future date.

57 Fed. Reg. 60,612, 60,618 (Dec. 21, 1992). In other words, seventeen months after the Access Board had stated its intention to address the sightlines issue, the Board was still thinking about the problem. It even solicited additional comments on the subject. *Id.*

In March 1994, the Access Board informally circulated a draft of a proposed amendment to ADAAG 4.33.3 which would require that only 70 percent of the wheelchair spaces have lines of sight over standing spectators. DOJ responded that the figure should be 100 percent. The Access Board's executive director reassured DOJ that the Access Board had not yet adopted the 70 percent requirement and would consult with DOJ in drafting the final rule. Letter from Lawrence Roffee to Deval Patrick (dated May 4, 1994).

On June 20, 1994, the Access Board published the interim final rule covering facilities owned by state and local government. 59 Fed. Reg. 31,676 (June 20, 1994). In the commentary, the Access Board mentioned that it was conducting research on "the design issues associated with providing integrated and dispersed accessible seating locations.... The Board intends to address issues associated with assembly areas in a separate rulemaking once this research is completed." 59 Fed. Reg. at 31,679. After three years, the Access Board apparently was still thinking about the problem.

On September 21, 1994, the Access Board published its notice of the draft recreational guidelines. 59 Fed. Reg. 48,542. Contrary to the earlier representations, the sightlines issue was not addressed in those guidelines. In response to the court's questions, DOJ reports that the Access Board is still studying the matter, but hopes to issue a draft guideline regarding sightlines over standing spectators some time during 1998.[62] United States' Responses to Second and Third Sets of Questions Posed by Court at 7.

---

**62.** There is no merit to defendant's contention that the Access Board's tentative plans to issue, through notice and comment rulemaking, a standard expressly addressing the issue of sightlines over standing spectators is "irrefutable proof" that the existing Standard does not address the topic. There are many reasons why an agency may voluntarily elect to utilize notice and comment rulemaking: the proposed rule may constitute a material amendment to the old rule, the agency may wish to avoid potential litigation over whether the new rule is legislative or interpretive, or the agency may simply wish to solicit public comment.

Over six years have now passed since the Access Board first announced its intention to address the sightlines issue, and more than seven years have elapsed since Congress directed the Access Board to promptly promulgate the design standards needed to implement Title III of the ADA. The Board has stated that there is strong—even "overwhelming"—support for requiring sightlines over standing spectators. *See, e.g.,* 57 Fed. Reg. at 60,618. To this court's knowledge, the Board has never indicated that it is having second thoughts about the need for such a requirement. On the contrary, the Board expects to issue a draft regulation governing sightlines over standing spectators "sometime in 1998." Roffee Decl. ¶¶ 6–7.

Admittedly there are some aspects of the problem that warrant careful scrutiny: how to balance the conflict between sightlines and integration, what percentage of wheelchair spaces should have enhanced sightlines, safety considerations, and the technical specifications for such sightlines. Still, such studies seemingly could have been completed in a matter of months. Certainly Congress expected that would be the case. The Access Board nonetheless has spent more than six years simply studying the issue.

In the interim, arenas and other public assembly areas are being designed and built around the country with little guidance from the Access Board on what is required in the way of sightlines. These structures will be with us for many years to come. To the extent those structures are being designed and built without sightlines over standing spectators, the Access Board, by its inaction, arguably has perpetuated discrimination against another generation of persons in wheelchairs notwithstanding a congressional mandate to the contrary. The failure to make a decision is itself a decision to maintain the *status quo.* Alternatively, if the Access Board has concluded that it is not feasible, or desirable, to require sight lines over standing spectators, then the agency should publicly disclose that decision.

When confronted with the first opportunity to interpret another statute of great breadth—the National Environmental Policy Act—Judge Skelly Wright observed that the judicial role in that instance was "to see that important legislative purposes, heralded in the halls of Congress, are not lost or misdirected in the vast hallways of the federal bureaucracy." *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 449 F.2d 1109, 1111 (D.C.Cir.1971). In keeping with Judge Wright's admonition, I have considered whether—in light of the Access Board's abject failure to timely address the issue—the DOJ Standards should be viewed as exclusive or whether a duty to provide lines of sight over standing spectators may also be enforced based upon the general non-discrimination provisions of Title III.

Plaintiffs and DOJ contend that the Standards are exclusive only as to those matters that specifically are addressed in those standards. For instance, if the standards require 24 parking spaces for persons with disabilities, this court would not have discretion to require defendant to provide 36 spaces. However, they argue, if a design issue is not addressed in the Standards, then the court must turn to the general non-discrimination requirements of 42 U.S.C. §§ 12182(a) and 12183(a)(1) and 28 CFR § 36.201(a). Some support for that position is found in 28 CFR § 36.213 as well as in the commentary that DOJ published on July 26, 1991, to accompany the final Title III regulations. *See* 28 CFR § 36.213 ("Subparts C and D [which include the design Standards] of this part provide guidance on the application of the statute to specific situations"); 56 Fed. Reg. at 35,563 ("Resort to the general provisions of subpart B is only appropriate where there are no applicable specific rules of guidance in subparts C or D" [the latter being the design Standards] ) and at 35,576 ("To the extent that a particular type or element of a facility is not specifically addressed by the standards, the language of this section is the safest guide.") DOJ also observes that the ADA is a civil rights law, not a building code, and should be interpreted accordingly. United States' Responses to Second and Third Sets of Questions at 13.

Defendant retorts that the Standards are exclusive as to all design issues (as opposed to operational policies). In defendant's view,

the designer need do no more than what is expressly required in the Standards. If a design issue is not addressed in the Standards, then the designer has no Title III obligations with respect to that design element.

Both sides make strong policy arguments, but in the end I am convinced that Congress intended that compliance with the design standards enacted by the Access Board and DOJ for new construction would be deemed to satisfy the Title III obligations with respect to the design of a structure. Congress specifically directed the Access Board to issue guidelines to implement Title III. 42 U.S.C. § 12204(a). The guidelines "shall establish additional requirements, consistent with this chapter, to ensure that buildings [and] facilities ... *are accessible, in terms of architecture and design* ... to individuals with disabilities." 42 U.S.C. § 12204(b) (emphasis added). The DOJ regulations must be "consistent with" the Access Board guidelines. 42 U.S.C. § 12186(c).

Congress also provided that until the DOJ regulations had been issued, compliance with the UFAS (or the ADAAGs, if they had been promulgated) "shall suffice to satisfy the requirement that facilities be readily accessible to and usable by persons with disabilities as required under section 12183 of this title." 42 U.S.C. § 12186(d). The implication is that compliance with the DOJ regulations, once issued, would similarly suffice to satisfy the requirements of § 12183.

In addition, § 12183(a)(1) provides that discrimination includes "a failure to design and construct facilities ... that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection *in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter ...* " The implication is that the standards are the exclusive source for design requirements.

Further support for that position is found in the enforcement provisions of Title III, which require the court to consider as a

mitigating factor "whether the entity could have reasonably anticipated the need for an appropriate type of auxiliary aid needed to accommodate the unique needs of a particular individual with a disability," 42 U.S.C. § 12188(b)(5), but notably omit any mention of whether the entity could have anticipated the design requirement. Again, the implication is that design requirements were to be spelled out in detail in the Standards, while auxiliary aids and operational policies would be covered by more general rules and, therefore, were subject to review on a case-by-case basis.

I also note that ADAAG defines the term "accessible" as "a site, building, facility or potion thereof that complies with these guidelines." ADAAG 3.5 (adopted by DOJ as Standard 3.5). That suggests that compliance with the guidelines constitutes compliance with the ADA requirements for new construction.

The interpretation of the ADA proposed by DOJ and plaintiffs is very problematic. It would allow any person to file an action contending that, in the opinion of this particular plaintiff, a design feature ought to have been included in the Rose Garden or some other new structure. The courts are ill-equipped to evaluate such claims and to make what amount to engineering, architectural, and policy determinations as to whether a particular design feature is feasible and desirable. In addition, although plaintiffs would limit such claims to design issues that DOJ and the Access Board have not expressly addressed, the courts often would have no way of knowing whether the Access Board had considered enacting such a requirement, but decided against it. It also would be difficult for anyone to design a new arena or other structure if the design requirements are subject to being changed retroactively.

I conclude that the Title III Standards promulgated by DOJ are exclusive as to all architectural design issues, and this court may not enforce a requirement for lines of sight over standing spectators on the basis of the general non-discrimination provisions in Title III itself.[63] *Cf. Caruso,* 968

---

**63.** Because the intent of Congress is clear, I do

not defer to DOJ's construction of the statute.

F.Supp. at 216–17 (reaching similar conclusion).

## C. Whether Defendant has any Defense to the Enforcement of a Requirement to Provide Lines of Sight over Standing Spectators.

█ I have concluded that in constructing the Rose Garden defendant was not required to provide lines of sight over standing spectators. However, I also recognize that this is an issue of first impression in this Circuit, and my conclusion is contrary to that of the eminent jurists who decided *Paralyzed Veterans*. If the Ninth Circuit disagrees with my analysis—and concludes that the TAM is a valid interpretive regulation, or that a line of sight requirement may be enforced directly under the ADA even in the absence of a specific Standard—then it will be necessary to decide whether defendant has any other defense to the enforcement of the line of sight requirement. To simplify matters for the Ninth Circuit, and to expedite any appeal, I will set forth in this section of the opinion how I would resolve that issue.

I would hold that defendant has no other defense, equitable or otherwise, to the enforcement of the line of sight requirement. The defense of "structural impracticability" is inapplicable here, since that defense is limited to those rare circumstances involving sites with unusual topographical features that preclude compliance with the Standards. Standard 4.1.1(5)(a). There are no unusual topographical features at the site of the Rose Garden.

Defendant also has asserted an equitable defense, relying on cases such as *Pfaff*, 88 F.3d 739. In *Pfaff*, the Ninth Circuit declined to retroactively enforce an agency's new interpretation of a law when the new interpretation—which was adopted by adjudication—represented a radical departure

See *Chevron U.S.A. Inc. v. Natural Resources & Defense Council, Inc.*, 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") Alternatively, I conclude that DOJ's construction is not "based on a permissible construction of the statute." *Id.*

from the agency's prior interpretation of the law, the petitioner had relied substantially and in good faith upon the prior interpretation, the petitioner was subject to fines or damages for having violated a requirement of which it was unaware and, "most egregiously," the agency had made "inconsistent and misleading misrepresentations" which had "led [the petitioner] down the garden path." *Id.* at 748.

Those circumstances are inapposite here. Defendant is not subject to damages or fines, nor is there any basis for concluding that defendant relied "in good faith" upon an earlier interpretation of the law or that the government "led [defendant] down the garden path." On the contrary, the undisputed evidence [64] demonstrates that defendant was well aware that the law might be interpreted to require lines of sight over standing spectators but chose to ignore that possibility and proceed with construction notwithstanding.

Defendant has represented that the design phase of the Rose Garden commenced in April 1991, which was after the ADA had become law and several months before the Access Board issued the final ADAAGs. Defendant knew that this was one of the first indoor arenas in the nation that would be subject to the requirements of the newly-enacted Title III of the ADA. Defendant was aware that at this early date the courts and the administrative agencies had not explored the full extent of Title III's impact upon the design and operation of indoor arenas. Any competent attorney would have urged his or her client to proceed with great caution, particularly when that client was about to invest a quarter of a billion dollars in a project that would be subject to those new (and as yet untested) standards. Defendant is in fact represented by a number of very capable attorneys.

**64.** There are few material factual disputes, if any, in this case. Rather, the parties mostly disagree as to the legal significance of the undisputed facts. Even where I have denied summary judgment on an issue, it usually is because the record is not adequately developed rather than any genuine factual dispute.

Defendant contends that before passage of the ADA, the term "comparable lines of sight" was generally construed as referring only to "seated" lines of sight, hence defendant reasonably concluded that it was required to do nothing more in designing the Rose Garden. The *Paralyzed Veterans* court concluded that the phrase had not developed a "universally accepted linguistic meaning," 117 F.3d at 583, and the record in the present case supports that determination. To the extent defendant contends that sightlines for wheelchair users have always been computed based upon seated spectators, that is a dubious defense.

It is no answer to say this is the way we've always done it—we've always discriminated against persons with disabilities. A prudent designer would have understood that, in enacting the ADA, Congress intended to do more than to simply maintain the *status quo*. Congress intended to establish higher standards for newly constructed structures, and to change the manner in which buildings were designed so that persons with disabilities could more fully share in the benefits that are available from public accommodations. Had Congress been satisfied with the *status quo*, there would have been no point in enacting the ADA. In a project of this magnitude, it was unreasonable for defendant to simply rely upon the law as it (allegedly) existed prior to the ADA, without acknowledging that a sea change had occurred in the interim and actively attempting to discern the significance of that dramatic change.

In any event, the design phase allegedly commenced in April 1991. Three months earlier, the Access Board had formally requested comments on whether it should require lines of sight over standing spectators. 56 Fed. Reg. at 2315. Defendant knew that such a requirement could be incorporated in the ADAAGs that were presently under development. Hence, from the very beginning defendant knew that such a requirement might be forthcoming. A prudent designer might have incorporated those sightlines into its plans. Defendant elected not to do so.

In July 1991, the Access Board temporarily deferred the sightlines issue. Even assuming that defendant relied upon the Access Board commentary as an indication that Standard 4.33.3 did not *presently* contain an express requirement that lines of sight be provided over standing spectators, defendant was now on notice that the agency was actively considering such a requirement, that formal adoption of such a requirement was being urged by many commenters, that the agency intended to address the issue in a forthcoming rulemaking, and that the Access Board believed that such a requirement might be both necessary and authorized by Title III of the ADA.

This should have been a giant caution sign to anyone about to construct a new indoor arena that was subject to the still-evolving requirements of Title III of the ADA. Groundbreaking for the Rose Garden was still two years away, and the structural components for the seating bowl would not even be ordered until 29 months later. Again, a prudent designer might have incorporated those sightlines into its plans. A conscientious designer might even have gone beyond the minimum legal requirements and voluntarily incorporated enhanced sightlines so that customers who rely upon wheelchairs could actually see the events that were to be exhibited at the Rose Garden. Defendant elected not to do so. On the contrary, defendant decided that it would not voluntarily provide enhanced sightlines for wheelchair users and it was not interested in even discussing the issue absent a legally binding requirement. Collier Depo. at 137–38.

Defendant has cited the remarks of Irene Bowen at a November 1992 meeting of baseball owners as evidence that it was led to believe that there was no "line of sight" requirement. However, in response to the court's questions, defendant conceded that there is no evidence that defendant was even aware of those remarks prior to the commencement of the instant litigation, let alone that defendant relied upon those remarks in the design and construction of the Rose Garden. Thus I need not even consider whether it would be reasonable, in designing a quarter-billion dollar arena, to rely upon remarks made by a mid-level official in a lame duck administration at a meeting of baseball owners. The same is true of the affidavit from

John Dunne. Defendant concedes there is no evidence that it was even aware of Mr. Dunne's views until after this litigation was filed. The Bowen speech and the Dunne affidavit have no probative value in this action.

Plaintiffs have proffered uncontested evidence to establish that defendant was timely placed on notice that it might be required to provide wheelchair users with a line of sight over standing spectators, but that defendant chose to proceed with its present configuration in the face of those warnings. In addition to the official public statements by the Access Board, defendant's senior project manager, Robert Collier, discussed this very issue with employees of Ellerbe Becket, the architectural firm that defendant hired to design the Rose Garden. According to Collier's deposition testimony, Ellerbe Becket told Collier that sight lines over standing spectators was something the disabled community always asks for but does not get. Collier Depo. at 205. This issue was discussed as early as September 1991. *Id.*

Defendant thus was on notice that sightlines over standing spectators was something that the disabled community believed was needed in order for wheelchair users to fully utilize the arena, and that they likely would demand such sightlines in the future Rose Garden. In the fall of 1991, the design of the Rose Garden was still being determined, and it would have been a comparatively simple matter to have made the design changes required to provide wheelchair users with lines of sight over standing spectators.[65] Over the next 15 months, as defendant and Ellerbe Becket continued to develop the design of the Rose Garden, they also were on notice that the Access Board was actively considering a requirement for sightlines over standing spectators. Defendant nonetheless chose not to incorporate those sightlines into its design.

In December 1992, the Access Board publicly stated that an "overwhelming majority of [public comments] favored including a provision requiring lines of sight over standing spectators in sports arenas and other similar assembly areas." 57 Fed. Reg. at 60,618. The Board was continuing to study the issue and "intends to address the issue of lines of sight over standing spectators" in a forthcoming rulemaking. *Id.* Defendant thus could infer that there was no express requirement for enhanced sightlines, but that such a requirement was a distinct possibility in the near future. The Rose Garden was still in the design process. Ground would not be broken until the following summer, and construction of the seating bowl would not begin for another 18 months, during which time the sightlines rule might well be modified. This was the best time to make any revisions to the design. Instead, defendant elected to proceed with the existing design.

In a letter dated March 18, 1993, Ellerbe Becket advised defendant that:

[A] group called ABLE [has] threatened to file a lawsuit under the Americans with Disabilities Act in Phoenix ... [T]his group seeks to create handicap seating areas that would have unobstructed sightlines in the event that people in front of such areas are standing. Based on this information, this issue [ ]would appear to merit discussion and, possibly, some additional design analysis ...

[T]he Americans with Disabilities Act is a Federal Civil Rights law enforced by the United States Department of Justice that has no interpretive/approval mechanism other than court action. If approved, this lawsuit could "expand" the requirements of this legislation ...

The letter also advised defendant that in designing the Rose Garden the architects had assumed that they were not required to provide lines of sight over standing specta-

---

65. In its response to the court's questions, defendant asserted that it would have cost at least twenty million dollars to incorporate sightlines over standing spectators into the Rose Garden assuming such a requirement had been incorporated in the design parameters from the outset, and a much larger sum if the design had to be modified at a later date. These contentions border on the incredible, and defendant has offered no evidentiary support or explanation for how these numbers were derived. Nor is there any evidence that similar expenditures were incurred in providing sightlines in other arenas and stadiums.

tors. "Based upon this potential litigation, we believe that additional analysis is required by Owner's legal counsel." Defendant received this letter several months before ground was broken for the Rose Garden, nine months before defendant ordered the structural components for the seating bowl, and 16 months before construction of the seating bowl commenced. According to defendant's senior project manager, Robert Collier, notwithstanding Ellerbe Becket's recommendation defendant did not solicit additional legal analysis on this issue nor did he recall that any additional design analysis was performed regarding this issue in March 1993. Collier Depo. at 131, 173. *See also* Crockett Depo. at 104–05. In March 1993, the Rose Garden was still in the design phase. Collier Depo. at 42.

On or about March 30 through April 1, 1993—three months before ground was broken and 16 months before construction of the seating bowl began—DOJ representatives met with representatives from the Atlanta Committee on the Olympic Games ("ACOG") to discuss ADA issues concerning the facilities that were being built for use in the 1996 Olympic Games. There may have been a second meeting with DOJ in early April 1993. DeFlon Depo. at 31, 35, 40, 51–52. Also in attendance at these meetings was Richard DeFlon, a vice president (or perhaps senior vice president) [66] from Ellerbe Becket's "sports design group" which was based in Kansas City. DeFlon Depo. at 17, 31, 35. This group designed both the Olympic facilities and the Rose Garden, though different teams within the Kansas City office were assigned to the two projects. DeFlon was the project manager for the Olympic project, and had a role in designing the sightlines for that project. *Id.* at 20, 38.

At his deposition, DeFlon first testified that the participants at these meetings were expressly told by the DOJ representatives that DOJ was interpreting Standard 4.33.3 as requiring sightlines over standing spectators. *Id.* at 35, 40, 41, 42, 43, 47, 48, 64. DeFlon

also testified that he promptly communicated DOJ's position on the sightlines issue to a number of employees in the sports design group, both individually and in meetings, with the intent of making that information generally available to those in Ellerbe Becket's Kansas City office. *Id.* at 47–51, 55–56. DeFlon specifically recalled discussing the sightline issue with Gordon Wood. *Id.* at 55–56. However, upon returning from a lunch break during the deposition, DeFlon abruptly changed his testimony and said that he couldn't recall whether he had obtained the information on sightlines from those meetings with DOJ in Atlanta or by reading a memorandum describing those meetings several months later. *Id.* at 82–84.

Despite DeFlon's hedging, there can be little doubt that DOJ's interpretation of 4.33.3 was discussed at those meetings in Atlanta and that DeFlon was present during those discussions. On April 19, 1993, DeFlon dictated a memo to the file to which he attached the business cards of the DOJ representatives along with his notes and sketches from the meetings "with the Justice Department in Atlanta on March 30 and on April 1, 1993." Those documents clearly depict lines of sight for wheelchair users, most of which are calculated over standing spectators, along with estimates of the number of wheelchair spaces at Olympic stadium that would have to provide enhanced sightlines. Obviously DeFlon could not have taken those notes during the meeting with DOJ, or had them in his possession on April 19, if the subject in fact did not arise until several months later.[67]

Other documents from early April 1993 confirm that the subject of sightlines over standing spectators was discussed in the meeting(s) with DOJ. *See, e.g.,* April 1, 1993, letter from Scott Braley; April 5, 1993, memorandum from Scott Braley. Some of these documents imply that DOJ was initially somewhat tentative on the sightlines issue. Indeed, DeFlon was of the opinion that when

---

**66.** DeFlon could not recall his precise title at that time. DeFlon Depo. at 12.

**67.** To the extent DeFlon does not presently recall the details of his meetings with DOJ, his contem-

poraneous notes from those meetings likely would be admissible as a past recollection recorded.

the DOJ representatives arrived at the Atlanta meeting, "I don't think they knew what sighlines in general meant." DeFlon Depo. at 201. Once the DOJ representatives understood the issue, however, they advised DeFlon and the others involved that lines of sight over standing spectators would have to be provided for a reasonable number of wheelchair locations. DeFlon Depo. at 199–201, 204. By April 5, 1993, a decision had been reached to provide enhanced sightlines in the design of the Atlanta facilities. *See* Braley memorandums, *supra.*

In a letter to ACOG's attorneys dated April 22, 1993, DOJ memorialized the discussions that had taken place during the meeting(s) in Atlanta:

> We informed you that we cannot resolve this matter or approve the designs of either the Olympic stadium or the baseball stadium unless at least a reasonable number of the wheelchair seating locations in each stadium configuration provide their occupants with a line of sight over standing spectators.

Letter from Thomas Contois and Joseph Russo, to Josie Alexander *et al.* (April 22, 1993). Although this letter was widely circulated, there is no evidence that any of the recipients disputed this account of the sightlines discussion. Nor does DeFlon recall any discussion in which the DOJ representatives stated that lines of sight over standing spectators were not required by the ADA design Standards. DeFlon Depo. at 196.

Several employees of Ellerbe Becket's Sports Design Group received a copy of either one or both Braley memorandums from early April 1993, including DeFlon, Ben Powell, Greg Prelogar, and Gordon Wood. A report on DOJ's meetings with ACOG, including the sightlines requirement, also appeared in the May 10, 1993, issue of a construction industry magazine entitled Engineering News Record.

On or about May 20, 1993, the project director for the Atlanta Stadium Design Team ("ASDT") sent a copy of several documents—most notably the April 22, 1993, letter from DOJ confirming that DOJ wanted sightlines over standing spectators—to at least five high-ranking employees of Ellerbe

Becket's sports design group in Kansas City (including DeFlon), along with an urgent request for suggestions on how ASDT should respond to the design changes that DOJ was demanding in the Olympic project in order to comply with those requirements. There can be no question but that by this date Becket had knowledge of DOJ's position on the sightlines issue.

There are some potential inconsistencies in DeFlon's testimony. For instance, DeFlon says he did not consider the information received from DOJ to be confidential, and made no effort to conceal it from other Ellerbe Becket employees. DeFlon Depo. at 47–51, 55–56, 97, 98. By contrast, another Ellerbe Becket project manager, William Crockett, has testified that DeFlon told him that the information obtained from DOJ was confidential. Crockett Depo. at 50–51. However, it is not necessary for me to resolve these differing recollections, or to decide whether DeFlon did in fact personally communicate to Crockett DOJ's position on sightlines or tell Crockett that the information was confidential.

DeFlon attended the meetings in Atlanta with DOJ officials, at which DOJ explained its interpretation of the sightlines requirement and asked that the Atlanta Olympic project be modified to provide lines of sight over standing spectators. DeFlon was a vice-president (or perhaps senior vice-president) of Ellerbe Becket's sports design group. The knowledge that DeFlon obtained from his meetings with DOJ, in his capacity as Ellerbe Becket's representative, regarding the legal requirements for designing arenas and stadiums—which is what Ellerbe Becket's sports design group did—is imputed as a matter of law to Ellerbe Becket as his employer.

DOJ's position was confirmed in the letter dated April 22, 1993, which was circulated to at least five high-ranking employees of Ellerbe Becket's sports design group by May 20, 1993, at the very latest, if not before. By now Ellerbe Becket clearly had actual notice of DOJ's position. It is irrelevant whether Ellerbe Becket timely communicated that knowledge to the particular members of its

sports design group who were working on the Rose Garden project; if they did not know, they certainly should have known. To hold otherwise would be to reward ignorance.

The knowledge of defendant's agent Ellerbe Becket—and in particular the knowledge of Ellerbe Becket's sports design group at the Kansas City office, which also was designing the Rose Garden—is likewise imputed to defendant. Consequently, Ellerbe Becket and defendant were now on notice that DOJ was demanding lines of sight over standing spectators. Ellerbe Becket and defendant also were on notice that they might no longer be able to rely upon the Access Board's statement that the issue still was being studied. At a minimum, this should have motivated a further inquiry of DOJ. Instead, defendant and Ellerbe Becket proceeded with the existing design that did not include lines of sight over standing spectators—even as Ellerbe Becket was revising the design for the Atlanta facility to include those sightlines.[68]

DeFlon's meetings with DOJ representatives occurred almost three months before ground was broken for the Rose Garden, eight months before defendant ordered the structural components for the seating bowl, and 15 months before construction of the seating bowl commenced. The letter from DOJ confirming the line of sight requirement was circulated to Ellerbe Becket's sports design group on or before May 20, 1993, also before ground had even been broken for the project or the structural components for the seating bowl had been ordered. In May 1993, the Rose Bowl was still in the design phase. Collier Depo. at 42.

On April 15, 1993, shortly after DeFlon's meeting(s) with DOJ representatives in Atlanta, defendant received an urgent letter from Prudential Securities, which was assisting with the issuance of revenue bonds to finance construction of the Rose Garden, concerning "rumors in the market with respect to problems on a new multi-purpose arena in terms of compliance with the requirements of the Americans with Disabilities Act." Prudential requested a "comfort letter" from Ellerbe Becket certifying that the Rose Garden was being designed in compliance with the ADA.

The following day, Ellerbe Becket responded with a letter indicating that the firm had attempted to comply with ADA requirements. However, Ellerbe Becket also warned defendant that many ADA requirements had yet to be construed by a court, and, "[a]s we have discussed, the requirements of ADA are written in a manner such that clear interpretations will be borne out of case law or future changes to the law." Ellerbe Becket also cautioned defendant that "we now have knowledge that some of [our] assumptions may be challenged in court. In light of this, we have recommended further study by [defendant's] legal counsel and by [Ellerbe Becket] to determine [the] likelihood of significant change in basic design parameters for the seating areas of the Arena." Ellerbe Becket also suggested that "[t]here may be ways in which precedent can be verified on a project-specific basis that would provide additional "comfort" as to the basis of the current design."

The latter suggestion presumably was aimed at obtaining the equivalent of an IRS "private letter ruling" regarding the Rose Garden's compliance with the ADA. This would seem to have been a prudent course of action, given the uncertain state of the law and the substantial costs that might be incurred if design changes needed to be made after construction was underway or complete. However, by defendant's own admission, neither defendant nor Ellerbe Becket ever pursued that suggestion, either in April 1993 or at any other time.[69] Moreover, one of El-

---

**68.** Defendant contends that DOJ subsequently entered into a settlement agreement with the Atlanta Olympics organizers which required less than 100 percent of the wheelchair spaces to have lines of sight over standing spectators. I do not consider that to be a reliable expression of the agency's interpretation of the law. By definition, a settlement agreement is a compromise under which both sides typically accept something less than they believe they were entitled to.

**69.** At oral argument, the DOJ representative advised the court that DOJ does not approve building plans, per se. Whether DOJ would have responded to specific questions about the interpretation of the regulations is another question.

lerbe Becket's employees, Gordon Wood, testified that when he learned that DOJ was construing Standard 4.33.3 to require lines of sight over standing spectators, he decided not to share that information with the Ellerbe Becket employees who were designing the Rose Garden because Wood personally disagreed with DOJ's interpretation of the law. Wood Depo. at 35–36.[70] It would appear that defendant and Ellerbe Becket both preferred to remain ignorant of the law, instead of making every effort to inform themselves of its requirements.

During 1993 and 1994, DOJ also sent a number of letters to persons designing other new stadiums and arenas, advising them of the requirement for lines of sight over standing spectators.[71] These letters also include detailed discussions of other design requirements. It would appear that DOJ was not concealing its interpretation of Standard 4.33.3, and was willing to meet with arena designers to discuss compliance with ADA requirements.

The official groundbreaking ceremony for the new arena was held on or about June 23, 1993. On or about July 15, 1993,[72] Gordon Wood distributed to all Ellerbe Becket project managers a sample letter to be sent to all Ellerbe Becket clients (which includes defendant.) The letter purported to summarize discussions between Ellerbe Becket and DOJ representatives regarding another project (presumably the Atlanta Olympics). According to this letter, the DOJ officials "agree that the 'comparable' sightline for wheelchairs is for seated patrons; *however, they are not sure that this interpretation will stand public or court scrutiny. It may be necessary to raise the platform in the wheelchair seating area for 'enhanced view' to allow for spectators who at times stand up in front of them.*" (emphasis added).

The first sentence is somewhat puzzling since, for the past few months, DOJ seems to have been advancing a different position in communications with employees of Ellerbe Becket's Kansas City office where Wood was employed. Moreover, DeFlon specifically recalls telling Wood about DOJ's position, DeFlon Depo. at 55–56. In addition, by no later than May 20, 1993, at least five high-ranking employees of Ellerbe Becket's sports design group had been sent copies of DOJ's letter of April 22, 1993, which stated DOJ's position on the sightlines issue. Wood's "client letter" of July 15, 1993, would seem to be

Section III–7.1000 of the TAM states that "[n]either the Department of Justice, nor any other Federal agency, functions as a 'building department' to review plans, to issue building permits or occupancy certificates, or to provide interpretations of [the accessibility guidelines] during the building process."

On the other hand, there is evidence that for larger projects such as a stadium or arena DOJ was amenable to some interaction regarding the compliance with ADA requirements. There also is evidence in the record that under similar circumstances DOJ responded to inquiries made by members of Congress seeking, on behalf of a constituent, clarification of the line of sight or other ADA requirements. The court takes judicial notice that Paul Allen, the man behind defendant Oregon Arena Corporation and the Portland Trail Blazers, is a co-founder of Microsoft and is presently ranked number four in a recent listing of the wealthiest Americans, with an estimated net worth in excess of 14 billion dollars. *Forbes'*, vol. 160, no. 2 (July 28, 1997) at 134. While Mr. Allen may not have ranked quite that high on the list in years past, the court has little doubt about his (and thus defendant's) ability to procure a letter of inquiry from a member of the local Congressional delegation or even an audience with top administration officials.

Had defendant requested a private letter ruling or consultation with DOJ, and been refused, then defendant might be in a stronger position to plead ignorance of the law. However, there is no evidence in the record before me that defendant made a serious effort to ascertain DOJ's position on this issue. Rather, defendant was content to assume that there was no requirement to provide lines of sight over standing spectators and did not inquire further. William Crockett's hearsay account of a phone call that an unidentified person might have made to a DOJ telephone hotline is both inadmissible and of little probative value.

70. Gordon Wood specifically recalls giving advice to the Rose Garden design team on the subject of sight lines for persons in wheelchairs. Wood Depo. at 14.

71. Among these are the West Michigan Regional Baseball Stadium in Grand Rapids, Michigan, the Veterans Memorial Auditorium in Des Moines, Iowa, and the Yakima County Stadium in Washington.

72. It appears that earlier drafts of the letter were circulating around Ellerbe Becket's Kansas City office for at least several weeks before that date.

**754**

contrary to the information that Ellerbe Becket had received from DOJ at this time (but consistent with Wood's personal opinion that DOJ was wrong. *See* Wood Depo. at 35–36.)[73]

Even taking this client letter at face value, Ellerbe Becket clearly recognized that there were serious questions about the sightlines requirement. The letter again cautioned clients to seek legal advice regarding this issue. The letter was circulated six months before defendant ordered the structural components for the seating bowl, and more than a year before the date on which defendant represents that the seating bowl was "substantially completed."[74] Despite this warning, the design for the Rose Garden was not revised, nor was additional legal analysis undertaken.

In late 1993, plaintiff Pike met with representatives of the Portland Bureau of Buildings to review the design for the Rose Garden. In a letter dated December 9, 1993, an employee of the Bureau of Buildings advised defendant of Pike's concerns, among which were the seating design: "What happens when the people in front stand up?"[75] At some time during December 1993—the exact date is not in the record—defendant ordered the structural components for the seating bowl.

On or about January 12, 1994, plaintiff Pike met with representatives of defendant to discuss his concerns. In a follow-up letter dated February 22, 1994, Pike reiterated his concern that "[n]one of the wheelchair locations provide sight lines over standing spectators. According to the Department of Justice, at least 50% of wheelchair locations should provide sight lines over standing spectators. Proposed changes to assembly area requirements will increase this number to 70%." Pike attached to that letter a draft of a revised ADAAG expressly defining the requirement that sightlines be provided over standing spectators.

In a series of letters during March 1994, defendant accused its architectural firm, Ellerbe Becket, of withholding information regarding DOJ interpretations of ADA regulations regarding, *inter alia*, wheelchair seating. Ellerbe Becket responded that such information was confidential, having been obtained through meetings with DOJ officials regarding the Atlanta Olympic Games, and thus could not be shared with other clients or even within its own office.

The court is highly skeptical of Ellerbe Becket's assertion that such information was privileged. Ellerbe Becket's responsibility was to design the Rose Garden so that it fully complied with the requirements of the ADA. If, as a result of discussions with DOJ

73. The record contains other evidence which suggests that Ellerbe Becket was not content simply to discern DOJ's position, but was attempting to advocate its own, narrower, view of the ADA. For instance, there is a September 8, 1993, memorandum from Greg Prelogar to Richard DeFlon (with a copy to Gordon Wood), which discussed how Becket should respond to DOJ's position on certain issues regarding the Atlanta project:

"Some items are ludicrous ... Others are easily attainable but I fear will set an unwelcome precedent.... I have great concerns about the precedents we will set for all future projects of this genre in the U.S....."

All of these individuals were part of Becket's sports design group in Kansas City.

74. Defendant defines substantial completion of the seating bowl to be the date on which "nearly all of the precast seating risers were in place and construction of the roof had commenced." Collier Aff. in Support of Summary Judgment ¶ 7. However, the building itself was not completed for another year.

75. In subsequent memorandums, defendant asserted that the seating plan design had been "presented several times to the Disabled Community and these opinions were not voiced. Our understanding is that the current seating plan has been approved." In a December 14, 1993, letter to the Bureau of Buildings, defendant also complained that it had held a number of meetings to review the design with representatives of the community, that plaintiff Pike had been specifically invited to attend those meetings, but he had attended just one meeting and that was two years before. In various letters, Pike responded that he did not feel the meetings were productive because the information flow went only one way; defendant's representatives presented their plans, but were not receptive to input from the community. Defendant has vigorously denied that allegation, but the dispute is not a material one for purposes of the pending motions for summary judgment.

officials regarding the Atlanta project, Ellerbe Becket had reason to believe that the Rose Garden design did not comply with the ADA, it would seem that Ellerbe Becket had an obligation to communicate those concerns to its client. This would not appear to be "inside information," such as whether a proposed merger of two specific companies would be approved. Perhaps certain details of the settlement negotiations with DOJ might somehow be deemed confidential, but it seems inexplicable that the meaning of a federal law could be regarded as a secret. There is nothing in the record to support Ellerbe Becket's blanket assertion of confidentiality.

In view of the potential for litigation between defendant and Ellerbe Becket, and because Ellerbe Becket is not a party to this action, I will make no binding pronouncements upon the propriety of Ellerbe Becket's conduct. For purposes of this case, however, Ellerbe Becket's knowledge will be imputed to its principal. I will assume that defendant had, or should have had, the same knowledge that Ellerbe Becket's employees had regarding DOJ's interpretation of the ADA requirements. Defendant and Ellerbe Becket can decide later, as between themselves, who will be responsible for any costs that defendant may incur as a result of these events.[76]

In a letter dated March 29, 1994, Ellerbe Becket cautioned defendant that the ADA was still evolving, and hence the proposed design for the Rose Garden "may or may not satisfy future ADA interpretations by the courts or Justice Department."

On June 30, 1994, the City of Portland Bureau of Buildings issued defendant a building permit to begin construction of the seating bowl. On July 5, 1994, DOJ informed defendant that DOJ had commenced an investigation into alleged ADA violations at the future Rose Garden. In a follow-up letter to defendant dated July 6, 1994, DOJ listed some of the alleged violations, which included "failing to provide a line of sight over standing spectators for spectators using wheelchairs." [77] Thus—only days after receiving its building permit for the seating bowl—defendant was personally placed on notice that DOJ was interpreting the ADA standards to require lines of sight over standing spectators, and intended to enforce such a requirement with regard to the Rose Garden. It therefore is disingenuous for defendant to pretend that it first learned of the possibility that there was a requirement for lines of sight over standing spectators when the TAM supplement was published in November 1994. In addition to the prior warning signals, and communications with defendant's architect, defendant now had received word "straight from the horse's mouth," not after construction of the seating bowl was "substantially complete" (as defendant contends) but when it had barely begun. DOJ also advised defendant that:

> It is our understanding that construction of the arena is underway, and that construction of the main seating bowl has recently begun or will begin in the near future. *While the Oregon Arena Corporation is free to continue with construction of the arena during the course of our investigation, please be advised that if any portion of the arena fails to comply with the requirement of the Standards, this office will insist that the arena be brought into full compliance with the Standards, regardless of the cost or difficulty of doing so.*

(emphasis added). In other words, defendant was expressly warned by DOJ of the dire consequences that could result if it chose to proceed with the project as designed.

On July 12, 1994, plaintiff's present counsel also informed defendant that DOJ had com-

---

76. The Department of Justice has since filed suit against Ellerbe Becket, alleging a systematic pattern of ADA violations in arenas that Ellerbe Becket has designed throughout the nation. *See United States v. Ellerbe Becket, Inc.*, CV No. 4–96–993 (D.Minn).

77. Other listed violations included "failing to provide an adequate number of wheelchair seat-ing locations as part of the arena's fixed seating plan," "failing to integrate wheelchair seating areas into the arena's fixed seating plan," "providing aisle seats with no armrests ... that are not on an accessible route from the arena's entrances," and "designing private suites or skyboxes that do not comply with the requirements of the Standards."

menced an investigation into alleged ADA violations at the Rose Garden, and asked whether defendant intended to postpone construction until the investigation was completed. Defendant responded that it was aware of the DOJ investigation, but believed that the design for the Rose Garden complied with the ADA and, therefore, "we intend to continue construction during the investigation." Defendant thus made a conscious decision to proceed with the project at its own risk. In a letter dated August 1, 1994, plaintiff Independent Living Resources urged defendant to resolve the alleged ADA violations "before construction begins." (emphasis in original.) Defendant rejected that advice as well.

On September 21, 1994, the Access Board published a draft of its recreational guidelines, which—contrary to the earlier representations—did not address the sightlines issue.

In October 1994, defendant claims to have "substantially completed" the frame of the seating bowl, in that most (but not all) of the concrete risers were in place and work had begun on the roof. There may be well-defined industry rules for computing the date of substantial completion, but that information does not appear in the record. Otherwise, this appears to be somewhat of an arbitrary date, one that conveniently allows defendant to assert that the seating bowl was substantially completed before DOJ published its TAM supplement a few weeks later. In October 1994, completion of the arena was still a year away, as was the installation of the seats.

In November 1994, DOJ published the TAM supplement, which formally articulated DOJ's interpretation of the lines of sight requirement.[78] In a letter dated November 21, 1994, DOJ notified defendant that the agency had completed its investigation and determined that the design for the Rose Garden violated the ADA by, *inter alia*, not

providing wheelchair users with lines of sight over standing spectators.

In a letter to defendant dated November 30, 1994, Ellerbe Becket wrote that:

d. In design of this building, all sightlines were determined based on all patrons being seated. No one is guaranteed an unobstructed line of sight, if spectators choose to stand. Note, however, that Level 7 locations do provide for sightlines over standing patrons. Cited section 4.33.3 does not state that wheelchair patron seating must be provided with sightlines over the heads of standing patrons. *If [defendant] directs, we can study the possibility of providing some raised [wheelchair] seating areas which may accomplish this enhanced sightline.* Since this is not addressed in ADA, we wonder how many such seats would be appropriate. It would seem that such seating areas might not be considered as "integral" to the fixed seating areas, since such areas may have an appearance of being raised up from surrounding seating areas.

(emphasis added). In a follow-up letter dated February 2, 1995, Ellerbe Becket advised defendant that:

At your request, we have studied the sightlines from wheelchair seating locations in the bowl if certain seats in front of these locations are not sold. Attached is a copy of drawings ... which show the results of this study.... The sightline study assumes that no seats would be sold in the two rows in front of wheelchair seating in the Upper Concourse and that no seats would be sold in the three rows in front of wheelchair seating at the Main Concourse level. *As you can see, by implementing these conditions, the sightlines of wheelchair patrons in these locations would be basically unaffected by standing patrons.*

(emphasis added).[79] Defendant rejected this latest proposal just as it had rejected all

---

**78.** A draft of the TAM supplement, which included DOJ's interpretation of the line of sight requirement, was circulated within the federal government in March 1994. In June 1994, DOJ sent the TAM supplement to the printers. It is unclear why the supplement was not available for distribution until November 1994, *i.e.*, whether it

was a printing problem or a deliberate decision to postpone distribution.

**79.** Ellerbe Becket expressed some concern that such wheelchair seating areas would effectively be isolated from the surrounding ambulatory seats, and questioned whether it would be appro-

previous proposals to provide enhanced sightlines for wheelchair users.

Given this record, there is little basis for defendant to protest that it was "led down the garden path" by the federal government. *Pfaff*, 88 F.3d at 748. On the contrary, defendant voluntarily chose to race down that path while ignoring all warnings of the peril that lay ahead. From the start of the design process in 1991, through the completion of construction in 1995, defendant (and its agent Ellerbe Becket) repeatedly were warned that there were serious questions about the Rose Garden's compliance with the ADA in regard to sightlines over standing spectators (among other issues). Defendant chose to ignore those warnings—including one issued by DOJ only days after the building permit for the seating bowl was issued—and to eschew its architect's suggestion that defendant seek further legal counsel, and built the Rose Garden without enhanced sightlines for wheelchair users.

Defendant contends it had no choice but to proceed with the obstructed sightlines, because the Rubicon was crossed in either late 1991, when the "footprint" of the building was determined, or at the very latest in December 1993, when defendant placed orders for the precast structural components that would form the seating bowl. Defendant contends that it would have been all but impossible to modify the sightlines after those dates, but it has offered only conclusory statements to support that contention. In addition, the record shows that defendant relocated some of the wheelchair areas in the seating bowl during the spring and summer of 1994, which belies defendant's contention that modifications were not possible.

In any event, defendant (and its agent) were on notice long before December 1993 with regard to DOJ's interpretation of the sightline requirements, and certainly knew that there were grave questions concerning the continued validity of Ellerbe Becket's interpretation of Standard 4.33.3. Moreover, construction of the seating bowl did not begin until July 1994, by which time DOJ had expressly warned defendant that it was alleged to be in violation of the requirement

priate to "segregate" all of the wheelchair seat-

for lines of sight over standing spectators, and had warned defendant of the potential consequences if it chose to proceed with construction anyway.

The court also observes that enhanced sightlines successfully have been incorporated into alterations of existing facilities, including the Portland Coliseum, and those successes were the impetus for the Access Board's proposal to require such sightlines in all new construction. 56 Fed. Reg. at 2314. In the absence of evidence to support its position, I cannot accept defendant's argument that it would have been necessary to radically redesign the entire building just to elevate the wheelchair pads a couple of feet. Admittedly, it would have been simpler to incorporate the enhanced sightlines during the initial design phase of the project. Defendant's options also were limited by decisions that defendants made during the design process, such as the location of the wheelchair seating. However, there is no evidence in the record that this precluded modifications, even comparatively late in the construction process, that would have provided enhanced sightlines for at least some of the wheelchair spaces. If all else failed, defendant could have withheld from sale the few seats immediately in front of the wheelchair spaces when they are in use, an option that was suggested by Ellerbe Becket in 1995 and is still available to defendant even today.

Defendant has not produced admissible evidence from which a reasonable factfinder could conclude that after either late 1991 or December 1993 it would have been impossible (or even prohibitively expensive) for defendant to provide wheelchair users with lines of sight over standing spectators. Moreover, there is overwhelming evidence that defendant and its architect Ellerbe Becket knew there was a serious problem with the sightlines well before the structural components for the seating bowl were ordered in December 1993, and before construction of the seating bowl commenced in July 1994, but chose to assume the risk and proceed with the existing design in order to save money.

ing areas in the manner described above.

The court is not entirely unsympathetic to defendant's position. Arguably it was shooting at a moving target, building a project for which design decisions often must be made well in advance, at a time when the governing law was in a state of flux. On the other hand, defendant didn't exactly go out of its way to comply with the ADA. Even assuming the regulations did not expressly require enhanced sight lines, prudence would have dictated that defendant provide them anyway. The consequences of being found in noncompliance with the ADA are simply too great to take that risk. Instead, defendant and its architect focused on doing the minimum that in their view was legally required, rather than asking themselves how they could implement the spirit of the ADA and make the facility accessible to persons with disabilities. They chose to gamble on the narrower interpretation, and in the process bought themselves a lawsuit.

### D. Conclusion

Standard 4.33.3 does not presently require that wheelchair users be given lines of sight over standing spectators. Although the ADA would authorize such a requirement, the Access Board and DOJ did not properly promulgate such a rule. Nor can such a requirement be enforced by virtue of the general non-discrimination provisions of the ADA; Congress intended that compliance with the design Standards would satisfy the requirement that new construction be designed and constructed so as to be accessible to persons with disabilities.

In the alternative, if the Court of Appeals decides that defendant was required to provide lines of sight over standing spectators, then defendant has not established any basis, equitable or otherwise, for exempting it from compliance with that requirement.

### 7. *Executive Suites:*

The Rose Garden, like many arenas and stadiums constructed in recent years, in-cludes suites.[80] These are enclosed rooms overlooking the arena floor. A sliding glass door leads to a deck with 12 seats from which to watch the event. Each suite is equipped for social events, with furniture, kitchen, sink, bar, refrigerators, an entertainment center (televisions, stereo) and a restroom with a built-in television monitor so the occupant does not miss a minute of the action. Most suites are licensed by businesses under a multi-year contract for the purpose of entertaining clients and other important guests.

Plaintiffs have alleged a number of ADA violations regarding these suites. Defendant has responded that (1) the suites are exempt from the ADA, (2) plaintiffs lack standing to maintain this claim, and (3) the suites comply with the ADA. I will address each of these arguments in turn.

### A. Are the Suites Subject to Title III of the ADA?

Title III of the ADA distinguishes between "commercial facilities" and "places of public accommodation." Commercial facilities are broadly defined (with exceptions not relevant here) as facilities whose operations will affect commerce and are intended for nonresidential use. 42 U.S.C. § 12181(2); 28 CFR § 36.104. This sweeping definition encompasses not only facilities that are open to the general public, such as stores, but also many other nonresidential facilities such as office buildings, factories, and warehouses, if their operations "affect commerce." TAM § III–1.3000. Places of public accommodation are a particular type of commercial facility, as more particularly defined in 42 U.S.C. § 12181(7). The definition includes a broad range of purveyors of goods and services, including hotels, restaurants and bars, sports arenas, theaters, retail stores, service establishments, doctors and lawyers, schools, gymnasiums, and museums. *Id.*

Although the language of the statute is not a model of clarity,[81] Congress apparently in-

---

**80.** In their briefs, the parties have used the term "private" suites. However, the brochures provided by defendant repeatedly refer to them as "Executive Suites." Likewise, the license agreement uses the term "Arena Executive Suite."

Since an issue in this case is whether the suites are public accommodations, the use of the term "private" may be misleading. The court therefore will refer to them only as "suites" or "executive suites."

tended that all commercial facilities—including public accommodations—would be governed by the standards for new construction as set forth in 42 U.S.C. § 12183(a), but only public accommodations are subject to the additional prohibitions contained in 42 U.S.C. § 12182. That is the interpretation adopted by DOJ, and I conclude it is a reasonable one that is consistent with the language and purpose of the statute and the legislative history and will be followed by this court.

■ Plaintiffs and DOJ contend that the suites at the Rose Garden constitute a public accommodation for purposes of Title III of the ADA. I agree. *Cf. Paralyzed Veterans,* 950 F.Supp. at 401 n. 18 (suites must comply with Title III requirements). A suite is merely an updated version of the "box seats" that have long been available at many ballparks. The suites provide additional amenities, and are partly enclosed, but otherwise the concept is essentially the same. It is as if defendant had enclosed a group of twelve seats with a clear partition. These suites are part of the arena, just like any other seat in the house. The suites are licensed on a multi-year basis, but that is true of many other seats at the Rose Garden which likewise are available only through multi-year contracts. The suites were offered to the general public on a first-come, first-served basis, as with all other season tickets at the Rose Garden.

Although the general public may not just stroll in and watch the game from the suites, that is true of any reserved seat in the building or, for that matter, any box seat at Fenway Park. The suites need not be open to every member of the public in order to be a public accommodation.[82] Many facilities that are classified as public accommodations are open only to specific invitees. For instance, a facility that specializes in hosting wedding receptions and private parties may be open only to invitees of the bride and groom, yet it clearly qualifies as a public accommodation. *See* 42 U.S.C. § 12181(7). Attendance at a political convention is strictly controlled, yet the convention center is still a place of public accommodation. *See* 42 U.S.C. § 12181(7). A gymnasium or golf course may be open only to authorized members and their guests, but that does not necessarily preclude it from being classified as a place of public accommodation. *Id.* A private school may be open only to enrolled students, but it is still a place of public accommodation. *Id.*

A further consideration is the manner in which the suites are used. It is common knowledge that suites are frequently—if not predominantly—licensed by businesses as a place for entertaining clients and other important guests. The guests socialize, watch the event, and talk business, while employees of defendant provide concierge services, furnish catered food, and tend the bar. In this respect, the suites closely resemble an "establishment[ ] serving food or drink" or a conference facility, both of which are considered to be public accommodations.[83] *Id.* Moreover, one of the principal purposes of the ADA was to tear down the barriers that prevented persons with disabilities from participating in many social and business activities. This is precisely the kind of function that was intended to be accessible to persons with disabilities.

A review of the master license agreement for the suites provides further evidence that the suites should not be regarded as a private facility that just happens to be located in

**81.** Section 12183(a) provides that "as applied to public accommodations *and commercial facilities,* discrimination for purposes of section 12182(a) of this title includes ..." (emphasis added). However, section 12182(a) refers only to discrimination in the context of a public accommodation.

**82.** However, since the wheelchair spaces in the suites are not available for use by other patrons, they are not counted towards satisfaction of the "one percent plus one" requirement. Because each suite provides its own wheelchair space, the seating in the suites is subtracted from the arena's total seating capacity for purposes of computing the "one percent plus one" requirement.

**83.** DOJ has argued that the suites, in their own right, affect commerce. I question whether that is an essential requirement, since I have determined that the suites should be treated as part of the arena as a whole, which admittedly affects commerce. Nonetheless, to the extent a separate finding is required, I have little difficulty concluding that the suites "affect commerce."

the same building as a public accommodation. The suites are licensed, not leased. No leasehold is created, and the licensee does not receive a key to the suite. The suite must be left unlocked at all times while occupied. The licensee also is forbidden to lock the storage closets and cabinets in the suite. Employees of defendant have access to the suites at all times, which may not be restricted by the licensee. Twice an hour, employees of defendant inspect each occupied suite in search of intoxicated guests.

The licensee may use the suite during scheduled events and for other functions, but does not have the exclusive right to use the suite. If the arena is rented for a function that requires additional space, defendant may commandeer the suite and make it available for the use of the arena lessee. The licensee may not alter the suite or paint a wall. If the licensee desires to hang a picture on the wall, it must obtain defendant's permission and all labor must be performed by defendant's employees. The licensee must comply with all rules established by defendant, as they may unilaterally be amended by defendant.

The license agreement confirms that the licensees lack anything that even approaches a true leasehold interest. They merely have acquired a license to attend events at the Rose Garden, and a very limited license at that. There is no principled basis on which to distinguish that license from the license that is acquired by any other spectator who purchases a ticket to an event at the Rose Garden. I conclude that the Rose Garden suites are places of public accommodation for purposes of Title III of the ADA.[84]

 Even assuming, *arguendo*, that they are not public accommodations, the suites clearly qualify as "common use areas." Those are defined as "interior and exterior rooms, spaces, or elements that are made available for the use of a restricted group of people." Standard 3.5. Examples of such a restricted group include the occupants of an office building or their guests. *Id.* An example of a common use area would be an employee lounge or cafeteria. TAM III–7.3110. DOJ has determined that common use areas must fully comply with the Standards. *Id.* Defendant has not questioned that interpretation.

**B. Do Plaintiffs have Standing to Maintain this Claim?**

 Defendant contends that plaintiffs lack standing to maintain this claim since they have not personally licensed one of the suites nor have they identified a current member of their organization—as opposed to persons with disabilities in the community—who is assured of access to a specific suite.[85] I conclude that plaintiffs do have standing.

Plaintiffs primarily rely upon the Supreme Court's decision in *Havens Realty v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), and its progeny. *Havens* concerned the use of "testers" to enforce the Fair Housing Act ("FHA"). Among the plaintiffs in *Havens* was an organization dedicated to enforcement of the FHA. It employed testers to pose as prospective renters. The defendant allegedly told the black tester that no apartments were available, while the white tester was told that there were vacancies. The organization then filed an action alleging a violation of the FHA. The threshold issue in *Havens* was whether the plaintiffs had standing to maintain such an action. Arguably, they had suffered no injury, since they never truly intended to rent the apartment even if it had been offered to them.

The Supreme Court held that the plaintiff organization had standing because the defendant's conduct had "perceptibly impaired"

---

84. Notwithstanding the use of the label "private" in the briefs, these suites are not "private clubs or establishments" for purposes of 42 U.S.C. § 12187, and do not qualify for that exemption from the requirements of Title III.

85. Plaintiffs have submitted an affidavit from Lori Sitton, a former member of the Board of Directors of plaintiff ILR, which attests that she uses a wheelchair, and that a friend's father works for a business that leases one of the suites. Ms. Sitton also states that she toured the suites during an open house. Plaintiffs have also submitted an affidavit from plaintiff Robert Pike, which states that he provides services to many large corporate clients, some of whom are "likely to have access" to the suites.

the organization's "ability to provide counseling and referral services," the organization had "suffered impairment in its role of facilitating open housing," and the organization had suffered a resultant "drain on the organization's resources" because it "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 379, 102 S.Ct. at 1124–25.

There is some tension between the Court's reasoning in *Havens* and some of the Court's more recent standing jurisprudence. To say that an organization has standing to contest a practice or a proposed action merely because it has expended funds to oppose that practice or action or will do so in the future is tantamount to recognizing "interest standing," *i.e.,* anyone who is interested enough to file a lawsuit is automatically vested with standing.[86]

Plaintiffs also cite *Spann v. Colonial Village, Inc.,* 899 F.2d 24 (D.C.Cir.1990). In *Spann,* the DC Circuit rejected the suggestion that an organization could "manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." *Id.* at 27. However, in an opinion authored by then–Circuit Judge Ruth Bader Ginsburg, the DC Circuit cited Havens for the proposition "that an organization establishes Article III injury if it alleges that purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action." *Id.* It was sufficient that the alleged violations of the FHA "impelled the organizations to devote resources to checking or neutralizing the" effects of the illegal practices, and "required them to devote more time, effort, and money to endeavors designed to educate" the public and the real estate industry regarding these illegal practices. *Id. See*

also *Legalization Assistance Project of Los Angeles County Federation of Labor (AFL–CIO) v. INS,* 976 F.2d 1198, 1204 (9th Cir. 1992), *vacated on other grounds,* 510 U.S. 1007, 114 S.Ct. 594, 126 L.Ed.2d 560 (1993); *El Rescate Legal Services, Inc. v. Executive Office of Immigration Review,* 959 F.2d 742, 748 (9th Cir.1991) (organizations formed to assist Central American refugees had standing to challenge defendant's practice of not providing translation of immigration hearings where the practice frustrates organizations' goals and requires them to expend resources in representing clients that they otherwise would spend in other ways); *City of Chicago v. Matchmaker Real Estate Sales Center,* 982 F.2d 1086, 1095 (7th Cir.1992).

To the extent the preceding cases are still good law, the plaintiffs in the instant action have standing to maintain this claim. However, there is a second basis for standing here. Although this case has not formally been designated as a class action, it has in fact been prosecuted by plaintiffs as representatives of the class of persons with disabilities. As a practical matter, that is the only viable means for administering an action of this sort.

Defendant acknowledges that an organization may have standing to represent the interests of its members, *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 2440–41, 53 L.Ed.2d 383 (1977), but contends that plaintiffs lack standing to contest the conditions in the suites unless they can demonstrate that they have a right to visit one of the suites. Even assuming plaintiffs met that burden, under defendant's theory of standing plaintiffs could obtain injunctive relief only regarding the conditions in that particular suite—which is the only one that they have demonstrated a right to visit—notwithstand-

---

**86.** The decision in *Havens* may reflect a doctrine of necessity. Testing was the most effective method—and perhaps the only effective method—of enforcing the FHA. If the organization lacked standing, then the Act likely would go unenforced, the illegal practice would continue, and the defendant would not be held accountable for its conduct. To deny standing would constitute an unjustified windfall for the defendant. Moreover, the other essential elements of standing were present. There was a ripe controversy,

with opposing interests who had a sufficient personal stake in the outcome of the action to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions," *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), and the violation likely would be redressed by a favorable decision. *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38–43, 96 S.Ct. 1917, 1924–1927, 48 L.Ed.2d 450 (1976).

ing that the same issues are common to all 70 suites. It would require seventy separate plaintiffs, one for each suite, to redress the identical conditions in each of the suites.

This problem is not limited to the suites. It is unlikely that any individual plaintiff will ever sit in each of the seats in the arena, or use each of the restrooms, or attempt to reach each of the ketchup dispensers in the arena. Instead, plaintiffs effectively are prosecuting this action as representatives of the class of persons with disabilities, so that all of these conditions may be addressed in a single action. The latter is essential because many of the challenged conditions are inter-related, i.e., any relief ordered with respect to one aspect of the arena will affect other conditions at the Rose Garden, to the potential detriment of other persons with disabilities (as will become more apparent later in this opinion). In addition, if each disabled person was obliged to commence a separate action regarding the conditions to which he or she was personally exposed, then defendant would face the prospect of multiple lawsuits and inconsistent judgments. It is in the interests of all concerned, and judicial efficiency, to address all of these claims and issues in a single proceeding.

A further consideration is the substance of the claims and the manner in which the suites are utilized. The parties agree that the suites ordinarily are not configured to be wheelchair accessible. Defendant contends that is not a problem, because it will re-configure the suite to be wheelchair-accessible if the suite licensee gives defendant 48 hours' notice that a person in a wheelchair will be using the suite.[87] However, that as-sumes the suite licensee knows that a guest uses a wheelchair, which will not always be the case, especially if the licensee and guest have never met in person. The person most likely to be injured by this condition is an out-of-town business invitee—perhaps a client or an employee from an office in anoth-er state—who arrives at the suite and discov-ers that it is not wheelchair-accessible. Since there is no right to recover damages under Title III, this individual could obtain only prospective injunctive relief.

Under a strict interpretation of the rules of standing, to obtain injunctive relief the individual would have to allege that he or she planned to attend another function in this particular suite, and also that he or she would again arrive at the suite and discover that it was not wheelchair-accessible. That is unlikely to occur. Even assuming the out-of-town invitee can anticipate being invited back to the suite—which is far from cer-tain—the licensee is now on notice that this particular individual uses a wheelchair (and presumably will arrange for the suite to be wheelchair-accessible on future visits), and the individual now knows that she must call ahead to make arrangements. Although the court can confidently forecast that the injury is likely to recur to someone, the probability is that a specific person will be injured only once. The court is reluctant to embrace a rule of standing that would allow an alleged wrongdoer to evade the court's jurisdiction so long as he does not injure the same person twice.

Another alleged violation concerns the lack of visual fire alarms in the suites. It is doubtful whether a particular individual could prove that he was facing imminent injury by virtue of the absence of visual fire alarms since, in theory, the Rose Garden may never have a fire. Conversely, if a fire does occur and the individual is caught un-aware because of the absence of visual fire alarms, it is unlikely that he will again be subject to the same injury—nor could he benefit from injunctive relief—since he may well be dead. Again, the allegations here lead to absurd results when analyzed under traditional standing principles, at least as to a single individual.

There is standing, however, if the plaintiff is the class of persons with disabilities or, in this case, the plaintiff organization as their de facto representative. Cf. Williams v. United States, 704 F.2d 1162, 1163 (9th Cir. 1983) (allowing organizations that represent persons with disabilities to maintain action aimed at improving the quality of life for

---

87. Although defendant prefers to receive at least 48 hours' notice, defendant has represented that if necessary it can re-configure the suite in as little as 20 minutes.

such persons, and listing similar decisions in other circuits); *Greater Los Angeles Council on Deafness v. Zolin*, 812 F.2d 1103, 1115 (9th Cir.1987).[88] Plaintiffs also have the incentive and resources to prosecute an action such as this, which often is not the case with an individual suite guest, especially one from out-of-town who may have no plans to ever return to Portland. I conclude that under the unique circumstances of this case, and in view of Congress' decision that in a private action violations of Title III are to be remedied by injunction and not by damages, the plaintiffs have standing to seek injunctive relief to redress the alleged violations of Title III in the suites (and for that matter, throughout the arena unless otherwise noted.)

## C. Do the Suites Comply with the ADA?

 Defendant first contends that it does not have to make all of the suites accessible to persons with disabilities. Rather, defendant contends it is sufficient to have a token accessible suite in the event that a person with disabilities decides to license a suite. Defendant is wrong. The suites typically are used to entertain clients and other important guests. The issue is not limited to whether the licensee has a disability, but also whether an invitee may have a disability.

Defendant cites the "scoping" rules, which provide that in some instances it is suffi-

cient to make only a certain percentage of a facility or design element accessible. For instance, if there is a bank of 20 public telephones, only a portion of them must be accessible to persons with disabilities. *See* Standard 4.1.3(17). That is because the telephones are fungible; it doesn't matter which of the 20 telephones the individual uses. It is sufficient that there are an adequate number[89] of accessible telephones available for use by persons with disabilities. Likewise, the regulations do not require that every room in a hotel be accessible, so long as a sufficient number of accessible rooms are reserved for persons with disabilities. *See* Standard 9.1.1.[90]

Defendant reasons that the suites are analogous to hotel rooms, and thus only a small percentage of suites must be accessible. I disagree. In a hotel, the individual wants a room for the night, and ordinarily does not care whether she is assigned to room 307 or room 412. By contrast, when a person with disabilities is invited to a gathering at a suite, there is only one suite that counts: the one to which the guest has been invited. It is no solace that there is a token accessible suite elsewhere in the building, or for that matter if every other suite in the building is accessible. The guest was not invited to those other suites, but to one particular suite. For that reason, it is imperative that all of the suites be accessible to persons with disabilities.[91]

---

88. In some instances, a person may also have standing to represent the rights of third parties when that person has a sufficient interest in the resolution of the issue, a nexus with the third party, and there exists "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 1370–1371, 113 L.Ed.2d 411 (1991) (standing of criminal defendant to assert rights of persons wrongfully excluded from jury). *See also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (same issue in civil case); *Singleton v. Wulff*, 428 U.S. 106, 113–18, 96 S.Ct. 2868, 2873–76, 49 L.Ed.2d 826 (1976) (doctors representing patients in controversy over public funding of abortions); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (liquor vendor representing class of those ages 18–21); *NAACP v. Alabama*, 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). Limitations on a litigant's assertion of *jus tertii* are not constitutionally mandated, and therefore jurisdictional, but

are merely prudential limitations designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative. *Craig*, 429 U.S. at 193–94, 97 S.Ct. at 454–455; *Board of Natural Resources v. Brown*, 992 F.2d 937, 945–46 (9th Cir.1993). The instant case would appear to be an appropriate candidate for *jus tertii* standing.

89. The regulations define that number.

90. This is not a comprehensive list of the rules governing transient lodging. There are additional requirements, *e.g.*, that the accessible rooms be dispersed to provide a choice of rooms equivalent to those available to the general public. *See generally* Standard 9.

91. This issue was anticipated by the Access Board. In the commentary accompanying the final Standards, the Board explained that "only a

Defendant next argues that although the suites are not ordinarily configured for wheelchair use, upon request defendant will modify a particular suite for such use. The policy is explained in a brochure given to suite licensees:

> Please contact the Suite and Preferred Services Department 48 hours prior to an event at which a disabled guest will be using the Executive Suite, and we will be happy to provide all of the appropriate modifications ... in order to accommodate your disabled guest.

In its briefs, defendant stated that although it prefers at least 48 hours notice that there will be a guest in a wheelchair, if necessary the modifications can be made in about 20 minutes.

Defendant contends that this policy is an "equivalent facilitation." Defendant could not be more mistaken. An "equivalent facilitation" is an alternative design or technology that will provide substantially equivalent or greater access to and usability of the facility. Standard 2.2. What defendant proposes is not an "alternative design or technology" that provides equivalent or greater access. Rather, defendant proposes a design that creates *less* access than is required, but—if given advance notice that a wheelchair user is in route—defendant will remove some of the barriers and temporarily comply with the ADA. That is unacceptable.

It always has been "possible" to improvise access, given advance notice that someone with a wheelchair is coming. You simply had two strong persons standing by to carry the wheelchair user up the stairs that could not be traversed by a wheelchair. However, Congress has served notice through the ADA that such solutions no longer are acceptable. In new construction, the facility must be designed to be accessible from day one.

There are other flaws in defendant's proposed operational solution. Defendant assumes that the suite licensee will know in advance that a guest uses a wheel chair, but that is not a realistic assumption. If the suite licensee is a business entertaining clients or buyers from out of town, the licensee may never have met the guest in person until he or she arrives at the event. The wheelchair user may also be hesitant to make a fuss, or to request special accommodations, especially if they are a guest.

Moreover, there is no reason why persons with disabilities should have to call in advance to warn people that they are coming, as if they were bearers of a contagious disease. Congress has mandated that newly constructed facilities must be fully accessible from the start. There is no reason why defendant could not have designed every suite to be accessible to persons with disabilities without 48–hours advance notice, or frantic efforts to modify the suite after the guest arrives and everyone realizes that she is in a wheelchair.[92] While it is "possible" to make "special arrangements" for wheelchair users, those contortions should rarely be necessary in newly-designed facilities such as the Rose Garden.

The ADA is not merely an obstacle to be overcome, a bureaucratic requirement that must be complied with on paper only. Nor is it permissible to assume that people in wheelchairs won't actually use public accommodations very often and, thus, it is sufficient that someone theoretically could use these facilities if a special request were made. The suites must comply with the design Standards and be made readily accessible to persons with disabilities.

## D. Visual Alarms in the Suites:

Public accommodations subject to the "new construction" rules must provide visual

---

reasonable number of spaces in a parking lot or stalls within a restroom would have to be accessible, but all meeting rooms at a conference center would have to be accessible because each one may be used for different purposes at a given time." 56 Fed. Reg. 35,409 (July 26, 1991.) *See also* H.R.Rep. No. 101–485(III) at 61, *reprinted at* 1990 U.S.C.C.A.N. 484; H.R.Rep. No. 101–485(II) at 118, *reprinted at* 1990 U.S.C.C.A.N. 401.

**92.** The court observes that one of the proposed modifications is to remove one seat on the deck so there is room for a wheelchair. That ought not to be necessary. A Clarin folding chair can temporarily be placed in the wheelchair space when it is not needed for wheelchair use. If the Clarin seats are good enough to be used as companion seats, then they are good enough to be used in the executive suites, and vice versa.

alarms for the benefit of persons with hearing impairments who cannot hear a fire alarm or emergency announcement. Standard 4.28.

> At a minimum, visual signal appliances shall be provided in buildings and facilities in each of the following areas: restrooms and any other general usage areas (*e.g.*, meeting rooms), hallways, lobbies, and any other area for common use.

Standard 4.28.1.

■ Originally, there were no visual alarms in any of the suites. Defendant has since agreed to install visual alarms in the restroom of each suite. That is expressly required by Standard 4.28.1, and ought to have been included in the original design. However, defendant contends that it does not have to install visual alarms in the main room of each suite because the visual alarms around the perimeter of the seating bowl of the Rose Garden bring the suites within the rule set forth in Standard 4.28.3(7). I disagree. That Standard provides that:

> In general, no place in any room or space required to have a visual signal appliance shall be more than 50 ft (15 m) from the signal (in the horizontal plane). In large rooms and spaces exceeding 100 ft (30 m) across, without obstructions 6 ft (2 m) above the finish floor, such as auditoriums, devices may be placed around the perimeter, spaced a maximum 100 ft (30 m) apart, in lieu of suspending appliances from the ceiling.

The suites do have a transparent wall from which it is possible to view the main seating bowl and event floor, but any strobe light that could be seen from the suites would be far away on the other side of the arena. Defendant's expert Salmen asserted that this was sufficient to satisfy the Standard, but then conceded that he had never even viewed the visual alarms in operation. Salmen Depo. (Vol. I) at 289. The court therefore discounts Salmen's opinion, to the extent that this is even a proper subject for expert testimony.

■ Salmen also offers his opinion on what the law means. Plaintiffs' experts have countered with their own interpretations of the law. The court does not find such "expert" testimony to be of much use in deciding this case. There may be unusual circumstances where a standard employs highly technical terms that require the assistance of an expert to interpret or to assess compliance, or where there is an issue regarding the historical meaning given to certain terms in an industry. As a general rule, however, the interpretation of a law is peculiarly within the court's own expertise and thus is not a proper subject for expert testimony.

The court did have occasion to view the visual alarms during its tour of the Rose Garden, and was not impressed. The visual alarms were not particularly noticeable from that distance, and this was on a day when the stands were empty. They would be even less noticeable from inside the suites, looking through a transparent wall, with the arena full of spectators, camera flashbulbs flashing, the scoreboard buzzing with activity, the arena lighting in a game-time mode, and even more lights and activity within the suite itself. Indeed, unless the hearing-impaired individual was directly facing the visual alarm, with no one in the suite standing between the individual and the alarm, the individual would be unlikely to even see the alarm.

Defendant argues that it is not necessary to have an unobstructed view of the alarm; one may also notice the departure from the ambient lighting caused by a reflection from the visual alarm. That might be true if the alarm was in the suite itself. It would not be true if the alarm was a considerable distance away, especially if there were room lights on in the suite itself. There is no evidence that defendant's proposed solution would be effective under the circumstances presented here.

Defendant also suggests that visual alarms are not really necessary because a hearing-impaired person will be alerted to the emergency by the behavior of other spectators, *i.e.*, if you see everyone else running for the exits, join them. The court questions whether that is a viable alternative. The only visible "exits" lead from the seating bowl onto the concourses. Large numbers of fans may simultaneously arise and exit the seating bowls for reasons other than an emergency

(*e.g.*, because there is a short pause in the action and everyone is running to the restroom or concession stand so they will return in time not to miss much of the event, or the traditional race to depart before the inevitable traffic jam at the conclusion of an event.)

Moreover, given the high noise levels at many events, such as rock concerts, visual alarms may also be an important means of alerting those without hearing impairments. The court cannot say that the requirement to install a visual alarm in each suite is irrational or that DOJ abused its authority in promulgating these regulations. Defendant is free to argue its position to the Access Board and DOJ and urge them to delete this requirement from the Standards. For now, however, the requirement to install visual alarms in each suite is the law of the land and defendant must comply with it.

### 8. *Premises Leased to Concessionaires:*

 At issue is a question of law: Is defendant OAC, as the landlord, a proper defendant in an action seeking injunctive relief to redress alleged Title III violations in spaces occupied by commercial tenants who lease space from defendant inside of, or immediately adjacent to, the Rose Garden Arena?

The underlying facts are not in dispute. Defendant leases a portion of its premises to restaurants and other vendors. The Niketown Field House retail store is located on the main concourse of the arena building. The Cucina! Cucina! Italian Cafe and Friday's Front Row Sports Grill are housed in a separate structure that is adjacent to the arena but still part of the overall Rose Quarter complex. These business are open to the general public, but they draw a large percentage of their customers from those attending events at the Rose Garden.[93] Plaintiffs have alleged a variety of Title III violations at these facilities. Defendant has disclaimed any responsibility for ADA violations that occur within the space that it has leased to third parties.

The non-discrimination provisions of 42 U.S.C. § 12182(a) apply to "any person who owns, leases (*or leases to*), or operates a place of public accommodation." (emphasis added). Thus, on its face, the law expressly applies to both the tenant and the landlord. The legislative history explains the reasoning behind this provision:

> This [provision] makes it clear that the owner of the building which houses the public accommodation, as well as the owner or operator of the public accommodation itself, has obligations under this Act. For example, if an office building contains a doctor's office, both the owner of the building and the doctor's office are required to make readily achievable alterations. It simply makes no practical sense to require the individual public accommodation, a doctor's office for example, to make readily achievable changes to the public accommodation without requiring the owner to make readily achievable changes to the primary entrance to the building.

> Similarly, a doorman or guard to an office building containing public accommodations would be required, if requested, to show a person who is blind to the elevator or to write a note to a person who is deaf regarding the floor number of a particular office.

> The amendment also clarifies that the owner of a public accommodation is liable for discriminatory policies. For example, if the corporate headquarters for a chain of restaurants designs all new restaurants to contain barriers to access, an injunction could be brought against the corporation to enjoin the inaccessible new construction.

H.R.Rep. No. 101–485(III) at 55–56, *reprinted at* 1990 U.S.C.C.A.N. 478–79. See also H.R. Conf. Rep. No. 101–596 at 76, *reprinted at* 1990 U.S.C.C.A.N. 565, 585 (the Senate accedes to the House version).

The issue also arose in the context of language making it a violation of Title III to subject a person to a denial of their Title III rights either "directly, or through contractual, licensing, or other arrangements ..." 42

---

93. At least one business in the Rose Quarter reportedly has gone out of business because it

was unable to attract enough customers during times when there were no events at the arena.

U.S.C. § 12182(b)(1)(A)(ii). The committee explained that:

> [T]he reference to contractual arrangements is to make clear that an entity may not do indirectly through contractual arrangements what it is prohibited from doing directly under this Act. However, it should also be emphasized that this limitation creates no substantive requirements in and of itself. Thus, for example, a store located in an inaccessible mall or other building, which is operated by another entity, is not liable for the failure of that other entity to comply with this Act by virtue of having a lease or other contract with that entity. This is because, as noted, the store's legal obligations extends only to individuals in their status as its own clients or customers, not in their status as the clients or customers of other public accommodations. Likewise, of course, a covered entity may not use a contractual provision to reduce any of its obligations under this Act. In sum, a public accommodation's obligations are not extended or changed in any manner by virtue of its lease with the other entity. The Committee intends that implementing regulations be issued by the Attorney General that will specifically address this area.

H.R.Rep. No. 101–485(II) at 104, *reprinted at* 1990 U.S.C.C.A.N. 387. The legislative history thus suggests that Congress intended that the landlord, rather than the tenant, would be responsible for ADA compliance in common areas. Whether the landlord also would be responsible for ADA violations within the space exclusively controlled by the tenant is unclear; the language of the statute and the legislative history could be interpreted in that manner, but the examples offered all concerned issues pertaining to common areas (e.g., the entrance to the building). Likewise, in the restaurant example the corporate headquarters was actively involved in designing the new restaurants, even though it did not personally operate them. DOJ has promulgated regulations regarding this topic:

> Both the landlord who owns the building that houses a place of public accommodation and the tenant who owns or operates the place of public accommodation are public accommodations subject to the requirements of this part. *As between the parties,* allocation of responsibility for complying with the obligations of this part may be determined by lease or other contract.

28 CFR § 36.201(b) (emphasis added). Defendant contends that it can, and has, allocated responsibility to the tenants to comply with the ADA. Plaintiffs and DOJ respond that the regulation clearly permits allocation of responsibility only as between the parties, *i.e.,* who will be responsible to pay for any required improvements. That allocation does not affect or negate the rights of third parties. DOJ has formally expressed its interpretation in the TAM:

> Both the landlord and the tenant are public accommodations and have full responsibility for complying with all ADA title III requirements applicable to that place of public accommodation. The title III regulation permits the landlord and the tenant to allocate responsibility, in the lease, for complying with particular provisions of the regulation. However, *any allocation made in a lease or other contract is only effective as between the parties, and both landlord and tenant remain fully liable for compliance with all provisions of the ADA relating to that place of public accommodation.*
>
> > ILLUSTRATION: ABC Company leases space in a shopping center it owns to XYZ Boutique. In their lease, the parties have allocated to XYZ Boutique the responsibility for complying with the barrier removal requirements of title III within that store. In this situation, if XYZ Boutique fails to remove barriers, both ABC Company (the landlord) and XYZ Boutique (the tenant) would be liable for violating the ADA and could be sued by an XYZ customer. Of course, in the lease, ABC could require XYZ to indemnify it against all losses caused by XYZ's failure to comply with its obligations under the lease, but again, such matters would be between the parties and would not affect their liability under the ADA.

TAM § III–1.2000 (emphasis added). There are practical considerations that support the positions advanced by both sides in this case. A customer should not have to obtain a copy of the lease and other contracts in order to determine who is the proper defendant. The customer should be able to bring an action, and let the tenant and landlord fight among themselves over who is responsible to pay for any required improvements. From an enforcement standpoint, making the landlord liable for the tenant's violations effectively enlists the landlord's help in monitoring compliance on its premises, a task for which DOJ lacks the resources to accomplish by itself. *Cf. Kim v. United States,* 121 F.3d 1269 (9th Cir.1997) (by making even innocent store owners responsible for misconduct by store's employees in connection with Food Stamp program, Congress created a powerful incentive for employers to monitor their employees' compliance with the program regulations.)

In addition, the Niketown store is on the main concourse of the arena, not in a building on the other end of town that coincidentally happens to be owned by defendant. Most, if not all, of the other concessions in the building are owned and operated by defendant. Likewise, the restaurant and tavern are part of the Rose Quarter complex, and draw most of their customers from visitors to the arena. On the other hand, the landlord did not design the interior, or decide where to place the tables and chairs in the restaurant, nor does it control the daily operating policies at these private businesses.

If this court were writing on a clean slate, it might well limit the landlord's liability to common areas. However, DOJ has adopted a different policy, and its interpretation of 28 CFR § 36.201(b) is consistent with the language of that regulation and therefore is entitled to deference.[94]

As a practical matter, if a customer brings a Title III action against the landlord for policies that are subject to the tenant's control, then the tenant likely is a necessary party who, on appropriate motion, must also be joined. Otherwise, the court might be unable to grant effective relief. That is particularly true in Title III cases, where the remedy in a private action is limited to prospective injunctive relief. Likewise, the landlord may be a necessary party in any action brought against the tenant for conditions that are the landlord's responsibility.

If the tenant and landlord stipulate as to the allocation of responsibility, the court may then dismiss the claims against the non-responsible party. The tenant and landlord may also implead each other and seek indemnification pursuant to the contractual allocation of responsibility. Consequently, the court does not believe that in most cases this will present a significant issue.

For purposes of the instant case, OAC—as the landlord—is a proper defendant. If OAC contends that some other party is contractually responsible for the challenged conditions, OAC may either proceed with this case in its present form, or it may implead or move to join those other parties. The prior briefing focused on whether defendant was a proper defendant, rather than the merits of the alleged ADA violations in the leased premises. I therefore will permit the parties (including any who may be joined) to submit supplemental briefing regarding the merits of the alleged violations.

### 9. *Camera Operator Areas:*

This dispute concerns the lack of wheelchair access to some areas used by camera

---

**94.** The initial draft of § 36.201(b) made the landlord responsible for common areas and for modifying policies, practices, or procedures applicable to all tenants. 56 Fed. Reg. 7460 and 7484 (Feb. 22, 1991). The present language resulted from modifications made by DOJ in response to comments received during the public comment period. 56 Fed. Reg. 35,555–56 (July 26, 1991). There is a paragraph in the commentary which states that:

The final rule leaves allocation of all areas [of responsibility] to the lease negotiations. However, in general landlords should not be given responsibility for policies a tenant applies in operating its business, if such policies are solely those of the tenant. Thus, if a restaurant tenant discriminates by refusing to seat a patron, it would be the tenant, and not the landlord, who would be responsible because the discriminatory policy is imposed solely by the tenant and not by the landlord.

56 Fed. Reg. 35,556 (July 26, 1991). However, this language is consistent with DOJ's position that the allocation of responsibility is effective only as between landlord and tenant, but not with respect to third parties such as customers.

operators. There are 23 camera positions at 12 camera locations (some locations have multiple positions). How those positions are used is determined by the organization hosting an event. For Trail Blazers games, the camera locations are used for television cameras, but they also can be used for still photography. The identity of the camera operators varies depending upon the event, For Trail Blazers home games that are not televised nationally, Post Up Productions—a division of defendant OAC—provides the camera operators.[95] For nationally televised games, the operators are furnished by the network (*e.g.*, NBC or TNT) that is broadcasting the game. The visiting team often broadcasts the game back to its home market. Typically, the visiting team contracts with local production companies rather than bring its own operators to each arena.

Some of the camera positions are accessible, but the parties dispute whether the glass is half-empty or half full. According to plaintiffs, only 3 of the 23 camera positions are directly accessible, plus one position that can be remotely controlled from the studio which (according to defendant) is wheelchair accessible. Defendant does not deny those numbers, but disputes their significance. According to defendant, although there are 23 camera positions, only 9 typically are used when the Trail Blazers televise a home game. Two of the nine positions are unmanned "slam cams" mounted on the baskets. A third is the remotely controlled camera. Of the remaining six camera positions, three are wheelchair accessible and three are not. However, defendant concedes that for certain events, such as nationally televised games, additional camera positions are used, which are not wheelchair accessible. In addition, the preceding description is merely the setup used by the Trail Blazers; the visiting team may have a different setup, as will other events. Indeed, unless the visiting team uses a camera feed supplied by the Trail Blazers, by necessity it must use camera positions *other* than those used by the Trail Blazers. Since the Trail Blazers use the only wheelchair-accessible camera positions, none of the visitor's camera positions would be accessible.

## A. Are the Camera Positions Covered by Title III?

 The threshold question is whether these camera positions are even covered by Title III of the ADA. I hold that they are. They are either "employee work areas," [96] within the meaning of Standard 4.1.1(3), or "common use areas," as defined by Standard 3.5. In either event, they are required to be wheelchair accessible.

## B. Is there any Excuse for the Failure to Design these Camera Operator Positions to be Wheelchair Accessible?

 Defendant contends that it should be excused from the ADA's require-

---

**95.** Trail Blazers home games are broadcast on a pay-per-view basis via cable television.

**96.** Defendant places considerable weight on the settlement reached between DOJ and the organizers of the Atlanta Olympics, which stipulated that the camera moat was not an employee work area. The court does not find that settlement controlling here. To begin with, in a settlement the parties often compromise their positions. DOJ has asserted, in a letter to defendant, that the camera areas at the Rose Garden are employee work areas. Second, the facts are different, including the purpose of the camera areas and the identity of the users. Third, even if the camera areas are not employee work areas, that does not preclude them from being common use areas, which yields the same result in this instance.

Defendant also suggests that the camera locations are exempt because they are used exclusively by persons employed by third parties. The factual premise of defendant's argument is seriously flawed, since one of those principal employers—Post Up Productions—is owned by defendant. The legal premise fares no better. This is not a separate floor that is leased to a third party who has exclusive control over the premises. The camera operator positions are part of the seating bowl. They are temporarily used by employees of these third parties. However, none of those third parties has exclusive control over those camera areas, nor could such third party modify those camera areas (*e.g.*, by installing a wheelchair ramp or lift.) The issue here is not the layout of the tables at Cucina! Cucina!, which might be remedied by moving the tables around. At issue here is a fundamental defect in the design of the structure itself. There is nothing that the third party camera company could do on its own to fix that defect.

ments because the standards for the design and location of the camera operator positions are dictated by rules issued by the national Basketball Association ("NBA").[97] I disagree. The ADA is the law of the land. The NBA is not. If the two conflict, ADA trumps NBA. The court also has reviewed those NBA rules and finds nothing in them that precludes designing accessible camera areas.

William Crockett, who was Ellerbe Becket's senior project manager for the design of the Rose Garden, admitted that the camera positions are work areas. Crockett Depo. at 88. Crockett did not make any determination that these positions were exempt from accessibility requirements. *Id.* at 89. Defendant and Ellerbe Becket specifically discussed "the fact that some camera locations would not be wheelchair accessible." *Id.* Defendant's expert,[98] John Salmen, also admitted that a camera position is a work area under the ADAAGs. Salmen Depo. (Vol. I) at 100. Ironically, it appears that the camera platforms were built with steps so they could be elevated so as to provide an unobstructed line of sight over standing spectators, as required by NBA rules.

There is no evidence in the record to demonstrate that it was not possible to design most[99] of the camera positions to be wheelchair-accessible. There is nothing about the site itself that would have made it structurally impracticable. Crockett Depo. at 89. The court concludes that there was no excuse for defendant's failure to design and construct the camera areas to be accessible to persons with disabilities, and that such failure violates Title III of the ADA.[100]

## III. DEFENDANT'S MOTION TO DISMISS ON GROUNDS OF MOOTNESS

At the time this action was filed in January 1995, the Rose Garden had not yet been completed or opened to the public. The complaint focused upon the provisions for wheelchair seating. After the arena was opened to the public, plaintiffs filed a brief alleging hundreds of additional ADA violations which included everything from the height of the mirrors in the dressing rooms to the placement of the dispensers for items such as toilet paper and ketchup. Defendant responded that many of these "violations" were merely errors or omissions during construction which either already had been, or soon would be, corrected. Defendant then moved to dismiss these "claims"[101] on grounds of mootness.

Since this action was filed, defendant has modified a number of conditions at the Rose Garden (other than those described in the earlier sections of this opinion) to plaintiffs' satisfaction, while not admitting that the original conditions violated the ADA. Defendant contends that those issues are now moot.

 Resolution of defendant's motion depends, in part, upon the remedies that are

---

**97.** According to Crockett, the "primary driver in the design of the building ... [was the] NBA requirements." Crockett Depo. at 90.

**98.** Salmen's entire report and opinions are seriously undermined by his erroneous assumption that the Rose Garden was subject only to the standards for existing facilities, rather than new construction. Salmen Depo. (Vol. I) at 104. There is a vast gulf between the two standards. The court has difficulty understanding how a putative expert on the proper application of the ADAAGs could make such a fundamental error.

**99.** Some of the cameras positions are unmanned, such as the "slam cams." Obviously it would be impracticable to make those cameras wheelchair-accessible. Conceivably there might also be a camera location in a particularly inaccessible location (*e.g.,* one that can be reached only by climbing a rickety ladder to a crow's nest).

**100.** The court did inquire as to whether the camera positions are fungible, *i.e.,* whether one position was equivalent to any other position. If they are, then arguably it may not be essential for every camera position to be fully accessible. That is an issue more appropriately addressed in the remedial phase of the case.

**101.** Technically, these are not separate "claims." Plaintiffs did not file an amended complaint listing all of the alleged violations. Rather, the complaint asserts only that the Rose Garden violates the ADA and the parallel Oregon statutes, and lists a few examples. The majority of the alleged violations are listed in the briefs as additional particulars. While this may not be a model of pleading, it will suffice for now since the parties and the court have been able to identify the alleged violations with reasonable certainty.

available to plaintiffs. If plaintiffs already have received everything to which they would be entitled, i.e., the challenged conditions have been remedied, then these particular claims are moot absent any basis for concluding that these plaintiffs will again be subjected to the same alleged wrongful conduct by this defendant. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1074–75, 71 L.Ed.2d 152 (1982). If those claims are moot, then there is no need for this court to decide whether there was in fact any violation of the relevant statutes.[102] Conversely, if plaintiffs may be entitled to additional remedies, such as damages, then these claims are not moot even if the condition has been satisfactorily modified.

### 1. *Whether Plaintiffs are Entitled to Recover Damages:*

Section 12188 of Title 42 defines the remedies that are available to redress a violation of Title III of the ADA, 42 U.S.C. §§ 12181 through 12189, which forbids discrimination against disabled persons in public accommodations and services operated by private entities. A private litigant may obtain injunctive relief and recover attorney fees under this subchapter, but is not entitled to recover compensatory or punitive damages on such claim.

Plaintiffs concede that they cannot recover damages on their ADA claim, but contend they have a right to damages pursuant to ORS 659.425(4) and ORS 659.121(2). ORS 659.425(4) provides that:

It is an unlawful practice for any place of public accommodation, resort or amusement as defined in ORS 30.675, or any person acting on behalf of such place, to make any distinction, discrimination or restriction because a customer or patron is a disabled person.

ORS 30.675 defines a "place of public accommodation" as "any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise." Defendant insists that ORS 659.425(4) does not apply to claims of discriminatory design and construction, hence plaintiffs have failed to state a claim under that section. Defendant also contends that plaintiffs have no standing to recover damages under that section. ORS 659.121(2) provides, in relevant part, that:

Any person claiming to be aggrieved by alleged violations of [ORS 659.425(4) and other enumerated statutes] may file a civil action in circuit court to recover compensatory damages or $200, whichever is greater, and punitive damages. In addition, the court may award relief authorized under subsection (1) [i.e., injunctive relief] and such equitable relief as it considers appropriate. At the request of any party, the trial of such case shall be by jury. In any action brought under this subsection, the court may allow the prevailing party costs and reasonable attorney fees at trial and on appeal....

There is little published case law construing ORS 659.425(4). *Bush v. Greyhound Lines, Inc.*, 295 Or. 619, 669 P.2d 324 (1983),

---

**102.** The question of whether there was an ADA violation may still need to be addressed in determining plaintiffs' right, if any, to recover attorney fees on grounds that this lawsuit was the "catalyst" for the alteration of those conditions. *See Wilderness Society v. Babbitt*, 5 F.3d 383, 386 (9th Cir.1993) (party need not always obtain formal relief on the merits to be deemed a prevailing party for purposes of recovering attorney fees; in some circumstances, a party may be deemed the "prevailing party" if it can demonstrate "a clear, causal relationship between the litigation brought and the practical outcome realized," i.e., the lawsuit was a "material factor" or played a "catalytic role" in bringing about the desired outcome.) *Wilderness Society* concerned the right to attorney fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C.

§ 2412(d)(1)(A). By contrast, the right to attorney fees in ADA cases is governed by 42 U.S.C. § 12117(a) and 42 U.S.C. § 2000e–5(k). My initial impression is that the distinction is not material, at least with regard to the right to recover attorney fees in cases where the defendant voluntarily agrees to provide the relief sought by the plaintiff. *Cf. Cox v. National Football League*, 889 F.Supp. 118 (S.D.N.Y.1995); *Moore v. National Ass'n of Securities Dealers Inc.*, 762 F.2d 1093 (D.C.Cir.1985); *Young v. Kenley*, 641 F.2d 192 (4th Cir.1981) (all recognizing that attorney fees may be awarded in Title VII cases where the plaintiff obtained most of the relief sought without the necessity of entering a formal judgment). I will reserve a final ruling on this legal question until such time as the issue of attorney fees is properly before me.

was an action filed by a bus passenger who was refused carriage because he was confined to a wheelchair. The jury found for the plaintiff. The Court of Appeals set aside the jury verdict on grounds there was no private right of action to enforce subsection (4). *Bush v. Greyhound Lines, Inc.,* 62 Or.App. 735, 662 P.2d 25. The Oregon Supreme Court reversed, and reinstated the verdict.[103] However, the opinion does not discuss the scope of conduct that is proscribed by ORS 659.425(4).

The only other published case interpreting this law is *Sellick v. Denny's, Inc.,* 884 F.Supp. 388 (D.Or.1995). The plaintiff in *Sellick* who weighed over 400 pounds, attempted to patronize a restaurant but had difficulty fitting comfortably into any of the available chairs or benches. He filed suit against the restaurant contending, *inter alia,* that the restaurant failed to make a reasonable effort to accommodate his disability. Judge Jones granted summary judgment for the restaurant, on grounds that (1) the restaurant did not discriminate against the plaintiff but instead offered to seat him in any of the existing chairs and therefore treated him precisely the same as every other customer and, (2) that ORS 659.425(4) does not impose a "reasonable accommodation" requirement. *Id.* at 393.

No published case has considered whether ORS 659.425(4) requires public accommodations to be designed and operated so as to be fully accessible to, and functional for, persons with disabilities such as those who use wheelchairs. A federal court, exercising supplemental jurisdiction over pendent state law claims, ordinarily is reluctant to decide an unresolved issue of state law that has not been construed by the state courts.

This particular state law issue, however, is crucial to the management of the instant case. Resolution of the state law question will determine whether there is any right to damages in this action, whether portions of the action are moot, and whether plaintiffs

are entitled to a jury trial. Conversely, if there is a right to damages, then this court (or perhaps a jury) will have to decide whether the challenged conditions violated ORS 659.425(4). For that reason, it is necessary for me to interpret ORS 659.425(4), at least to the extent required to determine whether plaintiffs have properly stated a claim for damages.[104] I conclude that plaintiffs have not adequately stated a claim for damages under ORS 659.121(2) and 659.425(4).

At the outset, I have difficulty understanding how plaintiffs have been injured by the alleged violations in a manner that would entitle them to recover damages. For purposes of obtaining prospective injunctive relief, plaintiffs adequately represent the interests of the community of persons with disabilities, which is why I have permitted this action to proceed. While technically this is not a class action, as a practical matter any relief that is granted with respect to the plaintiffs will benefit the class as a whole. In addition, plaintiffs (or the members of the plaintiff organization) have attended, and plan to attend, events at the Rose Garden and foreseeably will benefit from any relief obtained in this action.

The right to damages is different. ORS 659.121(2) allows a plaintiff to recover statutory damages of $200, or actual damages, whichever is greater, for a violation of ORS 659.425(4). Consequently, the plaintiff is not required to prove actual economic loss caused by the alleged violation. However, the plaintiff must still allege and prove some injury, be it the denial of goods and services or perhaps even just humiliation. Here, plaintiffs have alleged literally hundreds, if not thousands, of individual violations including, *inter alia,* the placement of the ketchup, feminine hygiene products, and toilet paper dispensers; the design of the drinking fountains, the Trail Blazers' locker room and the handrails on the walkways; and the length of the telephone cords. However, the record

---

**103.** The Oregon Legislature later amended ORS 659.121 to clarify that there is a private right of action to enforce ORS 659.425(4). *See Bednarz v. Bay Area Motors, Inc.,* 95 Or.App. 159, 161–62, 768 P.2d 422 (1989); 1987 Oregon Laws, ch. 822, § 1.

**104.** I do not believe that certification to the Oregon Supreme Court is appropriate here.

does not show that plaintiffs personally attempted to obtain ketchup and were unable to do so, or were unable to use a drinking fountain or toilet paper dispenser or to make a telephone call, or were injured by a faulty handrail. Nor does the record show that plaintiffs personally were injured by the alleged violations in the design of the Trail Blazers' locker room, or that plaintiffs have ever been in that locker room in any capacity other than as parties to this lawsuit.

I also question whether ORS 659.425(4) applies to passive conduct, *e.g.*, the failure to retrofit a building to be wheelchair accessible, or to install a wheelchair ramp, or to install wheelchair lifts on buses. Rather, the language of the statute—it is unlawful "to make any distinction, discrimination or restriction because a customer or patron is a disabled person"—suggests active conduct of some sort, especially conduct that is targeted at a specific individual. *Cf. Bush*, 295 Or. 619, 669 P.2d 324 (common carrier refused to transport customer because he was in a wheelchair) and *Sellick*, 884 F.Supp. at 393 (subsection (4) does not require restaurant to purchase special seats for use by morbidly obese customers).

■ Of course, there is no bright line standard. Nominally "passive" conduct—ignoring customers with disabilities, or not stopping a bus to pick up passengers with disabilities—can also be viewed as a form of active discrimination, and properly so. Likewise, although the language of the statute suggests that the discrimination ordinarily must be targeted at a specific person, the court can envision alternative scenarios involving discrimination against persons with a disability as a group that might fall within the parameters of the statute. For purposes of the instant case, it is not necessary to define the precise boundaries of the conduct that is forbidden by subsection (4). Rather, I need decide only whether the violations alleged in this particular case are covered by the statute so as to provide plaintiffs a right to recover damages. I conclude that ORS 659.425(4) was not intended to provide a right to recover damages for deficiencies in the design of a structure.

The court further observes that the ADA applies different standards to new construction than for existing buildings. By contrast, subsection (4) contains no date restriction. If the failure to make a building accessible to persons with disabilities is a violation of subsection (4), then at this very moment thousands of existing buildings and businesses are violating the law, and have been ever since this statute was enacted in 1979.

In theory, subsection (4) could be limited to the design of new structures, with the design element providing the "active" discrimination necessary to state a claim. However, such cases would seem to be uniquely unsuited for resolution under the provisions of ORS 659.121(2), which establishes the right to damages. For instance, it is unclear whether the failure to properly design the Rose Garden would constitute a single violation of the statute, or if each separate design flaw is an additional violation. Nor is it clear who would have standing to maintain such an action. Would the first person to file suit be entitled to recover all of the damages? Or would each individual with a disability who resides in the City of Portland—or perhaps in the State of Oregon and southern Washington as well—have the right to commence an individual action against the owners of the Rose Garden?

Regardless of whether there was one plaintiff or one thousand, ORS 659.121(2) would give each plaintiff the right to a jury trial. The jurors no doubt would be treated to a parade of (conflicting) expert witnesses who would attempt to interpret the blueprints, and perhaps even ADA regulations, for the jury.

I do not believe that the Oregon Legislature intended to establish a right to damages, pursuant to ORS 659.425(4) and ORS 659.121(2), in a case such as the one presently before this court. While not in itself determinative, I note that this statute has been on the books in its present form since 1979, yet there has not been a single published case applying subsection (4) to the design of a building or in any circumstances that are even remotely similar.

Likewise, for the first seventeen years after enactment of subsection (4), no regula-

tions were promulgated to implement the law. In December 1996—nearly two years after this action was filed—the Oregon Bureau of Labor and Industries ("BOLI") promulgated final regulations implementing ORS 659.425(4). These regulations largely mirror language in the ADA regulations. OAR 839–006–0310 requires public accommodations to "remove physical barriers to entering and using existing facilities when such removal is readily achievable." OAR 839–006–0320 requires a public accommodation to provide auxiliary aids and services when necessary to ensure access to goods, services or facilities. OAR 839–006–0330 provides that where barrier removal is not readily achievable, a public accommodation must take alternative steps to make goods and services available. These regulations do not purport to establish standards governing the design of newly constructed buildings, nor to establish a right to recover compensatory and punitive damages from a public accommodation that has failed to design a facility to be accessible to persons with disabilities.

The Oregon courts will have the final word, since this court's interpretation of state law does not bind the state courts. For purposes of this case, however, I hold that the plaintiffs have failed to state a claim for damages pursuant to ORS 659.425(4) and ORS 659.121(2).

Nothing that I have said precludes the plaintiffs or any other person from seeking damages for a specific incident in which that person was wrongly refused service or personally discriminated against by the operators of the Rose Garden on account of a disability. Nor do I preclude the possibility that plaintiffs may be entitled to some limited injunctive relief pursuant to ORS 659.425(4) and 659.121(2) with regard to some of the Rose Garden's *operating* policies and procedures, to the extent those matters are sufficiently distinguishable from the design of the building itself. The majority of the concerns that I have regarding a claim for damages under those sections are not applicable to a request for injunctive relief,

particularly one that is targeted at a specific discriminatory policy or practice as opposed to the design of the building as a whole.

## 2. *Potential for Future Violations:*

Plaintiffs contend that even if certain challenged conditions have been modified to their satisfaction, those claims are not moot because defendant "has failed to show that it has retained personnel sufficiently qualified in the ADAAG Standards to assure that any changes made in the facility are correctly performed and do not cause other violations." Plaintiffs also contend that defendant "has made no showing that it has addressed the pattern of issues throughout the facility rather than simply correcting the specific conditions plaintiff's experts identified."

Plaintiffs are entitled to inspect any proposed modifications to ensure that they have been completed properly. However, the court will not require defendant to employ a "qualified" ADA expert to ensure that defendant does not violate the ADA in the future.[105] Even assuming the court had authority to impose such a requirement—an issue that I do not decide here—it would seem, at least in this instance, that the high cost of litigation and of remedying alleged ADA violations already provides ample incentive for defendant to take appropriate steps on its own to ensure future compliance with the ADA. The likelihood that—after the conditions have been brought into compliance— plaintiffs will again be subjected to these same (alleged) violations appears to be rather low. That is particularly true of structural modifications, which are unlikely to be altered in the future.

## 3. *Issues No Longer in Dispute:*

**A.** *The following issues are no longer in dispute because the condition in question has been modified to plaintiffs' satisfaction.*

---

105. DOJ has filed an enforcement action against Ellerbe Becket, alleging a "pattern and practice" of ADA violations in facilities designed by that firm. The court expresses no opinion as to

whether a design firm such as Ellerbe Becket is required to employ a "qualified" ADA expert, or whether that would be a permissible remedy in that case.

*The parties do dispute whether the original condition was a violation to begin with.*

1. The Oregon Lottery kiosks have been removed.

2. The furniture in the Rose Room waiting area has been rearranged to facilitate wheelchair access.

3. A permanent bicycle rack has been placed under the intermediate stair landing on the west parking deck, thereby eliminating an (alleged) protruding object hazard.

4. Certain of the other alleged protruding object hazards have been modified to plaintiffs' satisfaction, including the shelf on the box office ticket window, certain exposed pipes, the sprinkler control assembly on Level 7, the earthquake joints in the Garden Garage, the television monitors in the press/media room, the television holder in star dressing area A, drinking fountains, and the fire extinguisher outside elevator number 5 on level 100.

5. The water stream on the drinking fountains has been adjusted so it is accessible to persons in wheelchairs.

6. The toilet paper dispensers located above the grab bars have been modified so they do not obstruct use of the grab bars.

7. The condiment dispensers located on lower counters are within reach range. Defendant has represented that its staff will ensure that the dispensers remain within reach range and will not be pushed back on the counters where they might be out of reach range.

8. The self-service food areas located in the Rotunda, the Stage 5, and the Eaternity are all within reach range providing the serving dishes are properly located and kept stocked. Defendant will instruct its staff in this regard.

9. Visual alarms have been installed in each toilet in the executive suites.

10. A visual fire alarm has been installed where it can be seen by persons using the Rose Room.

11. Tables have been installed in the Rose Room which provide sufficient knee space to permit use by persons in wheelchairs.

12. Longer handset cords have been installed on some public telephones.

13. There are vertical skirts under the lavatories (*i.e.,* the sink) in the restrooms which are designed to protect users against direct contact with the pipes (which, presumably, could cause burns if hot.) Those skirts have now been modified so as not to interfere with the minimum required knee clearance under the lavatories (for wheelchair users).

14. The grab bar in the standard toilet stall in the women's rest room in the Eaternity has been modified so that it is no more than 12 inches from the rear wall.

15. A coat hook has been installed in the standard accessible toilet stall in the men's room at entry A–2, in the ambulatory accessible toilet stall in the women's room near section 102, and in the standard accessible toilet stall in performer dressing area C.

16. A "forward approach phone" has been provided.

17. Various counters have been modified to provide a skirt so they can safely be detected by a person using a cane.

18. The bottom edge of the curb ramp at the elevator to the Commons Restaurant has been modified so it is flush with the landing.

19. Parking spaces on various levels of the Garden Garage that were intended to be used by vans allegedly lacked sufficient vertical clearance (*i.e.,* minimum height of 98 inches) because of various obstructions such as hanging signs, concrete beams, and ducts. Those van spaces have now been relocated so there is sufficient vertical clearance both in those spaces and along the route to those spaces.

20. The threshold at the door leading from the garage to the elevator at the P1 level entrance to One Center Court has been modified to eliminate a 1/2 inch vertical rise between the concrete and the tile floor.

21. The mirror over the lavatory in the men's staff employee locker toilet room has been modified so the bottom edge is not more than 40 inches above the finished floor ("AFF".)

22. The ice dispenser control in the press/media room has been modified so it is within the maximum reach ranges set forth in Standards 4.2.5 and 4.2.6.

23. The "hardware" (*e.g.,* lever or latch) on the door to the accessible standard toilet stall in the visitor's locker room has been lowered so that it is not more than 48 inches AFF.

24. Various modifications have been made to the wheelchair ramp leading to the basketball floor.

25. Various signs in the parking garages have been raised so they will not be obscured by parked vehicles. Other signs in the parking garage have been modified so the size of the letters is at least 3 inches high for all signs mounted at or above 80 inches AFF.

26. Additional signs have been posted informing persons with hearing loss about the availability of assistive listening systems, and displaying the appropriate international symbol.

27. A vanity in star dressing area A has been raised 1/4 inch to provide the required clearance.

28. Directional signs have been modified to include a cane-detectable base to alert pedestrians to the existence of these protruding objects.

29. Where appropriate, the parking spaces in the various garages have been restriped to provide the requisite number of properly-sized accessible spaces.

**B.** *The following issues are no longer in dispute because plaintiff concedes that the condition is not a violation.*

1. The Rose Quarter Marquee Sign is mounted at or above 80 inches AFF (above the finished floor), thus there is no restriction on the distance that it may protrude.

**C.** *The following issues are no longer in dispute because the parties agree that the condition is the responsibility of a third party.*

1. Plaintiffs contend that the "historic drinking fountain" on Winning Way violates the ADA because a drinking fountain accessible to wheelchair users is not provided. Defendant shut off the water to the fountain, but the City of Portland ordered that it be turned back on. The parties agree that this fountain is controlled by the City, which reportedly has agreed to install an ADA-compliant fountain.

**D.** *Issues that plaintiffs have failed to pursue.* There are a number of miscellaneous conditions that plaintiffs raised at earlier stages of this case, but which are not listed in either of the Resurvey Reports (dated February 25–26 and August 27, 1997.)[106] With the exception of the two conditions identified in Plaintiffs' Reply re: Limited Resurvey at 10 (placement of auxiliary counters off the circulation path, and protruding object hazard at rotunda bar), the court will assume that those conditions either have been modified to plaintiffs' satisfaction or that plaintiffs no longer contend that the conditions constitute a violation. The parties should promptly notify the court if they believe I have overlooked any issues that should still be part of this case.

**4. Conditions that Defendant Claims to have Redressed but Plaintiffs Disagree:**

The following are conditions that defendant claims to have modified so the design feature now complies with the ADA—without conceding that its prior condition violated the ADA—but plaintiff is not yet satisfied with the modifications:

1. Plaintiffs contend that the wheelchair-accessible portion of the bar in the Rose Room is too high, too narrow, and does not provide enough knee room. Plaintiffs also contend that this location is unsuitable for use by patrons because it doubles as a flip-up countertop so employees can enter and leave the bar, and is immediately adjacent to the cash register. Defendant has responded to those complaints by providing several acces-

---

**106.** The court is unable to devote the time required to sift through all the voluminous pleadings to prepare a comprehensive list of those items. Defendant has submitted a list of 26 conditions that it believes no longer are controverted. Defendant's Submission in Response to Plaintiffs' Resurvey at 5.

sible tables. However, plaintiffs also want defendant to adopt a policy requiring that an accessible table be available whenever the bar is open to the general public. Defendant refuses to establish such a policy, presumably because it may mean turning other customers away even though those tables are not presently occupied by wheelchair users. There ought to be some middle ground upon which the parties can agree, *e.g.*, that wheelchair users have first priority for using those particular tables, but in the absence of such demand the tables may also be used by other patrons. If the parties cannot resolve this issue between themselves, then the court will impose its own solution.

2. Plaintiffs originally complained that the wheelchair-accessible "low" tables along the concourse lacked sufficient knee clearance for wheelchair users. Defendant has provided a sample of a proposed replacement table, which plaintiffs agree would comply with the applicable Standards. However, plaintiffs have declined to sign off on this issue until defendant actually purchases and installs the new tables throughout the concourse. Assuming defendant follows through on that commitment, it would appear to resolve this issue.

3. Plaintiffs complained that the stall door to the ambulatory toilet in the women's room at the Eaternity swung inward and was not self-closing. Defendant replaced the door. Plaintiffs complain that the new door provides a 22–1/2 inch clear opening when, in their view, a 32–inch clear space is required. Defendant insists that this stall is not subject to Standard 4.22.4, which provides in relevant part that:

> If toilet stalls are provided, then at least one shall be a standard toilet stall complying with 4.17; where 6 or more stalls are provided, in addition to the stall complying with 4.17.3, at least one stall 36 in (915 mm) wide with an outward swinging, self-closing door and parallel grab bars ... shall be provided.

According to defendant, this Standard "requires that an ambulatory stall be provided in addition to a standard accessible stall only where six other toilet stalls are provided. The restroom at issue only has five stalls plus the standard accessible stall. Therefore, an ambulatory accessible stall is not required." Defendant's Submission in Response to Plaintiffs' Limited Resurvey at 2–3. I cannot agree with defendant's reading of Standard 4.22.4. The critical issue is whether the words "in addition to the stall complying with 4.17.3" modifies the phrase "6 or more stalls are provided," *i.e.*, if there are at least seven stalls (including one that complies with 4.17.3), or if it modifies the language that follows, *i.e.*, if there are six or more stalls, one must comply with 4.17.3 and one must be at least 36 inches wide. I conclude that the latter interpretation is the better reading of this language, thus 4.22.4 is applicable here.[107]

4. Plaintiffs complain that two ambulatory accessible toilet stalls in the women's room at section 102 are in excess of 37 inches and 38 inches wide, respectively, when an exact dimension of 36 inches is required. While some allowance usually is permitted for dimensional tolerances, *see* Standard 3.2, the parties have not submitted any information from which the court may determine whether this is within such tolerances, or the reasons for requiring an exact dimension of 36 inches (and the extent to which use of the restroom by persons with disabilities is impaired if the width is 37 or 38 inches.) Consequently, neither side is entitled to summary judgment at this time. Plaintiffs also have cited no authority for their assertion that the measurements set forth in ADAAG § 4.22.4 are "absolute dimensional requirements" for which "[c]onstruction tolerances do not apply." Plaintiffs' Reply re: Limited Resurvey at 4.

5. Plaintiffs complained that the handrails on the ramp to the Garden Garage at stair # 7, arena level, violated various Standards. Specifically, the handrails did not extend on either side of the lower end to a point 12 inches past the landing, the rail height varied on the stair side, and were not

---

**107.** Plaintiffs' reply brief asserted that Standard 4.23.4 is controlling. *See* Plaintiffs' Reply to Defendant's Submission in Response to Plaintiffs' Limited Resurvey at 3. In my view, however, this design element is governed by Standard 4.22.4.

level with the floor at the bottom landing. The latter two conditions have been satisfactorily modified, but plaintiffs contend that the handrails still must be modified so that they extend 12 inches past the bottom landing. Defendant has agreed to perform that work and, upon completion, this issue will be moot.

6. Plaintiffs have complained that portable trash cans sometimes are placed under the elevator call buttons, which interferes with wheelchair access to those buttons. That does not appear to be a design defect so much as a matter to be remedied by operational policies (or perhaps some red paint or stenciled letters on the floor indicating locations that should not be obstructed.) This would appear to be a condition that can be resolved without a formal injunction. Defendant informs the court that it has instructed supervisory personnel to ensure that the elevator buttons are not obstructed. Plaintiffs respond that those instruction have, to date, been ineffective. However, it is unclear how plaintiffs would propose to solve this problem.

7. Plaintiffs contend that the public telephones at the ticket office are not within the required reach ranges so they are accessible to persons in wheelchairs. Defendant has asked the telephone company (U.S. West) to address this problem. Plaintiffs contend the work has not been completed and "[t]his, in itself, demonstrates the need for injunctive relief requiring the correction to occur." However, U.S. West is not a party, and it is unclear what purpose would be served by enjoining defendant OAC.

8. Plaintiffs complained that rolling coat racks were not accessible to persons in wheelchairs who cannot reach standard height coat racks. Defendant elected to remove those coat racks. Defendant also represents that in the event it receives a request for a coat rack, "a modified coat rack will be provided where necessary." Plaintiffs have responded that "until defendant demonstrates that the coat racks that will be used are modified so that they are accessible, this issue has not been resolved." Defendant should arrange for plaintiffs to inspect and approve a sample modified coat rack, assum-

ing it actually exists. Otherwise, the court must assume that defendant has no modified coat rack, and is simply hoping that it never receives a request for one. Defendant needs to clarify its position on this matter before the court can determine whether the issue has been mooted.

9. Plaintiffs contend that the door threshold to the toilets at the conference room on level 4 exceeds 1/4 inch and is not beveled. Defendant has indicated that the threshold will be modified, but plaintiffs have declined to sign off on this item until the work has been completed. Assuming the work is properly completed, that will resolve this issue.

10. When plaintiffs previously inspected the arena they encountered an extension cord stretched across an accessible route, which could obstruct use of that route. Defendant responded that it had solved the problem by purchasing protective "cord receptacles" with beveled edges that were to be used for all cables more than 1/4 inch in diameter that cross walkways. In theory, this would create a "ramp" over the cords for use by wheelchairs. Plaintiffs inspected those devices and concluded that they did not correct the violation.

When plaintiffs recently re-inspected the arena, they did not observe any extension cords obstructing accessible routes. Plaintiffs nonetheless declined to certify this condition as having been corrected, because defendant has not demonstrated an acceptable method by which wheelchairs could traverse these extension cords.

There would seem to be two solutions to this problem. The first alternative is some sort of cable ramp, which complies with the relevant Standards, coupled with a policy of actually using that ramp whenever large extension cords cross accessible routes. The second alternative is simply not to stretch extension cords across accessible routes. It is unclear whether the latter is feasible. In either case, the efficacy of the solution will depend upon careful adherence to the relevant policy. The court lacks sufficient information to determine whether this issue has been satisfactorily resolved.

11. Plaintiffs complained that an access aisle leading to an accessible parking space on level 3 of the East Parking Deck has a 4 percent cross-slope with a bollard in the aisle. Defendant resolved that problem by relocating the parking space. However, plaintiffs contend that defendant has not finished re-striping the new access aisle. Defendant has agreed to do so, which will moot this issue.

12. Plaintiffs complained that, at various locations in the Garden Garage, the metal cover over the expansion joint between the deck and elevator tower was beveled at 1:1 with a vertical rise in excess of 1/4 inch. Defendant agreed to modify those covers. During the limited re-survey, plaintiff observed several non-compliant expansion joints. Defendant has explained that these joints are designed to move, hence they will require periodic maintenance with "patch rock," which defendant has agreed to perform. Plaintiff responds that these problems were caused not by movement of the expansion joints, but by improper installation and maintenance. Regardless of the cause, so long as defendant agrees to correct the problem and to properly maintain the joints, this issue will have been resolved. This court has no intention of retaining permanent jurisdiction over the Rose Garden to ensure that it is being properly maintained. If problems occur, plaintiffs may bring a separate action for injunctive relief to redress those new issues.

### 5. *Conditions that Defendant Denies are a Violation and has Not Modified:*

#### A. Protruding Object Hazards:

##### (i) Scope of Rule:

Generally speaking, a "protruding object" is one that protrudes into a circulation path, typically from a wall or other surface, at a height of between 27 and 80 inches AFF (above finished floor). Common examples include a drinking fountain, wall-mounted telephone, fire extinguisher, or a counter protruding from a wall. The rules governing protruding objects are intended to protect persons with vision impairments who use a cane. An object unexpectedly protruding into the circulation path poses a risk of serious injury to such persons. That danger can be minimized if there is a detectable barrier beneath the protruding object, at a height of less than 27 inches AFF. A person probing with a cane can detect that barrier and be alerted to the presence of the protruding object. *See* ADAAG A4.4.1 (describing cane techniques).

The rules governing protruding objects focus upon the "leading edge" of the object, but do not define that term. In reviewing the briefs, it is apparent that the parties have very different definitions of that term, which may help to explain why they have so frequently disagreed on the proper application of the Standards.

Plaintiffs contend that the "leading edge of the protruding object is the point above the finished floor at which the object begins to protrude from the wall." Letter from Stephen Brischetto, dated September 4, 1997, at 3. Defendant contends that the "leading edge" is the "furthest extent of the protrusion" into the circulation path. Defendant's Submission in Response to the Court's Request of August 21, 1997, at 3. The court agrees with defendant's definition. The "leading edge" is not the point at which the object *begins* to protrude from the wall but the *furthest extent* of that protrusion from the wall (or other structure on which the object is mounted).

In general, there is no restriction on protruding objects at a height above 80 inches AFF. *See* Standard 4.4.2. That is because the vast majority of the population is less than that height and is unlikely to be injured by walking into such an object. Similarly, there is no *per se* limitation on the distance that an object may protrude from the wall at or below 27 inches AFF.[108] *Id.* Such protrusions can be detected with a cane and ordinarily are not considered to pose a hazard.

---

108. There are additional restrictions to ensure that protruding objects do not unduly narrow the width of the circulation path. *See* Standard 4.4.1. For instance, the circulation path must be at least 36 inches wide at all times, though it may narrow to 32 inches for a distance of not more than 24 inches. *See* Standards 4.3.3 and 4.2.1. There also are other restrictions intended to provide clearance for wheelchair users.

Consequently, the focus of protruding object rule is upon the *disparity* between (1) the leading edge of the object measured between 27 and 80 inches AFF, and (2) the leading edge of that same object measured at or below 27 inches. The leading edge of the object between 27 and 80 inches AFF may protrude no more than four inches *further* into the circulation path than the leading edge of the object measured at or below 27 inches AFF (or 12 inches further into the circulation path in the case of a free-standing object mounted on a post or pylon).[109] *See* Standard 4.4. For instance, if the base of an object—measured at or below 27 inches AFF—protrudes a maximum of five inches from the wall, then the leading edge of the object may protrude no more than nine inches from the wall at a height of between 27 and 80 inches AFF.

The purpose of the rule is to prevent persons with vision impairments from being injured by protruding objects that cannot be detected by a cane. Consequently, a protruding object hazard often may be avoided by (1) mounting the object at a height of at least 80 inches AFF, or (2) installing wing guards or other protective devices at a height at or below 27 inches AFF to serve as a detectable barrier, or (3) in the case of an object that does not have to be readily accessible, enclosing the object behind a false wall or cabinet that extends to or below 27 inches AFF.

One of the paradoxes of the ADA is that the needs of one groups of persons with disabilities may at times conflict with the needs of other persons with different disabilities. Measures intended for the benefit of persons with vision-impairments—who require a detectable barrier at or below 27

inches AFF—may conflict with the needs of persons who use wheelchairs. The latter often require an unobstructed area beneath counters, drinking fountains, telephones, and other objects so they can reach those facilities.[110] With careful planning, however, it usually will be possible to satisfy the needs of both groups.

### (ii) Protruding Objects in Parking Garages:

■ Defendant contends the rule does not apply to protruding objects in parking garages, since any visually-impaired person arriving by car will have to be accompanied by a sighted person. While that argument has a superficial appeal, it is not the law, nor does the argument withstand closer scrutiny. A van may carry 15 persons with vision impairments and one sighted driver. The driver cannot be expected to personally guide each of the 15 passengers, nor should the driver have to. One of the primary purposes of the ADA was to maximize the independence of persons with disabilities. The Access Board and DOJ reasonably concluded that the elimination of protruding object hazards was a necessary step towards that goal. I hold that the parking garages at the Rose Garden are not excluded from complying with the Standards governing protruding objects.

### (iii) Placement of Planters, Waste Paper Baskets, and Similar Items Beneath Protruding Objects:

■ In response to plaintiffs' complaints, defendant has placed planters, waste paper baskets, and similar objects beneath various protruding object hazards so there is a detectable barrier at a height at or less than 27

---

**109.** The text of Standard 4.4.1 appears to say that if the object's leading edge is between 27 and 80 inches AFF, that object may not protrude more than four inches from the wall, even though there is less than a four-inch difference between that leading edge and the leading edge measured at or below 27 inches, *e.g.*, if the object protrudes nine inches from the wall at a height between 27 and 80 inches AFF, and eight inches from the wall at a height at or below 27 inches.

However, Figure 8(e), which is part of that Standard, suggests that the four-inch protrusion should be measured in reference to the leading

edge of the object at or below 27 inches, as opposed to the wall. In the preceding example, the difference (nine inches versus eight inches) is only one inch and thus the object would comply with the Standard. The parties and the court agree that the latter interpretation is correct, in view of the purpose that the requirement is intended to fulfill.

**110.** An unobstructed floor space may also be easier to clean, since there are no obstructions to interfere with wide brooms, mops, and floor buffing machines.

inches AFF. Plaintiffs contend this is not sufficient because these improvised barriers are portable and could readily be moved by a janitor who does not realize why the particular item has been placed at that location. While there is no *per se* rule precluding the use of such improvised barriers, the object being used as a barrier must either be secured in place or else be substantial enough that it will not casually be moved. In theory, the improvised barrier could still be moved by a negligent janitor but, then, a negligent janitor also could leave a mop and bucket laying in the middle of the floor. The ADA cannot protect against all hazards.[111] The court lacks sufficient information to determine whether the improvised barriers in question comply with the standard articulated here. However, the description "waste paper baskets" is not encouraging.

### (iv) Mobile Trash Cart:

█ Standard 4.4, which governs "protruding objects", applies to objects mounted from surfaces such as walls, posts, and pylons. That Standard does not apply to the mobile trash cart, depicted in photograph 51 of plaintiff's report. To the extent that cart presents a hazard if negligently operated, plaintiffs' remedy lies in tort.

### (v) Counters on Self–Service Food Carts:

█ The counters on the self-service food carts protrude less than 12 inches, which is within the range permitted under Standard 4.4.1 for objects protruding from posts or pylons (which is the most analogous standard.)

### (vi) Counters Mounted on Columns:

█ Defendant contends that the freestanding counters, which are mounted on columns, are not subject to the rules governing protruding objects because those Standards govern only protruding objects that are "mounted on a wall, post or pylon" whereas these counters are "mounted around columns." Memorandum in Support of Defendant's Motion to Dismiss at 26–27. The court has no intention of engaging in a game of semantics. The object of the rule is to ensure that a visually-impaired person walking down a corridor is not speared in the stomach or head by a protruding object that was not detected by the person's cane. The risk of injury is the same regardless of the label affixed to the object upon which the protruding object is mounted. For purposes of the rules governing protruding objects, a "column" is equivalent to a "post" or "pylon" and the same rules apply.

█ Defendant also argues that there are likely to be people congregating near the counter, and their presence is an adequate substitute for a detectable barrier. I disagree. At any given time, there may—or may not—be crowds of people present. Even if there are crowds present, that may not warn the visually-impaired individual of the hazard; during an event there will be crowds of people milling throughout the building. In any event, a hope and a prayer is not an adequate substitute for compliance with the ADA design Standards. Those Standards are mandatory, not precatory.

Although the court agrees that the present design violates Standard 4.4, remedying that violation presents additional problems. There is a potential conflict between the needs of visually-impaired persons—who require a detectable barrier at or below 27 inches AFF—and the needs of wheelchair users, who require clear space to maneuver a wheelchair under the counter so the latter is within reach range.[112] This will be ad-

---

**111.** Defendant will have considerable incentive to ensure that barriers guarding against protruding object hazards are not inadvertently moved. In the event someone is injured by such an incident, the record of this case will constitute *prima facie* evidence that defendant was on notice of the potential danger and the importance of guarding against that eventuality.

**112.** One possible solution, on which the court invites the parties to comment, would be to install a few narrow rods extending from the underside of the counter to the floor, spaced far enough apart to permit unobstructed wheelchair entry yet still provide a detectable barrier for the visually-impaired. This solution might also be applicable to some of the other protruding object issues, such as the baby-changing tables.

Alternatively, it may be possible to install a short raised lip on the floor under the table, twelve inches from its leading edge, to serve as a detectable barrier. The viability of that proposed solution depends upon the distance that the front

dressed further during the remedial phase of the case. It also is a matter upon which DOJ or the Access Board should offer additional guidance to designers.

### (vii) Baby–Changing Areas:

Defendant contends the shelves designated as baby-changing areas in the restrooms [113] are not protruding object hazards because they are located in a recessed alcove out of the circulation path. *Cf.* Standard 4.4, Fig. 8(d). The court agrees that these table are not subject to the four-inch limit on protruding objects because no one can approach the tables from the sides. However, it is possible to approach the shelves head-on. Defendants have suggested that the protruding objects rule is not applicable in close quarters but only in circulation paths. Even assuming that is correct, I cannot determine from the existing record whether the shelves protrude into any circulation paths (*i.e.,* walks, halls, corridors, passageways or aisles.) A more complete description of the location is needed. If the shelves do protrude into circulation paths, and the shelf is greater than 12 inches in depth, then there must be a detectable barrier, at or below 27 inches AFF, within 12 inches of the front edge of the shelf. However, any such barrier would have to be designed so as not to create an obstacle for wheelchair users who must maneuver their wheelchairs under the tables in order to use them.

### (viii) Protruding Objects Improperly Mounted Below 80 Inches AFF:

The protruding object requirements of Standard 4.4 do not apply to objects at or above 80 inches AFF. Standard 4.4.1. Defendant designed certain protruding objects to be mounted at or above 80 inches AFF,

but in fact they were installed at a lower height, some as low as 76 inches. Defendant contends that such deviations are permissible "dimensional tolerances" under Standard 3.2, which provides that "[a]ll dimensions are subject to conventional building industry tolerances for field conditions."

The threshold question is which party bears the burden of proof on this issue. The court concludes that this is an affirmative defense upon which the defendant bears the burden of proof. Defendant has offered no evidence as to what the "conventional building industry tolerances" are for the dimensions in question. What is an acceptable "dimensional tolerance" obviously will vary, depending in part upon the purpose for the standard and the technological capacity to closely adhere to the target dimensions. If this were a mission to Mars, coming within a few miles of the target might be the equivalent of hitting the "bullseye." By contrast, an error of even a few thousandths of an inch in the wrong place can ruin an automobile engine or microprocessor.

The court is inclined to adhere fairly strictly to the minimum elevations in this instance The rationale for the 80 inch AFF standard is that the vast majority of the population (with the exception of professional basketball players) is less than that height (*i.e.,* 6' 8"), hence such objects do not pose a threat to them. However, the same cannot be said for objects mounted at just 76 inches AFF (*i.e.,* 6' 4"). The court takes judicial notice that height generally follows a bell-shaped curve. Consequently, a difference of just a few inches substantially increases the percentage of the population that is exposed to danger.[114]

---

wheels of the wheelchair must be able to roll under the table in order for the table to be accessible. Figure 5(b) in Standard 4.3 suggests that twelve inches is sufficient at a height of one inch or less, providing there is additional leg room above that height. Similarly, Fig. 27(a) in Standard 4.15.5 and Fig. 31 in Standard 4.19.2 both suggest that the front wheels must be able to roll at least eight inches past the leading edge of the counter. Thus a short lip twelve inches under the table would permit the table to be accessible, but still provide a detectable barrier. However, such a lip might make it more difficult to clean underneath those tables.

**113.** Plaintiffs' submissions discuss only the baby-changing areas in the *women's* restrooms. The court assumes that similar facilities also are available in the *men's* restrooms.

**114.** Although the record does not reveal whether any of the visually-impaired plaintiffs are over 76 inches tall, the court concludes that they have sufficient standing to assert this claim, in view of the representative nature of this action, the prophylactic nature of the available remedies (which are limited to injunctive relief, and not damages), and the benefits of addressing all of the alleged ADA violations at the Rose Garden in a single proceeding. Modifications requested on behalf

The court also observes that, at least for purposes of the protruding object requirements, 80 inches is a minimum height. Better to err on the side of mounting the objects slightly above 80 inches instead of slightly below. On these facts, there is no excuse for not complying with Standard 4.4.1 by mounting the objects a minimum of 80 inches AFF.

### (ix) Visual Alarms Improperly Mounted Above 80 Inches AFF:

■ Standard 4.28.3(6) requires that visual alarms must be mounted 80 inches above the floor.[115] Defendant originally mounted some of the visual alarms at heights as low as 76 inches AFF. Plaintiffs complained that this was too low and constituted a protruding object hazard. Defendant responded by re-mounting these alarms at a height of 82 to 83 inches AFF. Plaintiffs now contend that the alarms are mounted too *high* because Standard 4.28.3(6) requires that visual alarms be mounted at *precisely* 80 inches AFF, as opposed to a *minimum* of 80 inches AFF as is the case with the protruding object standard. Plaintiffs' interpretation of the rule is correct.

The court is disturbed by defendant's seeming inability to find a carpenter who can nail straight. It does not seem that difficult a task to install a visual alarm at 80 inches AFF, rather than 76 inches or 83 inches. It is unlikely that the basketball rims at the Rose Garden are mounted at "approximately" ten feet, give or take three or four inches. Clearly it is possible to achieve the required degree of precision when defendant chooses to do so.

Despite those misgivings, the court will not require defendant to re-mount the alarms a few inches lower. The dangers of mounting a visual alarm too low are obvious. It can constitute a protruding object hazard, and the line of sight to the alarm can easily be obstructed. By contrast, there does not appear to be any apparent harm from mounting the alarms two or three inches above 80 inches AFF. Plaintiffs have suggested that if the alarm is mounted too high, it could be obscured by smoke collecting near the ceiling. However, the principal purpose of the alarms at the Rose Garden is to warn of a fire or other danger which is not yet apparent. If the smoke is thick enough to obscure the alarm, then the danger ought to be obvious, and no alarm is even necessary. Nor does it appear that mounting the alarm at 82 inches AFF instead of 80 inches AFF is a significant difference. The Standards do specifically require that the visual alarm be mounted not less than six inches from the ceiling, and that requirement should strictly be adhered to. However, there is no evidence that defendant has violated that requirement.

In this case, it is better to err on the side of being slightly high than too low (although it would be even better yet if defendant would simply install the alarms at the correct height to begin with.)

### B. The Remaining 72 Issues:

By my count, there are at least another 72 issues remaining in this case in addition to those that were addressed in this opinion. Most of these are comparatively minor and very site-specific, *e.g.,* a complaint about a faucet or stall in a particular restroom, or a missing sign. There is little point in my filling an entire volume of the Federal Supplement by writing an opinion on each issue.

Rather, I believe the best way to resolve the remaining miscellaneous disputes is to convene a special session of the court at the Rose Garden and address each issue *seriatim.* Plaintiffs will be given an opportunity to briefly describe the issue and the applicable rule, defendant can briefly respond, and then I will rule from the bench. There do not appear to be any factual disputes regarding these conditions. Rather, the sole questions are whether the condition complies with the applicable Standard, or whether defen-

---

of one group may adversely impact the needs of other groups, hence the importance of considering these issues together.

**115.** There is an exception if the ceiling is less than 86 inches high, in which case the visual alarms must be mounted six inches below the ceiling. The ceilings in the Rose Garden are generally at least 86 inches high, so the exception is not applicable here.

dant's proposed remedy is sufficient. These are questions of law for the court to resolve. The photographs, reports, and affidavits previously submitted may be used to illustrate the issue. The court can also view a disputed condition, if necessary, which is why the hearing will be conducted at the Rose Garden.

## IV. MISCELLANEOUS MOTIONS

Defendant's motion (# 129) to strike plaintiffs' supplemental concise statement of facts is denied. The court expressly offered both parties one final opportunity to supplement the record "with anything else you have." Jan. 29, 1997 Tr. at 94. Defendant's objections to the Rule 56(f) affidavit from plaintiffs' counsel are moot, since plaintiffs have since taken Mr. DeFlon's deposition.

Defendant's other arguments are unpersuasive. Arguably both sides have pushed the envelope at times with regard to discovery from expert witnesses and other discovery issues, but in the end this case will not turn upon such matters but rather upon the proper interpretation of statutes and regulations. Indeed, a good deal of the "expert" materials submitted by both sides has been of only marginal relevance or utility. Defendant has also submitted its own excerpts from the deposition of Mr. Labinski taken in connection with the Paralyzed Veterans case to offset those submitted by plaintiffs.

The court likewise denies plaintiffs' motion (# 135) to strike the affidavits of John Salmen and Teresa Jacubowski. However, there are serious deficiencies in the affidavit of William Crockett (# 126 (faxed copy) and # 131 (original signature)) dated March 21, 1997. That affidavit contains mostly conclusions of law dressed up as "facts" or the affiant's interpretation of documents that need no interpretation, or pure argument.

The statements in the affidavit are not based upon personal knowledge or even proper expert opinion, and there is no foundation for many of the statements. I will grant the motion, in part, and strike all of the Crockett affidavit with the exception of paragraphs 1 and 3(e).

Defendant's motion (# 42) to bar the testimony of plaintiffs' experts and to strike their report is denied. Plaintiffs' putative experts are at least as qualified (or unqualified) as defendant's putative experts to express opinions on the issues in this case. Notwithstanding the parties' efforts to stage a battle of the experts, resolution of this case is mostly a matter of the court interpreting the relevant statutes and regulations—a topic upon which expert opinion is of little help in this instance—and applying those rules to the undisputed facts. In any event, the reports of plaintiffs' experts would still be admissible even if it were only for their observations and measurements of conditions, tasks which they indisputably are qualified to perform, and to identify the particular Standards that plaintiffs contend are applicable to each challenged condition.

■ I reject defendant's argument that Robert Pike cannot offer expert testimony because he is a party to this action. In an era where experts frequently are little more than hired guns, lacking even a semblance of impartiality, there is little justification to exclude the testimony of an otherwise qualified expert merely because he or she also is a party to the action.[116] That is particularly true where trial will be to the court rather than to a jury.

Defendant's contingent motion (# 59) to compel answers from plaintiff's expert James Terry is denied. Although there may be some room for expert testimony in the reme-

---

**116.** Other courts have reached a similar conclusion. *See, e.g., Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir.1988) (party may testify as expert); *Rodriguez v. Pacificare of Texas, Inc.*, 980 F.2d 1014, 1019 (5th Cir.1993) (same); *Dunn v. Sears, Roebuck & Co.*, 639 F.2d 1171, 1174 (5th Cir.1981) (employee of party may testify as expert witness); *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035 (7th Cir.1990) (same); *Scheidt v. Klein*, 956 F.2d 963, 968 (10th Cir.1992) (party or his employee may

testify as expert, though probably dictum). Bias ordinarily is grounds for impeaching, not excluding, the expert's testimony. *Rodriguez*, 980 F.2d at 1019; *Dunn*, 639 F.2d at 1174. Defendant's reliance upon *Viterbo v. Dow Chemical Co.*, 646 F.Supp. 1420 (E.D.Tex.1986), *aff'd*, 826 F.2d 420 (5th Cir.1987), is misplaced. The experts in that case were not parties, and their testimony was excluded because of shortcomings in their data and methodology.

dial phase of the case, the court has little use for much of the "expert" testimony that the parties have proffered to date. Consequently, many of the questions that defendant has posed to Mr. Terry are now irrelevant to this case. The court also recognizes that a number of the participants in this action are involved in pending or prospective litigation in other states involving many of the same issues. The court will not permit the instant lawsuit to be used as a surrogate battlefield for other cases, particularly if Mr. Terry could not lawfully be questioned on certain topics as part of discovery in those other cases. The court further concludes that it will not benefit from additional evidence regarding the alleged bias of the respective experts for either side, or their qualifications (or alleged lack thereof.) The parties have articulated their positions regarding those issues on numerous occasions over the course of this case; there is no need to argue this issue any further. Finally, the court observes that Mr. Terry was extensively deposed on a wide range of topics both in this case and also in the *Paralyzed Veterans* case.

## V. CONCLUSION

Defendant's motion (# 129) to strike plaintiffs' supplemental concise statement of facts is DENIED. Plaintiffs' motion (# 135) to strike is DENIED as to the affidavits of John Salmen and Teresa Jacubowski, but GRANTED IN PART as to the affidavit (## 126, 131) of William Crockett, which is stricken except for paragraphs 1 and 3(e). Defendant's motion (# 42) to bar the testimony of plaintiffs' experts and strike their report is DENIED. Defendant's contingent motion (# 59) to compel answers from plaintiff's expert James Terry is DENIED.

The parties' motions for summary judgment (## 36 and 62), and defendant's motions to dismiss (# 45–1) or for summary judgment (# 45–2), are each GRANTED in part and DENIED in part as set forth in this opinion. The court will not repeat all of the particulars here, but will summarize some of the more significant rulings:

1. The placement of 33 wheelchair spaces on Level 7 violates the requirements of Standard 4.33.3.

2. After subtracting the excess spaces on Level 7, the arena as a whole violates the "one percent plus one" requirement mandated by Standard 4.1.3(19).

3. The Rose Garden violates both the horizontal and vertical dispersal requirements of the ADA and its implementing regulations by improperly clustering the great majority of wheelchair spaces in certain parts of the arena, while few or no wheelchair spaces are available in the remainder of the arena.

4. The use of Clarin folding companion seats at the Rose Garden is not a violation of the ADA or its enabling regulations.

5. There are significant concerns regarding infilling and ticket sale policies at the Rose Garden, particularly for Trail Blazers games but for other events as well. Some of the alleged policies and practices, if proven to be true, may constitute a violation of the ADA and its enabling regulations. Defendant OAC is a proper defendant to such a claim. Neither side is entitled to summary judgment on these issues.

6. Neither side is entitled to summary judgment regarding the modified aisle seats.

7. Standard 4.33.3 does not presently require that wheelchair users be given lines of sight over standing spectators. Although the ADA would authorize such a requirement, the Access Board and DOJ did not properly promulgate such a rule. Nor can such a requirement be enforced by virtue of the general non-discrimination provisions of the ADA; Congress intended that compliance with the design Standards would satisfy the requirement that new construction be designed and constructed so as to be accessible to persons with disabilities. In the alternative, if the Court of Appeals decides that defendant was required to provide lines of sight over standing spectators, then defendant has not established any basis, equitable or otherwise, for exempting it from compliance with that requirement.

8. The Rose Garden's executive suites are public accommodations subject to Title III of the ADA, and must fully comply with the ADA design Standards. Plaintiffs have

standing to seek injunctive relief to redress ADA violations regarding those suites. It is not enough to have a token accessible suite; every suite must be made accessible. Defendant's policy of modifying suites to be accessible if advance notice is provided violates the ADA. The suites must comply with the design Standards and be made readily accessible to persons with disabilities. Each suite must be equipped with a visual alarm.

9. Defendant, as the landlord, is a proper defendant in an action seeking injunctive relief for alleged Title III violations in areas occupied by commercial tenants who lease space from defendant inside of, or immediately adjacent to, the Rose Garden.

10. The camera positions are covered by Title III of the ADA and must be accessible to persons with disabilities.

11. Plaintiffs may not recover damages under ORS 659.425(4) and ORS 659.121(2) for alleged defects in the design and construction of the Rose Garden.

12. The court will not require defendant to employ a "qualified" ADA expert to ensure that defendant does not violate the ADA in the future.

13. The alleged ADA violations that have been modified to plaintiffs' satisfaction are now moot, as enumerated on pages 774 to 776 of this opinion. Several other issues will be mooted once defendant satisfactorily completes the promised modifications.

14. The parking garages at the Rose Garden are not excluded from complying with the Standards governing protruding objects.

15. The mobile trash cart is outside the scope of the design Standards.

16. The counters on the self-service food carts do not violate the Standards governing protruding objects.

17. The free-standing counters that are mounted on columns are protruding objects that violate Standard 4.4.

18. Visual alarms are supposed to be mounted at a height of 80 inches AFF. Defendant must raise any alarms that were improperly installed below that elevation, but need not lower those alarms that were mis-takenly mounted no more than two or three inches higher.

19. The court declines to decide whether there has been a "pattern" of ADA violations at the Rose Garden.

20. The court will hold a special session at the Rose Garden to hear arguments on and decide the approximately 72 secondary issues that remain.